1                  Hernandez - Cross/Harrison

2              THE COURT:  All right.  Yes, he has on a tank

3         top.  Others have shirts.  Another one has a

4         hooded sweatshirt.  Another one has an outer

5         jacket with a fur collar.  There are two of them

6         with hooded shirts and another one has a shirt, I

7         think.  But it speaks for itself.

8              Go ahead.

9              Was his lawyer present -- this was the photo

10        array -- I am sorry.

11             THE WITNESS:  No.

12             THE COURT:  Go ahead.  Strike that.

13   Q    Now, this photo array, Mr. Collins' photo array,

14   position No. 2 is the only man who has on a sleeveless

15   shirt, is that correct?

16   A    That's correct, sir.

17   Q    Now, the name of the man who saw this first photo

18   array, refresh my recollection?

19             THE COURT:  Santos.

20   Q    Mr. Santos, okay.  Mr. Santos was then taken to

21   view a lineup, is that correct?

22   A    At a later date, yes.

23   Q    How much later?  What was the time differential

24   just in days when you say a later date?

25   A    You mean from the time he viewed the photo array?

42

1                    Hernandez - Cross/Harrison

2      Q     Right.

3                THE COURT:  Until the time he saw the

4            lineup.

5      A     February 10 he views the photo array.  March 9 he

6    views the lineup.

7                THE COURT:  27 days, approximately.

8      Q     And he did not view the lineup on February 18, did

9    he?

10     A     No, he didn't.

11     Q     If I might see the lineup photo, please.

12                Now, March 10 Mr. Santos saw the lineup,

13    yes?  He saw a lineup?

14     A     March 9.

15     Q     March 9, my error.  Right?

16     A     Yes.

17     Q     Upon viewing the lineup how did he respond?

18     A     How --

19     Q     In other words, what did he say?

20     A     How did Mr. Santos respond?

21     Q     Excuse me?

22     A     How did Mr. Santos respond?

23     Q     That is correct.

24     A     If I may read what he said.

25                THE COURT:  Yes.

43

1                         Hernandez - Cross/Harrison

2       Q     Please.

3                    THE COURT:  If it refreshes your

4              recollection.

5                    THE WITNESS:  Yes, it will.  Thank you, sir.

6       A     Mr. Angel Santos identified No. 2 as being the

7   person who he saw, and this is what he stated, "the guy,

8   No. 2, he's the one I saw run by the furniture store."

9       Q     Now, there came a time that Mr. Diaz also viewed a

10  photo array, is that correct?

11      A     Yes, sir.

12      Q     And do you recall the date Mr. Diaz reviewed the

13  photo array?

14      A     Oh, Mr. Diaz viewed the photo array on February

15  22.

16      Q     And Mr. Diaz, did he view the same photo array as

17  is in exhibit, I believe, E?

18      A     Yes, sir.

19      Q     What did he say upon viewing the photo array?  How

20  did he respond?

21      A     He looked at the photo array.  He identified photo

22  No. 2, that being Mr. Jabbar Collins.  I would have to look

23  at my notes again to say exactly what he said.

24                   THE COURT:  Sure.

25      Q     Please do.

44

1                    Hernandez - Cross/Harrison

2                THE COURT:  Of the photo array?

3                THE WITNESS:  Of the photo array, sure.

4       A    Mr. Adrian Diaz stated when he identified photo

5    No. 2 as a person he saw leaving the building, that's it.

6    That's the person that he saw leaving the building in

7    reference to 126 Graham Avenue.

8       Q    And on March 9, was that the date of that lineup?

9       A    Yes, sir.

10      Q    And he viewed the same lineup as the one --

11               THE COURT:  Santos.

12      Q    -- Mr. Santos viewed, is that correct?

13      A    That's correct, sir.

14      Q    Which of the two gentlemen viewed the lineup

15   first, if you recall?

16      A    Mr. Adrian Diaz viewed the lineup first and

17   Mr. Santos viewed it second.

18      Q    Okay.  Mr. Diaz, now, when he viewed the lineup,

19   what was his response --

20      A    I am sorry, sir.  Whose response?

21      Q    How did he respond?

22      A    Whose response now?  Mr. Diaz?

23               THE COURT:  Diaz.

24      Q    Yes.

25      A    Mr. Diaz stated, "No. 2," and again I will have to

45

1                    Hernandez - Cross/Harrison

2      look at --

3                    THE COURT:  Go ahead.

4         Q    Please.

5                    THE COURT:  If it refreshes your

6              recollection.

7                    THE WITNESS:  Sure.

8         A    Mr. Adrian Diaz, he identifies No. 2 and he says,

9      "he's the guy who came out of the building holding a gun

10     and he put in his back.  Then he ran up Boerum, made a

11     right, then another right into a lot."

12        Q    As to the second lineup, the one on March 9, was

13     there an attorney present?

14        A    No, sir.

15        Q    The one on March 18 -- I mean, February, if I may,

16     18, there was an attorney, right?

17        A    I would have to check my notes.  There may have

18     been an attorney present at that time.

19        Q    I would ask you --

20                   THE COURT:  Check your notes.

21                   MR. VECCHIONE:  Judge, I have an objection.

22             This was a lineup where no one picked out the

23             defendant.  I don't know whether there is

24             relevance to this hearing.

25                   THE COURT:  Sustained.  You are talking about

1                    Hernandez - Cross/Harrison

2          the March 9 one.  The other lineups were given to

3          you, as I understand it, possibly under the Brady

4          theory.

5                    MR. VECCHIONE:  Yes, Judge.

6                    THE COURT:  That he was shown to certain

7          people who failed to make an identification.  That

8          is not before me.  We are here now to talk about

9          the March 9 lineup.

10                   Was there any lawyer present at the March 9

11         lineup?

12                   THE WITNESS:  No, sir.

13                   THE COURT:  When either witness viewed?

14                   THE WITNESS:  No, sir.

15                   THE COURT:  That answers that question.  No

16         lawyer was present.

17                   MR. HARRISON:  Yes, your Honor.  May I have

18         one minute.

19                   THE COURT:  Go ahead.

20                   (Pause)

21                   MR. HARRISON:  Your Honor, the defense has no

22         further questions.

23                   THE COURT:  Anything else, Mr. Vecchione?

24                   MR. VECCHIONE:  No, your Honor.

25                   Judge, that is the People's case for purposes

1                          Proceedings

2              of the hearing.

3                   (Witness excused.)

4                   THE COURT:  Anything you want to put in,

5              Mr. Harrison?

6                   MR. HARRISON:  The defense rests as to the

7              hearing, and we will wait for the Court's

8              permission to read the minutes.

9                   THE COURT:  And rely on the record?

10                  MR. HARRISON:  I rely on the record, and I

11             would like to make a closing argument.

12                  THE COURT:  Go ahead.

13                  MR. HARRISON:  The defense will admit to the

14             following and only in reference to the lineups in

15             question which were the ones on March 9.

16                  THE COURT:  Correct.

17                  MR. HARRISON:  Two photo arrays were shown.

18             The photo arrays have my client, Mr. Collins, with

19             a sleeveless shirt on, and the defense would argue

20             a tank top, but at least a sleeveless shirt.  He

21             was the only one with a sleeveless shirt on.

22                  The defendant would submit to the Court that

23             that focused the attention of the witnesses to one

24             individual photograph.  Subsequent to seeing that

25             photograph, they were then brought to the

48

1                          Proceedings

2        lineups.  At the lineups the man in the sleeveless

3        shirt was sitting there, thereby creating a

4        suggestive environment in which the wrong person

5        was chosen.  The defense would submit to the Court

6        that the lineup should be suppressed and if the

7        suppression is denied, in the alternative the

8        hearing be bifurcated as to bringing in the

9        witnesses.

10            The defense would also submit to the Court

11       that if there was an attorney at the lineups on

12       February 18, then at the subsequent lineup on

13       March 9 that right to an attorney attached.

14            THE COURT:  Do you want to be heard, Mr.

15       Vecchione?

16            MR. VECCHIONE:  Judge, first of all, if my

17       recollection is correct, the defendant was not

18       sitting in the lineup with a tank top on.  So

19       Mr. Harrison's statement about the man in the

20       sleeveless shirt sitting in the lineup --

21            MR. HARRISON:  I meant --

22            MR. VECCHIONE:  -- is incorrect.

23            THE COURT:  In the photo array he is talking

24       about.

25            MR. VECCHIONE:  Judge, he said in the photo

49

1                              Proceedings

2           array with the tank top, and the implication for

3           the record is when he sat in the lineup, he was

4           the only person in the lineup with a tank top on.

5           That is not correct.

6                 THE COURT:  I know it is not correct.  I saw

7           the pictures.

8                 MR. VECCHIONE:  I know of no case right to

9           counsel attaches because he afforded himself the

10          opportunity to have the lawyer at one lineup and

11          didn't afford himself to have the lawyer at the

12          second lineup.  Mr. Harrison is mistaken as to

13          whatever law he thinks exists at this point.

14                THE COURT:  I think there was some testimony

15          that these witnesses, Diaz and Santos, looked at

16          several photo arrays.

17                MR. VECCHIONE:  That's correct, Judge.

18                THE COURT:  Which Mr. Harrison brought before

19          me and they saw and the police officer mentioned

20          to me that there were different people in all

21          those lineups, in all those photo arrays, and

22          Mr. Collins was not in any one of them other than

23          the one we designated as People's Exhibit 1.

24                MR. VECCHIONE:  That's correct, Judge.

25                THE COURT:  So I don't see where there is any

53

1                                    Proceedings

2               MR. HARRISON:  I am going to come here to

3        your part, your Honor.  The way the buildings are

4        these days, I will go to 120 and never get out of

5        there.

6               THE COURT:  Fine.

7               MR. HARRISON:  Also, the Antommarchi ruling,

8        before I discuss it with my client, I just wanted

9        to know how the Court approaches it.

10              THE COURT:  I have a form I give to the

11       defendant.  You and the defendant sign it.

12              MR. HARRISON:  I understand that.

13              THE COURT:  Okay.

14              MR. HARRISON:  But I have not --

15       hypothetical.

16              THE COURT:  Take a form with you and you can

17       discuss it with your client at your leisure, not

18       here because I have a jury deliberating now.

19              MR. HARRISON:  Understood.

20              (Visit allowed between defendant and mother.)

21                          *  *  *  *  *

22                   It is hereby certified that the
                     foregoing is a true and accurate
23                   transcript of the proceedings.

24       ----------------------------------------X
                     DONNA MANNING, RPR
25                   OFFICIAL COURT REPORTER
                     SUPREME COURT-KINGS COUNTY

08-CV-1359

TRANSCRIPT SERIAL#_____
BOX #_____
SYS. ID#: _1578_

54

pp 54-152

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS - CRIMINAL TERM - PART: 39
-------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

       -against-

JABBAR COLLINS,

                         Defendant.
-------------------------------------------------X
Indict. No. 2884/94
          8907/94

               360 Adams Street
               Brooklyn, New York
               March 6, 1995


B E F O R E:

    HONORABLE FRANCIS X. EGITTO, Justice




A P P E A R A N C E S:

       OFFICE OF CHARLES J. HYNES
       DISTRICT ATTORNEY, KINGS COUNTY
          Attorney for the People
       BY:  MICHAEL VECCHIONE, ESQ.,
            -and-
          STACEY FRASCOGNA, ESQ.,
            -and-
          CHARLES POSNER, ESQ.,
          Assistant District Attorneys


       MICHAEL HARRISON, ESQ.,
          Attorney for the Defendant



          NIKOLETA ELEFTERIOU
          Official Court Reporter

1        Proceedings

2           THE CLERK:  Case on trial continues.

3           MR. HARRISON:  Michael Harrison, 401 Broadway,

4      for Jabbar Collins.  Good morning, Your Honor.

5           MR. VECCHIONE:  Michael Vecchione for the

6      office of the District Attorney.

7           THE COURT:  Shortly before the court reporter

8      arrived -- I will take the others in a moment --

9      shortly before the court reporter arrived, we had a

10     discussion as to what what illegal or immoral acts

11     the D.A. would question the defendant on if he took

12     the witness stand and I have representations from

13     the D.A., Mr. Vecchione, particularly that if the

14     defendant took the witness stand, he would not

15     question him on his Family Court matter nor his

16     Y.O. matter on cross examination.  Correct?

17          MR. VECCHIONE:  That's correct, Judge, the

18     Family Court matter was dismissed and the Y.O.

19     adjudication replaces the conviction in any event,

20     so there is nothing I could ask.

21          THE COURT:  So you don't plan on cross

22     examining on any illegal or immoral acts.  Okay?

23          MR. HARRISON:  Yes, Your Honor.

24          MR. VECCHIONE:  That's right.

25          MR. HARRISON:  Also, the defense is going to

1    Proceedings

2   withdraw the alibi notice for Margaret Collins and

3   we request that she be allowed to sit with my

4   client's mother.

5    THE COURT:  Since she is not going to be a

6   witness in the case, she has a perfect right, like

7   anyone else, to sit in the courtroom.

8    MR. HARRISON:  Yes, Your Honor.

9    THE COURT:  But you understand that she

10   understands that sitting in the courtroom she can

11   not testify.

12    MR. HARRISON:  That's understood, Your Honor.

13   She is in the courtroom now as is my client.  We

14   all understand.

15    THE COURT:  Mr. Collins?

16    THE CLERK:  Antomarchi is executed.

17    THE COURT:  (Continuing) Mr. Collins, did your

18   lawyer explain to you that while we are picking a

19   jury, some juror may want to approach the bench and

20   tell me why he wants to be excused or why she wants

21   to be excused, and you just signed a paper saying

22   even though you have a right to come up and listen,

23   you are willing to let your lawyer come up and

24   listen and then come back and explain to you.  You

25   don't feel that you want to exercise that right to

1        Proceedings

2    come up to the bench, is that right?

3        THE DEFENDANT:  Yes, it is.  He explained it

4    to me.

5        THE COURT:  And I have the statement signed by

6    the defendant and his counsel.

7        Anything else you want to discuss before I

8    bring in the panel?

9        MR. HARRISON:  No, Your Honor.  Just, at this

10    juncture, the only witness the defense intends to

11    call is a Louisa Lopez.  I had a Gerard Crippen as

12    an investigator.  I don't foresee calling him, but

13    you never know.

14        THE COURT:  Have you got a statement?

15        MR. HARRISON:  No, but I will give the DA's

16    number should he have anything, to turn it over to

17    you.

18        MR. VECCHIONE:  From Lopez.

19        MR. HARRISON:  No, I have no statement from

20    Lopez.  My investigator, Crippen.

21        THE COURT:  Have you got notes from Crippen?

22        MR. HARRISON:  No.  I don't have notes

23    personally.

24        MR. VECCHIONE:  Well, Judge --

25        THE COURT:  Wait, that's not an answer.  Did

58

1           Proceedings

2     he make notes of his conversation with the

3     witness?

4           MR. HARRISON:  I have to call and

5     double-check.  I have had nothing turned over to

6     me.

7           THE COURT:  Because that's Rosario material.

8           MR. HARRISON:  I understand that, Your Honor.

9           THE COURT:  Just so you know.  And all Rosario

10    material from the People has been turned over?

11          MR. VECCHIONE:  No, Rosario, no, that's not

12    correct.  Discovery Rosario material will be turned

13    over once we select the jury.

14          THE COURT:  So let's get it done sometime

15    today.

16          MR. VECCHIONE:  It's already done and

17    read -- it's already copied and sitting in my

18    office.

19          THE COURT:  All right, let's get the jury in.

20          (Whereupon, the panel of prospective jurors

21    entered the courtroom.)

22          THE COURT:  Good morning.

23          Will you all please rise?

24          THE CLERK:  Jurors, kindly stand and raise

25    your right hand.  Do you and each of you solemnly

1    Jury Selection

2  swear or affirm that you will truly answer all

3  questions asked of you relating to your

4  qualifications to serve as a juror in this

5  action?

6    (Jurors respond in the affirmative.)

7    THE CLERK:  Please be seated.

8   Jurors, when you hear your name called,

9  kindly answer "here" to the calling of your name.

10  Take all your belongings and take the seat that's

11  assigned to you.

12    Take seat number one, Phyllis Kessler.

13    THE COURT:  Please answer.

14    THE PROSPECTIVE JUROR:  Here.

15    THE CLERK:  Take seat number two, Berlent

16  Thompson.

17    Take seat number three, Anne Curatolo.

18    Take seat number four, Marlene Gooding.

19    Take seat number five, David Morrero.

20    Take seat number six, Arthur Morris.

21    Take seat number seven, John Cane.

22    Take seat number eight, Patrick Monaghan.

23    Take seat number nine, Cybil Hammil.

24    Take seat number ten, Gene Claude Edouard.

25    Take seat eleven, Evelyn Glaubach.

1           Jury Selection

2                Take seat twelve, Robert Gibaldi.

3                Take seat thirteen, Luz Williams.

4                Take seat fourteen, Delta McCalla.

5           THE COURT:  Okay.

6                Now, ladies and gentlemen, I intend to make a

7      brief statement to all of you and to then ask

8      certain questions.  I want you to know I am

9      directing my remarks to every juror in the room,

10     those in the jury box and those of you sitting in

11     the audience.  Please pay close attention to all

12     the questions that I ask and particularly the

13     general questions which I direct to the body as a

14     whole.  The reason for this is that if you, who are

15     outside the rail, are called to sit in the jury

16     box, you will be asked if your answers to those

17     general questions would be the same.  The purpose

18     of these inquiries is to obtain 12 citizens of

19     Brooklyn to serve as jurors at this trial.  The

20     case involves the trial of criminal charges brought

21     by the People of the State of New York against the

22     defendant, Mr. Jabbar Collins.  The charges against

23     the defendant are contained in an indictment which

24     allege that the defendant committed certain

25     criminal acts.  The indictment charges the

1    Jury Selection

2    defendant with what we call "felony murder"; that

3    someone was killed during the course of a robbery.

4    Those are the allegations.  They are no proof

5    whatsoever.  Now, if any of you disagree with me,

6    please just raise your hands.  See, we have a

7    situation here where we have a white man and a

8    black man.  Now, would you all agree with me that

9    everybody in this country is entitled to a fair

10   trial?  Anybody disagree with that?  Anybody

11   disagree with me that it would be improper and

12   unamerican to treat the case, because of the

13   person's color, race or religion, anybody disagree

14   with that?

15        Mr. Jabbar Collins is entitled to a fair

16   trial.  And before he can be convicted, the People

17   must prove beyond a reasonable doubt that this

18   defendant committed the acts charged against him.

19   It would be totally and completely unamerican for

20   someone to say:  Well, a white man was killed.

21   Conversely, it would be unamerican to convict this

22   defendant if Mr. Vecchione does not prove his guilt

23   beyond a reasonable doubt merely because of race or

24   color.  Does anybody disagree with that?  And I

25   tell you members of the jury now, whoever is picked

1          Jury Selection

2          on this jury, if that issue comes up in the jury

3          room, that is if somebody talks about race or color

4          in the jury room and not the facts of the case, I

5          would like a note telling me that that's going on.

6          Is that clear?  Anybody have any objection to

7          that?  Because I want you all to feel, and please,

8          in the back of your minds, put a cloak; as a matter

9          of fact, Mr. Collins is already draped with the

10         mantle of the presumption of innocence.  I want you

11         to put a complete cover over the defendant.  I want

12         you not to consider the color -- the color, the

13         race, the religion of the victim.  I want you to

14         say:  There is a defendant and there is a victim.

15         You are all under oath.  Will you all promise that,

16         that you will consider this case based soley on the

17         fact that there is a defendant who is presumed to

18         be innocent and there is a victim and they are not

19         to consider their race or their color.  If any of

20         you feel differently, please, I will excuse you,

21         but if you feel any different, tell me now.  I

22         think you are being unfair to yourself if you feel

23         that way and you don't tell us.  You don't have to

24         tell me exactly that's it, but I will excuse you,

25         because between you and me, you are being unfair to

1     Jury Selection

2     yourself if you are going to judge this case based

3     on who the people are that are involved.  All

4     right?

5          Can I now start with the legal part of the

6     case?  Okay?

7          Now, the indictment, I want you to know that

8     the indictment is merely a charge.  It is merely

9     the way by which the People of the State of New

10    York bring to court individuals it claims have

11    violated the law.  And it is not any evidence

12    whatsoever of the guilt of the defendant.  I want

13    you to know right now, the mere fact that someone

14    said Mr. Collins did something is no -- there is no

15    proof.  The proof has to come from the witness on

16    that chair.  Now, Mr. Collins is presumed to be not

17    guilty.  And this presumption of innocence

18    continues throughout the trial, unless a jury,

19    having considered all of the evidence, finds that

20    the defendant is guilty beyond a reasonable doubt

21    of the charges made against him.  The burden of

22    such proof is on the District Attorney and that

23    burden never shifts.  There is no burden on the

24    defendant.  He and his attorney may sit during this

25    entire trial and do nothing.  At the conclusion of

1          Jury Selection

2          the trial, it will be my province as the Judge to

3          instruct you as to the law which is applicable to

4          this case and the jury must follow my instructions

5          on the law.  The jury on the other hand is the

6          exclusive judge of the facts and the jury alone

7          determines whether the People have proven the

8          charges with respect to this defendant beyond a

9          reasonable doubt.  In other words, you must take

10         the law from me and I must take the facts from you

11         as you find those facts to be.  As jurors, your

12         verdict must be unanimous.  You will be called upon

13         to deliberate.  Can you promise the defendant and

14         the People that you are willing to participate in

15         deliberations by expressing your views based on the

16         evidence in this case, keeping an open mind and

17         listening to the views of your fellow jurors?

18              I don't hear you.

19              (Jurors respond in the affirmative.)

20              THE COURT:  Now, you are going to see

21         witnesses come to the witness box.  They are going

22         to testify.  That's evidence, but that you do every

23         day of your life; on the job, at home, with your

24         kids, with your family, when people talk to you.

25         In your own minds, whether you think you know it or

1          Jury Selection

2          not, you are sort of deciding whether they are

3          telling you the truth, whether they are giving you

4          a line, whether they are exaggerating.  You do that

5          every day.  You don't deliberate every day.  And

6          the reason I say that is because we as humans don't

7          like to listen, we like to talk.  And in many many

8          cases, and I am sure you have experienced, you are

9          talking and that person is not even hearing what

10         you are saying.  He just wants you to keep quiet so

11         he can say what he has to say.  Maybe a good

12         example of that is someone stops you and asks you:

13         Hey, Joe, how are you doing?  I don't know, my wife

14         has been sick, and before you can finish, he says,

15         that's good and walks on.  He didn't hear a word

16         you said.  He was just waiting for you to stop

17         talking so he can go on his way.  You can't do that

18         in a jury room.  In a jury room, you must discuss

19         the facts.  Your fellow jurors must listen to what

20         you say the facts are.  They will then tell you

21         what the facts are and you must listen to the other

22         jurors and then hopefully arrive at a verdict.  Can

23         you all do that?

24             Now, the reason I say that is because -- and

25         it always happens in some case down the line,

1      Jury Selection

2      and you change your remarks to the jury

3      accordingly -- I had one juror that went into the

4      jury room and if you haven't been here before, you

5      wouldn't know it, there is a nice ledge and a

6      window which can't be opened.  And this fellow

7      walked in, doesn't matter whether he said guilty or

8      not guilty, he had made up his mind.  He heard one

9      witness and he sat back and enjoyed the case and he

10     said:  Hey, look man, this guy is so and so.  Let's

11     use the word "not guilty."  He says:  Not guilty.

12     I don't care.  When the rest of you decide to agree

13     with me, we go out and tell the judge, and that

14     went on for two days until I got wind of it.  But

15     you see, I am not telling you if you are in a

16     minority to change your vote just because there is

17     even eleven against you.  Unless you are convinced

18     by their arguments that your position is wrong, you

19     do not under any circumstances change your vote.

20     And unless some of the arguments that they give you

21     tells you that your view of the evidence was not

22     right, don't change your opinion, but be willing to

23     change if you are convinced that your position is

24     wrong.  Now, there is nothing wrong with being

25     stubborn, there is nothing wrong with being too

1       Jury Selection

2       proud, too convinced that maybe you viewed

3       something wrong.  There is nothing wrong with that,

4       but you can't sit on the jury.  If any of you feel

5       that you are that type of person, that once you

6       decide something, even if God came down from his

7       heaven you wouldn't change your mind, please, let

8       me know now.  There is nothing wrong with it, but

9       you can't sit on the jury.  Will all of you

10      promise, both sides, that if you are

11      convinced -- you will vote according with your own

12      conscience, but if you are convinced that you are

13      wrong, you will change your position, whichever way

14      it goes?  I don't care which way.  Will you all do

15      that please?

16          (Prospective jurors respond in the

17      affirmative.)

18          THE COURT:  Good.

19          The lawyers have a right to challenge

20      jurors.  If that should be done, you are not to

21      consider it a reflection on your integrity or even

22      your capacity to serve.  Lawyers have a tendency of

23      deciding from the little we learn about your

24      background who they would like on this particular

25      case.  The best example might be if, let's assume

1          Jury Selection

2          you were the victim of a robbery or a mugging.  The

3          defense lawyer says:  Gee, I'd rather not have you

4          on this case because you may be thinking of what

5          happened to you when you are deciding the case

6          against Mr. Collins.  You see what I am saying?

7               Now, this is a case which happened back in

8          1994, in February, at 126 Graham Avenue in the

9          lobby of that building in Brooklyn.  And the

10         victim's name is Abraham Pollack.  Anybody know

11         about this case?  Anybody live in that particular

12         area?  What's the cross streets?

13              MR. VECCHIONE:  Boerum.

14              THE COURT:  Graham and Boerum.  And you never

15         heard about an alleged robbery or murder that took

16         place in the area?

17              PROSPECTIVE JUROR NO. TWO:  Yes, I did.

18              THE COURT:  Do you know anything about it?

19              PROSPECTIVE JUROR NO. TWO:  No, I don't.  I

20         heard about it but I --

21              THE COURT:  Would that affect you in any way?

22         In other words, can you listen to the witnesses

23         here, without thinking of what you heard about the

24         case, and just judge the case based on what they

25         tell you here?

1      Jury Selection

2           PROSPECTIVE JUROR NO. TWO:  Yes, I can.

3           THE COURT:  How about the rest of you?  You

4      are in the area.  Can you listen and judge the case

5      solely on the evidence here, even if it brings back

6      some recollection of what happened there?  Okay?

7      Judge only the case here?

8           Now, any of you have any pressing or family

9      business obligations which will keep you from

10     devoting your attention in this case?  If any of

11     you have any health problems, and I will tell you

12     what my schedule is, we usually start the trial at

13     10 o'clock, go to lunch between one and two, and we

14     work in the afternoon until about five or as soon

15     as whatever witness is on the stand, we will try to

16     finish with that witness.  Anybody have any problem

17     sitting for that period of time?  Anybody have any

18     hearing problem?

19          PROSPECTIVE JUROR NO. 11:  Judge, I would like

20     to know if we would be allowed to leave earlier on

21     Friday.  I observe the Sabbath.

22          THE COURT:  I don't interfere with anybody's

23     observances and I suppose at this time of the year,

24     3 o'clock or so would probably be a good time.

25          PROSPECTIVE JUROR NO. 11:  Fine.

1      Jury Selection

2          THE COURT:  Oh, yeah.  I mean, that goes

3      without saying.  If anyone has any

4      particular -- that goes when we have a -- if you

5      are picked on the jury and we have lunch in or

6      lunch out, if anyone has any dietery problems, we

7      will take care of those.  There is no problem with

8      that either.  Okay?

9          Now, I am going to ask certain questions now.

10         (Jury selection not recorded.)

11             *        *        *

12         (Whereupon, the following transpired outside

13     the presence and hearing of the prospective

14     jurors.)

15         THE CLERK:  Counselors, this is an A Felony.

16     There are twenty challenges per side.  As to the

17     entire panel, any challenges for cause, People?

18         THE COURT:  How about number two?

19         MR. VECCHIONE:  Yes, I that's what I was going

20     to ask.

21         THE COURT:  That's the lady that said no

22     matter what, if she didn't -- if there was not a

23     witness who saw the actual shooting, I think those

24     were her words, she would not vote.

25         MR. HARRISON:  No objection.

1       Jury Selection

2           THE CLERK:  Any others counselors, for cause?

3           THE COURT:  The whole panel.

4           MR. VECCHIONE:  The whole panel?

5           THE CLERK:  Yes.

6           MR. VECCHIONE:  Number 14, Ms. McCalla.  She

7       is the woman who indicated her son was convicted

8       many times.  I understand she didn't articulate on

9       the record she couldn't be fair.  In fact, said the

10      opposite.  I think having a son who had been

11      convicted and said many times sat and watched

12      trials, I can't imagine she can separate.

13          THE COURT:  She announced to us that she

14      could.  That's denied.  I can only judge what they

15      tell me.

16          Anything else?

17          MR. VECCHIONE:  No.

18          THE CLERK:  Defense, cause?

19          MR. HARRISON:  No.

20          THE CLERK:  Peremptorily, first twelve, that's

21      up to and including number thirteen, Miss

22      Williams.

23          Peremptorily, People?

24          MR. VECCHIONE:  Number four, Gooding.

25          THE CLERK:  What?

1          Jury Selection

2              MR. VECCHIONE:  What did you say, up to what

3      number?

4              THE CLERK:  Up to and including Luz Williams.

5              MR. VECCHIONE:  Can you give me one second,

6      Judge?

7              THE COURT:  Sure.

8              (Short pause in the proceedings.)

9              MR. VECCHIONE:  Number thirteen, Miss

10     Williams.

11             THE CLERK:  Any others?

12             MR. VECCHIONE:  No.

13             THE CLERK:  Peremptorily, defense?

14             MR. HARRISON:  Number one and three are

15     acceptable to the defense.  I am going to challenge

16     number five.

17             THE CLERK:  Mr. Morrero.

18             MR. HARRISON:  I am going to challenge number

19     six.

20             THE CLERK:  Martino.

21             MR. HARRISON:  I am going to challenge seven.

22             THE CLERK:  Cane.

23             MR. HARRISON:  Eight is acceptable, acceptable

24     to us.  I am going to challenge ten, eleven and

25     twelve.

1          Jury Selection

2              THE CLERK:  Ten, eleven and twelve.

3              MR. HARRISON:  Let me just, if I may --

4              THE COURT:  Go ahead.

5              MR. HARRISON:  (Continuing) So that we are

6      clear and I am clear, one, three -- one and three

7      are acceptable to the dedefendant.  I challenge

8      five, six and seven.  Eight was acceptable to the

9      defense.  I challenge -- nine was acceptable.

10     Didn't challenge him.  I don't remember ten.

11     Eleven and twelve I am challenging.  And, again,

12     with reasons if necessary.

13             THE CLERK:  That makes juror number one,

14     Phyllis Kessler.  Juror number two, Anne Curatolo.

15     Juror number three is Patrick Monaghan.  Juror

16     number four is Cybil Hammil.

17             MR. VECCHIONE:  Judge, before we go on, before

18     we go on --

19             THE COURT:  You want reasons?  You want

20     neutral reasons?

21             MR. VECCHIONE:  I would love them, every one

22     of them, with the exception of Mr. Morrero is a

23     male and -- he is male but white.  Judge, the point

24     is --

25             THE COURT:  He is white.

Jury Selection

1

2     MR. VECCHIONE:  It's who you challenge and I

3 think --

4     THE COURT:  You want neutral reasons.

5     MR. HARRISON:  Let me start with number

6 thirteen.  Gibaldi has a cousin -- number twelve,

7 he had a cousin who is a police officer.  When I

8 was talking to him, the more I spoke, the more his

9 arms folded in front of me showing body language.

10 It was indicative that he did not like me nor my

11 client.  That's my reason.  Number eleven,

12 Glaubach, and I did put on, I believe, two

13 Caucasian women anyway.

14     THE COURT:  Forget what you put on.  Each

15 juror is entitled to serve jury duty.  You have to

16 tell me why.

17     MR. HARRISON:  Okay.  Because she had a car

18 that was fire bombed and somehow I just

19 extrapolated that we had a situation where there

20 was a major crime caused against her.

21     Number ten, I think -- ten was mugged.

22     THE COURT:  Ten was a white woman.

23     MR. HARRISON:  Ten was a white woman.

24     THE CLERK:  Edward Collins.

25     MR. VECCHIONE:  White male.

1            Jury Selection

2                 THE COURT:  White male.  What about him?

3                 MR. HARRISON:  And he basically works for

4       homes protection and he mentioned he was robbed

5       and/or mugged and the defense position is it's too

6       close to the crime.

7                 THE COURT:  Those are your reasons?

8                 MR. HARRISON:  Those are my reasons.

9                 MR. VECCHIONE:  Cane?

10                MR. HARRISON:  Cane I just -- I did not feel a

11      positive flow with him; that's number seven, and

12      would simply argue that I put on the floor --

13                THE COURT:  Don't tell us who you put on.  Give

14      us the reason for number seven.

15                MR. HARRISON:  I did not have a good feeling

16      with him.  I can't give a specific reason.

17                THE COURT:  You are supposed to give a neutral

18      reason.

19                MR. HARRISON:  My reason why I did not feel

20      chemistry with him, I saw his arms crossed and it's

21      the defense position when arms are crossed based on

22      a charge like this, extrapolating from body

23      language, he is moving -- that's moving against me.

24                MR. VECCHIONE:  Five and six he challenged as

25      well.

1        Jury Selection

2                THE COURT:  But I am saying --

3                MR. HARRISON:  Six, I am sorry.  On number six

4        he said he was held up.

5                THE COURT:  So?

6                MR. POSNER:  In the store he was working with.

7                MR. HARRISON:  He is --

8                THE COURT:  He wasn't personally held up, his

9        store was.

10               MR. HARRISON:  I extrapolated from the store.

11       We have a hold-up scenario.

12               THE COURT:  It was a gunpoint hold-up.

13               MR. HARRISON:  And I remembered that number

14       five was a crime victim.  I don't -- if I am wrong,

15       correct me.

16               MR. VECCHIONE:  You are wrong.

17               THE COURT:  He was not a crime victim.  He was

18       the only one who was not a --

19               MR. HARRISON:  May I stick my face out there?

20               THE COURT:  Sure.  He is the Hispanic man.

21               MR. HARRISON:  I will withdraw my challenge to

22       five.  I believe I believed he was a crime victim.

23       In good faith I would assume that not to be true.

24               THE COURT:  He is the only one in the first

25       row that was not a crime victim in the front row.

1          Jury Selection

2              THE CLERK:  David Morrero.

3              MR. HARRISON:  I withdraw it.

4              THE COURT:  The defendant has exercised five.

5              MR. VECCHIONE:  Just to make it clear for the

6      record, Mr. Harrison is withdrawing after having

7      gone back into the courtroom, not because the Court

8      has seated him over objection, but because

9      Mr. Harrison went back into the courtroom.

10             THE COURT:  Yes.

11             THE CLERK:  Mr. Morrero will now be juror

12     number three.  Okay.

13             THE COURT:  Five and two.

14             THE CLERK:  As to Delta McCalla, peremptorily,

15     People?

16             MR. VECCHIONE:  Yes, challenged.

17             THE COURT:  Five by the defense and three by

18     the People.

19             THE CLERK:  Correct.

20             (Back in the courtroom.)

21             THE CLERK:  The following jurors whose names I

22     call, kindly step out of the jury box.  Delta

23     McCalla, Edward Collins, Evelyn Glaubach, Robert

24     Gibaldi, John Cane, Joseph Andimo, Luz Williams,

25     return to Central Jury.  Marlene Gooding and

1          Jury Selection

2     Berlent Thompson.

3          THE COURT:  Are the remaining jurors

4     satisfactory, Mr. Harrison?

5          MR. HARRISON:  Acceptable to the defense, Your

6     Honor.

7          MR. VECCHIONE:  Yes, acceptable, Your Honor.

8          THE CLERK:  Jurors, kindly stand and raise

9     your right hand.

10          Do you and each of you solemnly swear or

11     affirm that you will try this action in a just and

12     impartial manner and to the best of your judgment

13     render a verdict in accordance with the law and the

14     evidence, so help you God?

15          (Jurors respond in the affirmative.)

16          THE COURT:  All right.  Can all of you in the

17     front row, can you slide over as far as you can so

18     these jurors can sit there?

19          THE CLERK:  Jurors -- shall I fill the box?

20          THE COURT:  Yes.

21          THE CLERK:  Jurors, once again, if you hear

22     your name called, kindly answer "here" to the call

23     of your name.  Take your belongings and take the

24     seat that's assigned.

25          Take seat number one, Umberto Bartolomeo.

1        Jury Selection

2            THE COURT:  If any of you can't be fair and

3        impartial jurors, come right up here and tell

4        me.

5            THE CLERK:  Take seat number two, Michael

6        Grieco.

7            Just step down and step around, sir.

8            (Whereupon, there was a discussion at the

9        bench between all counsel, prospective juror and

10       the Court.)

11           THE COURT:  Report back to Central Jury.

12           THE CLERK:  Take seat number two, Maureen

13       Morris.

14           Take seat number three, Elizabeth Knafo.

15           Take seat number four, Ronald Young.

16           Take seat number five, Rachel Axelrod.

17           Take seat number six, Arthur Warshowsky.

18           In the second row, seat number seven, Remo

19       Narduzzi.

20           THE COURT:  Can you folks slide over, please,

21       just so that our five jurors can sit on the end

22       please?

23           THE CLERK:  Take seat number eight, Laney

24       Nelson.

25           (Whereupon, a discussion was had off the

1        Jury Selection

2        record at the bench between all counsel, the

3        prospective juror and the Court.)

4            THE COURT:  Report back to Central Jury,

5        ma'am.

6            THE COURT OFFICER:  This gentleman, number

7        seven, would like to approach.

8            THE COURT:  Why did you take the seat?

9            (Whereupon, a discussion was had off the

10       record at the bench between all counsel, the

11       prospective juror and the Court.)

12           THE COURT:  Excused.

13           By the way, you come to the point up here, I

14       am not going to fight with you if you tell me you

15       don't understand English because I will be making a

16       mistake.  If you are telling me the truth, that's

17       one thing.  If you are not telling me the truth,

18       you are still going to be sitting downstairs and

19       counting cars going over the Brooklyn Bridge.

20           Stay downstairs and make sure you tell me at

21       the end of the day how many cars went over the

22       bridge.

23           THE CLERK:  Take seat number seven in the

24       second row, Helen Williams.

25           THE COURT:  Can you be a fair juror, Miss