# EXHIBIT A

```
 1                    Proceedings
 2              (Discussion at bench off the record.)
 3              C I C E R O    M U R P H Y    called as a
 4         witness on behalf of the People, was duly sworn and
 5         testified as follows:
 6                    THE CLERK:  Please be seated.  In a loud,
 7         clear voice, please state your name.
 8                    THE WITNESS: Cicero Murphy.
 9    REBUTTAL EXAMINATION
10    BY MR. VECCHIONE:
11         Q    Mr. Murphy, I am going ask you to speak up loudly
12    so everybody can hear you.
13         A    Can I have some water?
14                    THE COURT:  Yes.
15         Q    Ready?
16         A    Ready.
17         Q    Mr. Murphy, do you know Jeffrey Marshall?
18         A    Yes, I know Mr. Marshall.
19         Q    Do you see him in the courtroom?
20         A    Yes.
21         Q    Would you point him out?
22         A    The gentleman to the far end with the glasses.
23                    THE COURT:  Indicating Marshall.
24         Q    Ever talk to him?  Did you ever talk to him?
25         A    Did I ever talk to him?
```

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5040

Murphy - Rebuttal/Vecchione (Marshall)

1

2    Q    Yes.

3    A    Yes.  Sure, yes.

4    Q    Did he ever talk to you?

5    A    Yes.

6    Q    Did he ever talk to you about an incident that

7    occurred at 110 Tompkins Avenue, a liquor store?

8    A    Yes.

9    Q    What did he say about that to you?

10   A    He stated that he was outside and some people went

11   inside, Cabeza and-- Cabeza and another person went inside.

12   Q    Did he tell you what his participation was in this

13   thing, this holdup?

14   A    Lookout.

15   Q    And did there come a point when Mr. Marshall

16   discussed with you whether or not he was going to proffer an

17   alibi as to this case?

18   A    Yes.

19   Q    And what did he say to you about what he was going

20   to do about an alibi in this case?

21   A    That he was going to have his father state that he

22   was upstairs.

23   Q    By the way, did you see-- sorry.  Withdrawn.  Did

24   you ever hear Mr. Marshall talking to anyone else about this

25   alibi?

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

```
 1                    Murphy - Rebuttal/Vecchione (Marshall)

 2                    MR. HARRISON: Objection.

 3        A     Yes.

 4                    THE COURT:  Overruled.

 5        Q     Who would that be?

 6        A     Vita.

 7        Q     Do you know Vita?

 8        A     Yes.  I met Vita.

 9        Q     And did you know how-- sorry.  Withdrawn. Do you

10   know if there was a relationship between Vita and Marshall?

11        A     They was supposed to get married.

12        Q     Who told you that?

13        A     They both.

14        Q     What did Marshall tell you about what he wanted his

15   father to say with respect to this case?

16        A     He was upstairs.  His father looked out the window

17   and called him to the window.

18        Q     Did he tell you if that was the truth or not?

19        A     Who?

20        Q     Marshall.

21        A     He just said he wanted his father to say he was

22   upstairs.

23        Q     And he told you he was downstairs as the lookout,

24   right?

25        A     Yes.
```

Murphy - Rebuttal/Vecchione (Marshall)

1

2      Q      Did there come a point when you went to speak to

3      his father?

4      A      I went there with Vita.

5      Q      Where did you go?

6      A      Tompkins Avenue.  77.

7      Q      And did you go to a specific apartment in that

8      building?

9      A      It is on the fourth floor.

10     Q      Whose apartment was it?

11     A      His father's apartment.

12     Q      The person that you saw in that apartment, was he a

13     man or a woman?

14     A      It was a man.

15     Q      Who did you go to that apartment with?

16     A      Vita.

17     Q      The person that you spoke to, the man, did you see

18     him outside the courtroom just a few moments ago?

19     A      Yes.

20     Q      Did you know his name when you went to see him?

21     A      All I knew was he was Born's father.

22     Q      Did you ever hear the name Ben or Ben Brackett?

23     A      I don't recall.

24     Q      What was the purpose of you going to 77 Tompkins

25     Avenue with Vita to talk to Born's father?  Why did you go

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

Murphy - Rebuttal/Vecchione (Marshall)

2    there?

                                     *supposed*

3        A   Well, we was suppose to go there to make sure they

4    had their story correct.

5        Q   And did you listen to Mr. Brackett?

6        A   Yes.  I heard him.

7        Q   Did you do any talking?

8        A   No.  I sat there and I observed.

9        Q   Why were you chosen by Mr. Marshall and Vita to go

10   and listen to this?

11                 MR. HARRISON: Objection.

12                 THE COURT:  Overruled.

13       A   Because I had graduated from being a paralegal and

14   he wanted me to be there to help him out.

15       Q   Who did the talking, other than Brackett, in the

16   apartment?

17       A   Vita.

18       Q   By the way, you are in jail now, right?

19       A   Yes.

20       Q   Do you have any cases pending?

21       A   Two.

22       Q   Did you come to my office or did I reach out for

23   you with respect to this information?

24       A   I came to you.

25       Q   How long did it take you to find me with respect to

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

Murphy - Rebuttal/Vecchione (Marshall)

1   this information?

2       A    Took me a little while from the telephone.  It took

3   me a while.

4       Q    As you sit here now, Mr. Murphy, did I or anyone in

5   the District Attorney's office or the police department

6   promise you anything in return for your testimony?

7       A    No.

8       Q    Do you expect anything in return for your testimony

9   from the DA's office?

10      A    No.

11              MR. VECCHIONE: No further questions.

12  CROSS-EXAMINATION

13  BY MR. HARRISON:

14      Q    Mr. Murphy, there was a time that you came to me

15  and you came to me in trust and you told me you wanted to

16  help Jeffrey Marshall; is that correct?

17              MR. VECCHIONE: Objection to form.

18              THE COURT:  I will allow it.  Overruled.

19      Q    Yes?

20      A    I came to you at that point.

21      Q    And you came to me in trust and you told me you

22  wanted to help Mr. Marshall; is that correct?

23      A    That's before my life was threatened.

24      Q    Just yes or no and stop making things up. Answer

Murphy - Cross/Harrison (Marshall)

the question.

    MR. VECCHIONE: Judge, I object to the characterization.

    THE COURT:  As far as making things up, strike that, but answer the question.

Q  Just answer the question, Mr. Marshall.

A  Say it again.

Q  You came to me and you said, Mr. Harrison, I want to help Mr. Marshall, didn't you?

A  Yes.  I made that statement.

Q  That's right.  And we had a conversation, right?

A  Yes.

Q  So in a way, you were a spy in Mr. Marshall's camp, weren't you?

A  I was never a spy for anyone.

Q  You came to me and you discussed Mr. Marshall's case, yes?

A  We spoke on his case, yes.

Q  And you offered to do legal research for Mr. Marshall's case, didn't you?

A  Yes, I did.

Q  And right now you are sitting here testifying against Mr. Marshall; is that correct?

A  I am testifying to what happened.  What was told--

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5040

Murphy - Cross/Harrison (Marshall)

1

2      Q     And you came to me in trust, didn't you,

3   Mr. Murphy?

4      A     Came to you because he asked me to come to you.

5      Q     You raped my trust, didn't you, Mr. Murphy?

6      A     No.

7      Q     You raped me.

8      A     There was never no trust between you and I.

9      Q     There was no trust when you came to me and told me

10  Mr. Marshall was completely innocent and you wanted to help

11  him and now you are testifying against him.  There is no

12  rape of my trust?

13     A     I never came to you in that form.  I came to you

14  because I was asked to help him and I offered to help him

15  with legal research in his case.  Now, all that latter part

16  that you stated, this is the first time I am hearing all

17  this.

18     Q     So you did not rape, R-A-P-E, rape my trust; is

19  that correct?  Just yes or no, Mr. Murphy.

20     A     What do you mean by rape?

21     Q     You raped me.  You raped me.  You came to me in

22  trust to help Mr. Marshall.  You come now to testify for the

23  DA.  I feel raped.

24     A     I'm sorry.

25     Q     Oh, you look very sorry.  How dare you rape me.

Murphy - Cross/Harrison (Marshall)

1

2 How dare.

3         THE COURT:  Anything further?

4         MR. HARRISON: I'd like to see a copy of his

5 record.

6         THE COURT:  Sure.  Do you have it, counsel?

7         MR. VECCHIONE: Absolutely, Judge.

8         (Handed to counsel.)

9   Q   Now, you were a paralegal; is that correct?

10   A   Still am.

11   Q   And you are still a paralegal; is that correct?

12   A   Yes.

13   Q   So of course you know how the law works; is that

14 correct?

15   A   What do you mean?

16   Q   Now, let's go back to 1975?

17         THE COURT:  Counsel.

18         MR. VECCHIONE: Can we have an answer before he

19 goes on?

20         THE COURT:  Before you go, you should wait.

21 He said, What do you mean.  When you said, You know

22 how the law works, he said, What do you mean.

23   Q   Do you understand how the law works, yes?

24   A   I don't understand how you are phrasing it.

25   Q   You came and offered to do legal research for me;

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1                    Murphy - Cross/Harrison (Marshall)

2    is that correct?

3         A    Because I know how to research.  I don't understand

4    the law.  That don't mean-- I'm not an expert.

5         Q    But you came to me and offered to do legal

6    research; is that correct?

7         A    I came to help.  Yes.

8         Q    So you came to me to help Mr. Marshall, right?

9         A    Yes.

10        Q    And now, let's go back to June 25, 1975.  You were

11   arrested for petit larceny; is that correct?

12        A    I don't recall.

13             MR. HARRISON: I ask for a stipulation, your

14             Honor.

15        A    May I see the record?  My rap sheet.  I don't have

16   a copy.

17             MR. VECCHIONE: He said he doesn't recall.

18             Perhaps something would refresh his recollection.

19             We have an extra rap sheet.  We can she show it to

20             Mr. Murphy.

21             THE COURT:  Do you want to do it that way?

22             MR. HARRISON: Yes, your Honor.

23             THE COURT:  Please hand up an extra copy. We

24             will have that deemed marked as-- we can call it

25             Defense Exhibit K.

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5040

```
 1                    Murphy - Cross/Harrison (Marshall)

 2                    MR. HARRISON: Yes, your Honor.

 3                    THE COURT:  As to the 1976 arrest, you are

 4            talking about.  Take a look at it.  Do you have

 5            it?

 6                    (Handed to witness.)

 7                    MR. HARRISON: That's 1975.

 8                    THE COURT:  Do you know how to read those?

 9                    THE WITNESS:  Yes, I know how to read it.

10       Q    June 25, 1975.

11       A    Yes.  I remember that.

12                    THE COURT:  Does that refresh your

13            recollection.

14                    THE WITNESS: Yes.  I remember that.

15       Q    Why don't you tell the jury, Mr. Paralegal, about

16   why you were arrested for petit larceny?  We'd like to hear

17   about it.

18       A    Petit larceny?

19       Q    Yes.

20       A    It says controlled substance right here.

21       Q    It does?

22       A    Yes.

23       Q    Well, that case was dismissed, wasn't it?

24       A    Which one are you talking about?

25       Q    The controlled substance case was dismissed in
```

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1       Murphy - Cross/Harrison (Marshall)

2    1975; is that correct?  So we are not going to talk about

3    that.  The last arrest in 1975 for petit larceny.

4       A    I am trying to recollect what happened.

5       Q    I'd like to know what happened. You are an honest

6    man.  I want to hear what happened?

7       A    I was arrested.

8       Q    What were you arrested for?

9       A    Petit larceny.

10      Q    What did you steal, if you remember?

11      A    No.  Now that you brought that back, I didn't steal

12   anything. The case was later dropped.

13      Q    So you were arrested wrongly; is that correct?

14      A    That case was dropped.

15      Q    Excuse me?  Okay. I will accept that.

16      A    I didn't steal anything. The case was dropped.

17           MR. VECCHIONE: Judge, I have an objection.  If

18           the case is dropped or dismissed, I think

19           Mr. Harrison has an obligation not to go into those

20           cases.

21           THE COURT: Yes, that's true. If you know that,

22           you should not--

23           MR. HARRISON: I don't think the sheet says

24           anything about the condition of that case.

25           MR. VECCHIONE: Then he should be prepared to

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1                   Murphy - Cross/Harrison (Marshall)

2    cross rather than just plunge into it.

3            THE COURT:  Don't you stick your chin out.

4    You just handed that to him. So let's be fair.

5            MR. VECCHIONE: They have had a connection with

6    one another.

7            THE COURT:  He is not obligated to check his

8    record.  Let's not play games, Mr. Vecchione.  Stop

9    using that sheet like it was a laundry list.

10            MR. HARRISON: Sorry, your Honor.

11            THE COURT:  That's an old DA trick.

12            MR. HARRISON: Yes, your Honor.

13    Q    Now, Mr. Murphy, let's see.  You were arrested for

14    robbery in the third degree in 1975; is that correct, on

15    3/6/75?

16    A    Robbery in the third degree?

17    Q    Yes.  Were you arrested for that?

18    A    That's what it says here.

19    Q    Well, were you or is the sheet wrong?

20    A    I can't recall.  That was in '75.  Almost 20 years

21    ago.

22    Q    You don't recall the--

23    A    I mean but I have been arrested because it is on

24    the sheet.  This is almost 20 years now.

25    Q    Let's go to 1977.  You were arrested for attempted

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5040

```
 1                    Murphy - Cross/Harrison (Marshall)
 2   murder; isn't that correct?
 3        A    I was charged for attempted murder.
 4        Q    Who did you try to murder?
 5        A    I didn't try--
 6             MR. VECCHIONE: Objection to the form.  An
 7        arrest is not what the sheet should be allowed to
 8        ask about.  It is convictions.
 9             THE COURT:  Yes.  Ask him about any
10        convictions, if there were any.
11        Q    Okay. You were convicted for robbery; is that
12   correct?
13        A    When are you talking about?
14        Q    The one in 1977.  You were arrested for robbery; is
15   that correct?
16             MR. VECCHIONE: Objection, Judge, to form.  He
17        asked an arrest again.
18             THE COURT:  Yes.  Sustained.
19        Q    You were convicted for robbery in 1977, yes?
20        A    Yes.
21        Q    Who did you rob?
22        A    I didn't rob anyone.  I was accused of robbing.
23        Q    Of course, you were accused falsely, right?  You
24   were accused falsely, right?
25        A    I was convicted of the crime.
```

Murphy - Cross/Harrison (Marshall)

1

2      Q    And would you tell the jury about this robbery?

3      A    In '77?

4      Q    Yes, in '77.

5      A    The robbery was of a person that lived down the

6  block.

7      Q    Did you use any weapon, did you use strong arm

8  tactics?

9      A    No, I didn't use a weapon.

10     Q    Did you injure that person?

11     A    No, I didn't injure the person.

12     Q    Would you tell the jury about this robbery?

13     A    I was with someone and the person, they had a beef

14  and because I was with them, I got charged with acting in

15  concert because I wasn't going to let him get hurt, but I

16  didn't force my way in no one's house.  I did not rob no

17  one, and I did not try to kill anyone. I just had a mere

18  acting in concert.

19     Q    Of course, you didn't rob my confidence when you

20  came to me for Mr. Marshall, did you?

21     A    I didn't know we had confidence in one another.

22     Q    You didn't know we had confidence; is that correct?

23     A    No.

24     Q    I feel very hurt.

25     A    I'm sorry.

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

```
 1                   Murphy - Cross/Harrison (Marshall)
 2        Q    Okay.  Now let's go to-- now, you were on parole
 3   till July 2, 1981 in that case; is that correct?
 4        A    No.  That's not correct.
 5                   MR. HARRISON: I'd ask for a stipulation, your
 6             Honor.
 7                   THE COURT:  As to what?
 8                   MR. HARRISON: As to what I am reading.
 9                   THE WITNESS: You said '77 and that's not
10             correct.  So you can stipulate all you want.  It's
11             not correct.
12        Q    I can stipulate all I want.  I thank you.  I thank
13   you, Mr. Murphy.
14        A    You are welcome.
15                   MR. HARRISON: Then we accept the stipulation,
16             your Honor?
17                   THE COURT:  What else-- I asked you what the
18             stipulation was as to.
19                   MR. HARRISON: That he was on parole until
20             1981.
21                   THE COURT:  Is that correct?  On parole till
22             '81?
23                   THE WITNESS:  That's incorrect-- what are you
24             talking about?  The first case, the--
25        Q    How many cases do you have that gets you so
```

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1       Murphy - Cross/Harrison (Marshall)

2    confused?

3        A    Because-- because I don't understand what you are

4    talking about.  Say where I can understand.

5        Q    Okay.  You were put in prison on this robbery that

6    you didn't commit, right?

7        A    Which one are you talking about?

8        Q    Which robbery am I talking about?

9        A    Yes.  Which robbery are you talking about?

10       Q    Robbery of 2/16/77?

11       A    '75 or '77?

12       Q    I don't care about the '75 robbery.  I am talking

13   about the one in 1977?

14       A    What's your question?

15       Q    You were put in jail for five years; is that

16   correct?

17       A    Yes.

18       Q    And of course, your sentence would have then been

19   over in 1982, right?

20       A    '82, yes.

21       Q    And you were released to parole, weren't you?  I

22   mean, they released you?

23       A    Yes, they released me on parole.

24       Q    And you remained on parole; is that correct?  You

25   had to report to a parole officer, yes?

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

```
1                    Murphy - Cross/Harrison (Marshall)

2          A    Yes.

3          Q    And you were released from the division of parole

4      on July 2, 1981; is that correct?

5          A    No.   That's not correct.

6               MR. HARRISON: I'd ask for a stipulation, your

7               Honor.

8          A    Wait a minute.   May I say something?

9               MR. VECCHIONE: Perhaps he should ask him when

10              he was released from parole.

11              THE WITNESS: I know when I was released and

12              that was in '79 of February.  '79 February.  Yes.  I

13              know when I was released.  That's not '81.

14         Q    So why you come to me and tell me Mr. Marshall is

15     innocent and now you are flipping your story?

16         A    Why I come to you and what?

17         Q    Tell me Mr. Marshall is innocent and now you are

18     flipping your story?

19         A    I came to you to research for Mr. Marshall.

20         Q    And you told me he was innocent, right?

21         A    I believe in innocence.

22         Q    I heard it.

23         A    I heard it?

24         Q    You heard that said to me?

25              THE COURT: Hold it.  I am not getting too
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Murphy - Cross/Harrison (Marshall)

many objections with this, so I am going to put my

two cents in.  I can understand why the DA's don't

all want to object.  If you want to testify, we

will call you as a witness and put you under oath

and you can be examined, cross-examined. Maybe I

will even ask you a few questions. I don't think

you want that.  All right.  So the bottom line is

stop testifying. Ask questions.  And while you are

pondering that, we will have the reporters change.

MR. HARRISON: Yes, your Honor.

(Whereupon, Ellen Gianoulakos relieved

Beth Cicero as Official Court Reporter.)

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5040

1        Murphy-Cross-Harrison (Marshall)

2   CROSS-EXAMINATION (Continued)

3   BY MR. HARRISON:

4        Q    Mr. Murphy, do you know what it means to be a

5   predicate felon?

6        A    Yes.

7        Q    And that means that more than one felony over a

8   ten year period after you have been released from prison or

9   parole, is that correct, if you know?

10       A    I know predicate means you have two felonies.

11       Q    Within ten years, right, if you know; if you

12  don't, you don't?

13       A    I wasn't aware of the last part.

14       Q    Now, on June 17, 1980, you were convicted and --

15  upon a verdict after trial of robbery in the first degree,

16  is that correct?

17       A    Yes.

18       Q    And who did you rob?

19       A    I was supposed to have robbed a Mr. Keefter

20  Wilson, but I never robbed him.

21       Q    But then you were innocent, right?

22       A    I have never robbed Mr. Keefter Wilson.  I'm still

23  appealing that case.

24       Q    But the jury was wrong in convicting you, is that

25  correct?

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1           Murphy-Cross-Harrison (Marshall)

2       A    The jury came back with a verdict of guilt.

3       Q    But you are innocent, right, and you didn't rob

4   anyone, is that correct?

5       A    My case is still on appeal.

6       Q    Okay; it is still on appeal?

7       A    Yes.

8       Q    Since 1980, is that correct?

9       A    No, my appeal started back in '85.  The appeal

10  process take years, a little while to be, you know, it just

11  don't happen overnight.

12      Q    And you were convicted on 7-27-1981, is that

13  correct; you were convicted, right?

14      A    Yes.

15      Q    7-22, July 22, 1981, yes?

16      A    Yes.

17      Q    And of course, as of this date in March of 1993,

18  it is still being appealed, is that correct?

19      A    Yes, it is.

20      Q    And you currently have two open cases, is that

21  correct?

22      A    Yes.

23      Q    And what are those open cases for?

24           MR. VECCHIONE:  Objection, judge.

25           THE COURT: Well, he can testify as to what

Murphy-Cross-Harrison (Marshall)

1    he's charged with.

3    Q    What are you charged with?

4    A    I'm charged with possession of a weapon.

5    Q    And you have two charges, yes?

6    A    Possession of a weapon in the second -- in the

7    first -- I mean --

8         THE COURT: You said there were two cases

9         pending, two separate cases?

10        THE WITNESS: Yes.

11        THE COURT: One is for a weapon and what's the

12        other one?

13        THE WITNESS: Supposed to be assaulting this

14        girl.

15        THE COURT: One for assault, one for a

16        weapon.  Go ahead.

17   Q    And that would make you a predicate felon,

18   wouldn't it?

19        MR. VECCHIONE:  Objection, judge.

20        THE COURT: What does that mean?  It is a

21        charge.  It doesn't make him a predicate felon.

22   Q    If you were convicted, you would become a

23   predicate felon?

24   A    That's if I was convicted.

25   Q    Yes, if?

1                    Murphy-Cross-Harrison (Marshall)

2        A    Yes.

3        Q    And you reached out and spoke to the District

4   Attorney's Office, right?

5        A    What you mean by reach out?

6        Q    You contacted the DA on this case, right?

7        A    Yes.

8        Q    And after our conversation --

9        A    You keep referring to our conversation.  What did

10  we conversate about?   *converse*

11       Q    You came to me, didn't you?

12       A    And what did we conversate about; you showed me   *converse, for Gods sake!*

13  some papers.

14            THE COURT: Please answer the question because

15            otherwise, you are going to have him testifying

16            and I don't want that.

17            THE WITNESS: Oh, okay.

18            THE COURT: You came to him, yes?

19            THE WITNESS: Yes.

20            THE COURT: And he said, we had a

21            conversation.  Your answer?  If your answer is no,

22            say no.

23            THE WITNESS: I mean, what do you mean by

24            conversation?

25       Q    We discussed the Jeffrey Marshall case, yes?

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1181

1                  Murphy-Cross-Harrison (Marshall)

2        A    We just briefly touched on it, yes.

3        Q    Right, we stood in the hallway and talked about

4   the case, is that correct?

5        A    But we mostly talked about your success.  You

6   showed me pictures of how you won cases and --

7        Q    Right --

8        A    That's what we mostly talked about.

9        Q    Absolutely, but we also talked about the Jeffrey

10  Marshall case, right?

11       A    Briefly.  Mostly you.

12       Q    Okay; but we also discussed the Marshall case,

13  right?

14       A    A little bit.

15       Q    And whether I talked about my success or my

16  failures, you came to me as a representative of Mr.

17  Marshall, is that correct?

18       A    That's true.

19       Q    Where did you meet Mr. Marshall?

20       A    I met Mr. Marshall in 275 Atlantic Avenue.

21       Q    And you used to help Mr. Marshall in the law

22  library, didn't you?

23       A    Yes.

24       Q    And you came to me and asked if you could help Mr.

25  Marshall, is that correct?

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

Murphy-Cross-Harrison (Marshall)

1

2      A     Say that again.

3      Q     You came to me and asked if you could help with

4    Mr. Marshall's case, is that right?

5      A     Yes.

6      Q     Isn't -- now, this event allegedly we are talking

7    about took place February 9th and 10th, 1991, is that

8    correct?

9      A     Say that -- '91?  Say that again, please.

10      Q     The events you said Mr. Marshall has confessed to

11   you about, that took place in February of 1991,

12   February 9th and 10th, is that correct, if you know?

13      A     I don't know -- I don't --

14      Q     So you don't know the date of the event?

15      A     I didn't say that.  Don't put words in my mouth.

16   I'm asking you what you mean.  Say it again.

17      Q     Do you know the date of the event at the liquor

18   store, yes or no?

19      A     Not the actual date.

20      Q     Okay.

21      A     It has been awhile.  I don't recall.  I don't have

22   the papers no more.  I don't have papers in front of me

23   like you do.

24      Q     So, Mr. Marshall gave you papers on this case, is

25   that correct?

Murphy-Cross-Harrison (Marshall)

1

2    A    Yes.

3    Q    And he trusted you, is that correct?

4    A    I trusted him, too.

5    Q    And the event happened in 1991, if you know?

6    A    I don't have papers in front of me.  I don't

7  recall what day it happened.

8    Q    And you first came forward to the District

9  Attorney's Office when; when?

10   A    I'm trying to answer your question.  Can I have a

11  minute, please?

12   Q    Sure.

13            (Pause.)

14   A    A little -- about two months, something to that

15  effect.

16   Q    Two months ago, you came forward?

17   A    Yeah.

18   Q    And of course, you went to the District Attorney's

19  Office because you needed some kind of help with two open

20  cases?

21   A    No, I wasn't incarcerated at that time.

22   Q    So the answer is no, is that correct?

23   A    No to what?

24   Q    That you did not come to the District Attorney

25  because you needed some kind of help, just yes or no?

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5040

```
1                    Murphy-Cross-Harrison (Marshall)

2      A    What type of help, sir?

3      Q    Excuse me?

4                THE COURT: With your cases?

5                THE WITNESS: Oh, I didn't come to him for

6           nothing about my case.  As a matter of fact, I

7           didn't even mention that I had cases.

8      Q    Okay; and when was the last time you spoke to

9  Vita?

10     A    The night my life was threatened.

11     Q    And now, there came a time that you were recently

12 released from jail, is that correct?

13     A    Say that again.

14     Q    When was the last time -- when were you released

15 from jail last, approximately?

16     A    February, yeah, February something.

17     Q    February of 19 what?

18     A    '93.  That's because they let me go.

19     Q    And were you released from jail before or after

20 you spoke to the District Attorney?

21     A    What you mean?

22     Q    You spoke to the District Attorney three months

23 ago, is that correct?

24     A    Yeah.

25     Q    And you were released from jail in February of
```

Murphy-Redirect-Vecchione (Marshall)

1  1993, is that correct?

2     A    Yes.

3     Q    Yes, right?

4     A    Yes, that is correct, I was released.

5     Q    And of course, you and old Mr. Brackett had a

6  conversation, right; you and old Mr. Brackett, right?

7     A    Who is Mr. Brackett?

8            MR. HARRISON: I have no further questions.

9  RE-
   DIRECT EXAMINATION

10 BY MR. VECCHIONE:

11    Q    First of all, Mr. Murphy, 275 Atlantic Avenue

12 where you met Mr. Marshall is a jail, right?

13    A    Yes.

14    Q    It's the Brooklyn House of Detention?

15    A    Brooklyn House of Detention.

16    Q    And you and he were both in jail, is that correct?

17    A    Yes, I was in there first.  He came after me.

18    Q    That's where he asked you to help him?

19    A    With his legal work.

20    Q    And that's where he told you what you told us,

21 right?

22    A    Yes.

23    Q    And that's where you -- by the way, did you ever

24 hear Vita and him cooking up this alibi?

Murphy-Recross-Harrison (Marshall)

1

2      A    On a visit.

3      Q    When you came to me in the DA's office, you

4  weren't incarcerated at that time, were you?

5      A    No.

6      Q    By the way, did Mr. Marshall also ask you to get

7  rid of a gun for him that was used in this case?

8      A    Yes.

9      Q    Did you ever do it?

10     A    No, I got beat up.

11          MR. VECCHIONE:  Thank you.  I have no further

12          questions.

13          THE COURT: Anything further?

14 RECROSS-EXAMINATION

15 BY MR. HARRISON:

16     Q    And after Mr. Marshall asked you to get rid of the

17 gun for him, of course, you went and called the District

18 Attorney's Office, didn't you, yes or no?

19     A    After Mr. Marshall what?

20     Q    Told you to get rid of a gun for him, you went and

21 called the District Attorney's Office, right; said, hey, I

22 have a murder weapon?

23     A    No, that's --

24     Q    Yes or no?

25     A    I'm going to tell you how it happened if I can get

1                      Proceedings

2   a minute.

3       Q    I'm just asking for a yes or no.

4              THE COURT: Just answer that one question.

5   Did you go to the DA or not on that, yes or no.

6              THE WITNESS:  I didn't come to the DA --

7              THE COURT: Yes or no, please, on that

8   question.  Once he told you about the gun, did you

9   go tell the DA about that?

10             THE WITNESS: No.

11             THE COURT: Anything else?

12             MR. HARRISON: I have no further questions.

13             THE COURT: Thanks.  Step down.

14             (Witness excused.)

15             THE COURT: People?

16             MR. VECCHIONE:  At this time, the People

17  rest, judge.

18             THE COURT: Both sides rest.

19             MR. HARRISON: Defense may have -- does not

20  rest, your Honor.

21             THE COURT:  Proceed.

22             MR. HARRISON: The defense would ask time for

23  consideration.

24             THE COURT: How much time do you need to

25  consider?

1                         Proceedings

2          MR. HARRISON: Until tomorrow morning.

3          THE COURT: Come up here and consider it now.

4     Bring back the Cabeza jury.

5          COURT OFFICER: Yes, judge.

6          (Whereupon, there was a discussion at the

7     bench.)

8          THE COURT: Mr. Harrison, Mr. Marshall.

9          MR. HARRISON: The defense rests, your Honor.

10         THE COURT: Thank you.  We will wait for the

11    Cabeza jury and we will tell you what will be

12    happening tomorrow.

13         (Pause.)

14         (Whereupon, the Cabeza jury entered the

15    courtroom.)

16         THE CLERK: Please note for the record that

17    all sworn jurors and alternates on the Cabeza jury

18    are present.

19         THE COURT: Thank you.  Okay, everybody has

20    rested.  There might be a little piece tomorrow

21    morning, I think some kind of a stipulation.  We

22    will see.  If it is there, it is there, if it is

23    not, it is not.

24         In any case, you will not be hearing anymore

25    testimony, you will be relieved to hear.

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-504

1                              Proceedings

2          The next order of business in a criminal

3     trial is what we call summations, closing remarks

4     to jurors made by the lawyers.  Again, just like

5     with openings and with anything else that takes

6     place other than from the witness stand or

7     exhibits, stipulations, what is said in summations

8     is not evidence.  They are allowed to, the lawyers

9     are, to refer to testimony during the trial to

10    make a point.  If their recollection of that

11    testimony differs from your recollection,

12    disregard it.  Adopt your own recollection.  They

13    are permitted to make arguments to you based upon

14    the testimony and the evidence and ask you to make

15    what they consider to be reasonable inferences

16    from that testimony.  So it is like a summation,

17    sum up of the evidence in the case.

18         Now, the way it is going to work, because we

19    have the two juries, is the first thing that will

20    happen is, first of all, I want the Cabeza jury

21    here, will hear the first summations, correct?

22         MR. LONDON:  Correct.

23         THE COURT: So the Cabeza jury, please be here

24    at the usual time, at about 10:15.  We will try to

25    get you out at 10:30, at which time we will hear

Proceedings

1
2    from Mr. Cabeza's attorney, Mr. London, and then

3    we will hear from the DA and his summation on the

4    Cabeza case.

5         We will then probably take a short recess and

6    then we will have the Marshall jury here, but we

7    probably won't hear that summation until the

8    afternoon and maybe not until about 3:15 because I

9    have another thing to do at 2:30 tomorrow.  I will

10   be tied up in the building on something else,

11   maybe for a half hour, forty-five minutes.  So the

12   way to work this, I think, and we can take care of

13   that any additional piece at that time, Mr.

14   Harrison.

15        MR. HARRISON: Yes, your Honor.

16        THE COURT: So there is no sense in having the

17   Marshall jury sitting around here in the morning.

18   Marshall jury agree with that?

19        Okay, but I want you here when I'm ready for

20   you, even though you have to wait, maybe, so don't

21   get mad at me if you have to wait a little bit,

22   but I think it is save to have you folks here, if

23   you are here like between 2 and 2:30 at the very

24   latest, all right, this way I know you are here

25   and if we are ready for you by 3:15 -- what we are

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1                          Proceedings

2          going to do is only hear Mr. Harrison's summation

3          on the Marshall case and we will not hear the DA's

4          summation on Marshall until Monday morning -- we

5          are not going to work Friday on this case -- and

6          then as soon as the DA does the summation on

7          Marshall Monday morning, I will then charge the

8          jury.

9               I have the absolute privilege of charging

10         twice in this case, so what we will do is probably

11         -- and I'll let you know more about this

12         tomorrow, but we will probably charge one jury

13         immediately after, and more than likely the Cabeza

14         jury first, -- it doesn't really make a

15         difference.

16              What I might do, if the Marshall jury is here

17         anyway maybe I will charge Marshall first -- I

18         don't know, I'll let you know tomorrow -- charge

19         one jury in the morning and then after lunch the

20         other jury will be charged.

21              So that if everything works well, on Monday,

22         both juries should begin their deliberations.

23              So just to reiterate for tomorrow, Cabeza

24         jury 10:15, Marshall jury between 2 and 2:30 at

25         the latest in your jury room and we will finish 90

1192

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1      Proceedings

2      percent of this case in terms of the lawyers'

3      participation by tomorrow.

4           All right, so in the meantime, you are still

5      not permitted to talk about this case.  So

6      continue to keep an open mind and do not talk

7      about it with anybody, please.  It becomes now

8      even more important as we get close to the end of

9      this case that you don't do that, all right.

10           See you tomorrow morning.  Have a nice

11     evening.

12           (Whereupon, the Cabeza jury and the Marshall

13     jury left the courtroom.)

14           THE COURT: All right, appropriate lawyers be

15     here tomorrow by 10:30.

16           Mr. Harrison, I guess if you get here about

17     3 o'clock.

18           MR. HARRISON: Yes, your Honor.

19           THE COURT: That will be okay, and hopefully

20     we will be able to get started about 3:15.

21           MR. VECCHIONE:  I want to remind the Court

22     and Mr. Harrison, judge, I don't think he made his

23     motions at the end of the entire --

24           THE COURT: I didn't ask for it because we

25     haven't finished, but I did remember that, but I

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5040

1                          Proceedings

2        may not remember it tomorrow, so please remind

3        me.

4              MR. LONDON:   One minor housekeeping matter,

5        judge.   On the request to charge on what this

6        Court is going to charge this jury.

7              THE COURT: Yes.

8              MR. LONDON:   Obviously, this Court is going

9        to charge an accomplice testimony as it relates to

10       Arnold Stover.

11             THE COURT: I forgot all about that.

12             MR. LONDON:   I know you didn't really forget

13       about that.

14             THE COURT:   No, thank you.  Judges never

15       forget anything.

16             MR. VECCHIONE:   One of those old DA tricks,

17       because there are two young DAs, so --

18             THE COURT: Where is the other young one?

19             Unlike other judges, I always did requests to

20       charge on the record, hearing for the first time,

21       and some judges make a big magilla out of it,

22       which is a French word, right.   Take requests to

23       charge go in chambers, think about it, and I

24       forgot about it, but I'll take whatever requests

25       you want, but certainly I'm going to be charging

```
1                          Proceedings
2       on accomplice, sure, as a matter of law, on the
3       what's his name.
4              MR. LONDON:  Arnold.
5              THE COURT: Arnold Stover.
6              MR. LONDON:  Obviously, I don't want to put
7       the Court on the spot, but I have to sum up
8       tomorrow morning.
9              THE COURT: No, I understand.  You are a
10      hundred percent correct.
11             Any requests that you have, you can make them
12      now.
13             MR. LONDON:  As it relates to the accomplice
14      testimony, judge, is it my understanding that the
15      Court is going to charge he is an accomplice as a
16      matter of law and that his testimony by itself is
17      not enough to convict my client and they must find
18      independent corroboration beyond a reasonable
19      doubt before they can return a verdict of guilty
20      in this case?
21             THE COURT: They must find, yes, he is an
22      accomplice as a matter of law and his testimony
23      would need to be corroborated, absolutely.  And
24      the testimony taken as a whole would have to prove
25      his guilt beyond a reasonable doubt.
```

| | |
|---|---|
| 1 | Proceedings |
| 2 | MR. LONDON:  Fine.  Okay.  The only other |
| 3 | request to charge I would have would be that of |
| 4 | eyewitness testimony also, judge. |
| 5 | We have Mendez and Rivera who allegedly see |
| 6 | my guy walking out after it occurs.  Does that |
| 7 | rise to the level that this Court feels eyewitness |
| 8 | testimony would be charged? |
| 9 | THE COURT: If you believe that they know him, |
| 10 | and I'm not sure that was seriously contended, |
| 11 | even by you, that they didn't know him. |
| 12 | MR. LONDON:  No, it was not. |
| 13 | THE COURT: It is not an issue in the case. |
| 14 | I think your argument probably would be, and |
| 15 | of course, it is your choice, more directed |
| 16 | towards their motivation to do this, maybe what |
| 17 | Mr. Cabeza said, they don't like their buddies to |
| 18 | have become cops.  I don't know. |
| 19 | It is buyable, it is a believable point.  The |
| 20 | jury may not, but I don't think your emphasis |
| 21 | would be as to ID. |
| 22 | MR. LONDON:  No, it is not. |
| 23 | THE COURT: So I don't think you would be |
| 24 | entitled to any strong identification charge, |
| 25 | other than  to say that identification in any case |

*(handwritten annotation on line 9-10: "contested?")*

1          Proceedings

2     must be proven beyond a reasonable doubt as the

3     case law -- I think it was Whalen that tells us we

4     have to do it, People versus Whalen.

5          MR. LONDON;  Do you have a separate charge as

6     it relates to witnesses who testify with felony

7     convictions?

8          THE COURT: No, no, what I basically tell

9     jurors is, you have heard testimony here from a

10    number of witnesses who have indicated a number of

11    times that they have been convicted of illegal

12    acts, convictions of felonies misdemeanors and

13    whatever, and I tell them they can consider that

14    and should consider that as bearing on their

15    credibility, but I don't have a specific felony

16    conviction charge.

17         MR. LONDON:  Fine.  I have one other point

18    then, judge.

19         My client testified in this case.  His sister

20    and his mother did not testify.  Will the

21    prosecution be allowed to comment during his

22    summation on the failure of Mr. Cabeza to call his

23    sister and mother to testify that he was home with

24    them during his summation?

25         THE COURT: I won't let him.

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5040

1       Proceedings

2           MR. LONDON:  Fine, I want that on the record.

3           MR. VECCHIONE:  You will not let me, judge?

4           THE COURT: No.

5           MR. LONDON:  That was my point.

6           THE COURT: I am going to charge that he's an

7       interested witness as a matter of law.

8           MR. VECCHIONE:  Judge, can I ask the Court as

9       to why I'm precluded from testifying -- commenting

10      on that?

11          THE COURT: Testify as to what?  What is your

12      argument, that they should have come forward and

13      testified on his behalf?

14          MR. VECCHIONE:  Not necessarily that.

15          THE COURT: Was he with them that night?

16          MR. VECCHIONE:  Not necessarily, but that

17      they are allowed to consider, as well, the lack of

18      evidence.

19          THE COURT: The defendant is not obligated to

20      do a thing.

21          MR. VECCHIONE:  But he has put this in issue.

22          THE COURT: No, no, what has he put in issue,

23      he's put in issue the fact that he was -- that

24      night, he was home, decided to walk his dog.  He

25      hasn't raised an alibi defense here.

1                          Proceedings

2              MR. VECCHIONE:  He has said --

3              THE COURT: There wasn't even timing on the

4    thing, that he was for sure with his mother and

5    sister at all times.

6              MR. VECCHIONE:  That is correct.

7              THE COURT: At least, even Mr. Marshall got

8    the witness to say, and the jury to believe it --

9    I don't know -- but they had Mr. Brackett testify

10   that specifically at the time of the shots, he

11   then turned around and say, hey, come here,

12   whatever he said, from the other room, and at

13   least the actual incident is covered.

14        I mean, what do you want to ask him?  I mean,

15   what do you want to argue to the jury?  You want a

16   missing witness charge?

17             MR. VECCHIONE:  I don't know, maybe you would

18   consider it.

19             THE COURT: No, I wouldn't, would not.  I

20   don't think you are entitled to that at all, Mr.

21   Vecchione.

22        If it was raised in some, for example, if he

23   testified specifically as to an alibi that, for

24   example, he heard shots also and came running down

25   the street, almost immediately afterwards, and

1199

1          Proceedings

2    that just before those shots, he was having tea

3    with his sister or with his mom or whatever,

4    specifically setting up an alibi, and then they

5    don't testify, I might have some reason to adopt

6    that reasoning.

7         MR. VECCHIONE:  Judge, I would remind the

8    Court it was Mr. London who asked the question,

9    did you do this, where were you.  Mr. Cabeza gave

10   some answer he didn't, like, I'm assuming, and

11   then Mr. London said, weren't you at the apartment

12   to get the dog, and then he said, oh, yeah, I had

13   to go up in the apartment when this happened.

14        That's what he said.  That's what he

15   testified to.  I didn't ask the question, Mr.

16   London asked the question.  I elaborated on it on

17   cross-examination.

18        THE COURT: I don't specifically recall

19   testimony that he was both with his mother and his

20   sister at the very time the incident occurred.

21        MR. VECCHIONE:  Judge, you're correct,

22   precisely, that question and answer, you are

23   absolutely correct.  Mr. London, however, hooked

24   it up very nicely, I might add, perhaps because he

25   was going to argue this to you at this point, but

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1               Proceedings

2    clearly, the implication was at the time this

3    happened, at around midnight or thereabouts,

4    around the 9th or 10th of February when it was

5    turning into the 10th, where were you?  Cabeza

6    didn't answer too well.  He then said, well, do

7    you remember going up to get the dog?  He said,

8    oh, yeah, I was in the apartment.  I had to be in

9    the apartment at that time because I later walked

10   the dog.

11     THE COURT: That doesn't mean that these two

12   witnesses -- and you don't know the answer because

13   you never interviewed the mother or sister, did

14   you?

15     MR. VECCHIONE:  Judge, I asked him who was

16   there at that time and he said his mother and his

17   sister were home.  Did they see you there?  I

18   asked that specifically, did they see you there?

19   His answer was, yes, they did.

20     THE COURT: Do you have the testimony or

21   statements from those two witnesses?

22     MR. VECCHIONE:  No, I don't, judge.

23     THE COURT: As to what may have occurred that

24   night?

25     MR. VECCHIONE:  Judge, I don't, but what does

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1           Proceedings

2    that have to do with me at this particular issue

3    here?  It is Cabeza who put this into issue, not

4    me.  He put it in.

5         THE COURT: Cabeza has said, as I recall, that

6    he was home and decided to walk his dog and came

7    upon the scene; didn't he say that?

8         MR. LONDON:  That is correct.

9         MR. VECCHIONE:  But Mr. London said to him

10   the predicate question -- there goes that word

11   again -- the question before was, where were you

12   when this happened?  Do you remember what you were

13   doing when this happened on the 9th or 10th.  No,

14   I don't, I don't remember.  Do you remember being

15   in the apartment with the dog?  Oh, yes, I

16   remember that because I had to be there because I

17   later walked the dog.  That's what he testified to

18   judge.

19         MR. LONDON:  Judge, I asked him --

20         MR. VECCHIONE:  What do you think he was

21   talking about, an hour later?  Why did you ask him

22   where he was an hour later?  He's going to ask

23   him, where were you when the crime occurred.

24   That's what the purpose of those questions were.

25         Then I followed up and said, was your sister

1       Proceedings

2    and mother home at that time? Yes. Did they see

3    you? Yes, they did. That's what I asked. What

4    are we talking about?

5        THE COURT: At the time of the incident?

6        MR. VECCHIONE:  Yes, judge.

7        THE COURT: Or at some portion during the

8    evening?

9        MR. VECCHIONE:  At the time of the incident

10   is what I asked based upon the follow-up, based as

11   a follow-up to Mr. London's direct examination.

12       MR. LONDON:  Judge, I asked him where he was

13   before he walked the dog. He said, well, I must

14   have been in the house because that's where the

15   dog was.

16       THE COURT: He had to get the dog.

17       MR. LONDON:  Yeah, I had the dog, I brought

18   the dog down.  I stayed away from midnight, from

19   11:30, from 1, from 12:30.  There is no indication

20   in the record of anything about specifics about

21   time.

22       THE COURT: Well, look in the record.  If

23   there is any specifics as to the exact time, I

24   will reconsider my decision, but if it is a vague,

25   general questioning, and maybe that was the fault

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5040

1          Proceedings

2     of somebody here.  They should have zeroed in on

3     it.  Are you saying at the have time as far as you

4     know -- in other words, were you home with your

5     sister and mother and they saw you and you were

6     talking with them, as far as you know, when this

7     incident occurred.

8          MR. LONDON:  That was not asked.

9          THE COURT: If, in fact, it was covered as it

10    was with Marshall, then it might be an issue I

11    would allow you to comment on, but other than

12    that, I'm not going to permit it.

13         What else?  Do you have any other requests?

14         MR. LONDON:  No.

15         THE COURT: Do you have any requests?

16         MR. VECCHIONE:  I assume your Honor is going

17    to give the standard charge on the issues of law

18    and then I will make a decision as to whether or

19    not we will dismiss any of the counts.

20         THE COURT: Yes, I want to do that.  Make sure

21    he knows because he may want to argue certain

22    counts more vigorously than others.

23         Do you want to make a request to charge?

24         MR. HARRISON: Yes, I would make a request for

25    the identification charge, your Honor.  No one

1          Proceedings

                                    has
2    here, as far as Mendez and Rivera, have any tie-in

3    to my client.  Mendez never even pointed to my

4    client, never identified him, Collins never

5    identified him and Rivera is now making an

6    identification from the witness stand almost two

7    years later and --

8         THE COURT: Rivera indicated he knew your

9    client.

10        MR. VECCHIONE:  Yes.  Judge.

11        MR. HARRISON: He said he saw him a few times,

12   your Honor.

13        THE COURT: You are not entitled to an

14   identification charge under those circumstances.

15        As far as people not identifying him in the

16   court, why get involved.  Of course, the jury will

17   be told identification must have proven beyond a

18   reasonable doubt as a general concept, but if you

19   have witnesses that are testifying that they know

20   your client from a prior occasion, a simple

21   identification charges.  You wouldn't be entitled

22   to the more extensive Daniels-type charge because

23   the danger of mistaken identification is not

24   here.  That's not the argument.

25        The argument, it would seem, from both sides

1                           Proceedings

2        that I have heard is not that they made an error

3        because they were inaccurate, they didn't get the

4        right description, they didn't see, the lighting

5        conditions and the whole routine.  I don't think

6        that is your argument.  I think your argument is

7        that they are doing what they are doing because

8        they cut deals for themselves.

9            So if that is your argument, then what are we

10       getting into identification for, other than to

11       give a general premise as you are entitled to

12       under the law.

13           MR. HARRISON:  If I may, your Honor, my

14       argument with Rivera is that he saw the wrong

15       man.  My argument with Rivera, and I will reveal

16       it at this juncture, is he said there were two

17       people in the store, not three.  He never saw the

18       third.  Mr. Marshall was allegedly a lookout.  So

19       now he sees two people coming out of the store, he

20       testifies, I believe, that there was a problem

21       with the lighting.

22           He testifies that he's smoking marijuana and

23       drinking alcohol, and it is quite obvious when you

24       put the entire picture together, the entire

25       scenario, the res gestae, it is quite obvious he's

1206

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5040

1          Proceedings

2     pointing to the wrong man and calling him Mr.

3     Marshall, because Mr. Marshall, if you were to

4     accept Stover's testimony, did not leave the store

5     with him, and if you were to accept Collins's

6     testimony, he was never in the store, and if you

7     accept Mendez's position, he wasn't even there.

8          THE COURT: What was Rivera's testimony as to

9     his prior knowledge of your client?

10         MR. HARRISON: He said he saw him a few times

11    in the neighborhood.  That's what he said.

12         THE COURT: I'll give you the general charge

13    on identification which is very simple.  I may

14    expand a little bit to give a couple of facts to

15    the jury because of Rivera, but that's it.  You

16    are not getting a Daniels-type charge.

17         MR. HARRISON: I would ask for reconsideration

18    after my summation and the People's summation.

19         THE COURT: You can always make another

20    request for the Court to charge at any time, even

21    after I charge, but as of now, I'm denying any

22    expanded Daniels-type charged on identification,

23    but you might be entitled to something more than

24    the pro forma one or two lines that the Court of

25    Appeals says are sufficient in cases that don't

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1                     Proceedings

2   involve identification as a serious issue.

3       MR. HARRISON: I have one other issue that I

4   am pondering.

5       THE COURT: We may have lesser included

6   offenses that we have to consider.  Anybody going

7   to ask about those?

8       MR. LONDON:  I'm not.

9       THE COURT: You don't want any lesser included

10   offenses?

11       What about you?

12       MR. HARRISON: No.

13       THE COURT: What about the DA?

14       MR. VECCHIONE:  No, judge.

15       THE COURT: That's interesting.  What else?

16       MR. HARRISON: I'm crossing Mr. Cicero

17   Murphy.  He's telling me in Q and A that he

18   informed the DA's office three months ago about my

19   client's alleged statements to the District

20   Attorney's Office.

21       MR. VECCHIONE:  I think, to be accurate, he

22   said two months ago.

23       MR. HARRISON: I would ask why I'm never

24   informed until the very last second when I proffer

25   forth Benjamin Brackett in good faith, months and

1208

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1                      Proceedings

2     months and months ago, now I'm faced with Cicero

3     Murphy at the last minute without the jury ever

4     knowing he's going to be produced.

5         I just would like to let the Court know from

6     the defense's position, that it is quite

7     upsetting.

8         THE COURT: Well, you can be upset, but where

9     is the obligation on the DA to tell you he has

10    found out your witness may be lying?

11        MR. HARRISON:  We produced a witness list.

12    He knew about this man two months ago.  If I was

13    to accept Cicero Murphy's testimony, he knew about

14    Ben Brackett from the get up and go.

15        THE COURT: You are saying the DA has an

16    obligation to come in and say, hey, I crushed your

17    alibi, don't put the witness on?

18        MR. HARRISON: Well, not only was it an alibi

19    crush, he's saying that it is another confession

20    involved here.  I mean, we talked about alibi,

21    okay.  Now, we are talking about another totally

22    unrelated confession that now suddenly I'm hearing

23    about.

24        THE COURT: It is not a confession, it's a

25    third-party admission, and not to law enforcement,

1209

1                              Proceedings

2          but it does possibly rub a little bit that if you

3          may have known of any additional admissions, that

4          you didn't say anything at all or reveal anything

5          else in this case.

6                MR. VECCHIONE:  That's true, judge.  I didn't

7          reveal the admissions of John Stover.

8                THE COURT: Were you aware of the admissions

9          that Murphy would testify to?

10               MR. VECCHIONE:  Yes.

11               THE COURT: Because, very frankly, and again,

12         I'm not finding that you did anything a hundred

13         percent inappropriate here, but maybe, even twenty

14         percent inappropriate, but even at our discussions

15         at the bench when we talked about the rebuttal

16         witness, you never said anything about that there

17         might be a third-party admission involved here.

18               MR. VECCHIONE:  Judge, except that I had to

19         do that in the context of where they were at the

20         time that this conversation takes place in terms

21         of busting the alibi or setting up the alibi.

22               THE COURT: I'm not too sure you had to throw

23         that in.  Frankly, you could have accomplished or

24         tried to accomplish it without that, and what he's

25         saying is he got snookered a little bit.

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5040

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-50

1          Proceedings

2          As far as the alibi, I don't think he has any

3     obligation.   Anybody disagree with that?

4          You go forward with what you want to go

5     forward with, and he has to do what he has to do,

6     so I don't know if you are making that argument,

7     You feel a little bit -- you used an expression

8     that was rather dramatic.   I don't think I'd go

9     that far, but I can see as a lawyer, that would

10    upset you, but, hey, this is a tough ballgame,

11    right?

12         MR. HARRISON: Absolutely, your Honor.

13         THE COURT: So on that, you are not on any

14    legal standing.   I don't think you have any

15    serious legal standing on the other issue, except

16    it would have been maybe more forthcoming for him

17    to let you know or certainly let the Court know.

18         We were talking about what this witness would

19    testify to, that it was more than -- because I was

20    surprised that that came out.   I did not expect

21    that.   I thought I was going to hear all I heard

22    about concocting of an alibi, not that he also

23    made admissions.

24         MR. VECCHIONE:   To tell you, in all honesty,

25    judge, I did not intend to do that until I heard

1211

1          Proceedings

2      the entire story again and felt that it was

3      necessary for the context.

4          THE COURT: Okay, any other requests?

5      Tomorrow morning, if you have any, you can make

6      more.

7          MR. LONDON:  I assume the Court has no intent

8      on marshalling any of the evidence.

9          THE COURT: Do you want me to?

10         MR. LONDON:  I do not.

11         THE COURT: Then I won't.

12         How about you?  Do you want me to marshall.

13         MR. HARRISON: I don't want to you marshall

14     for Marshall.

15         THE COURT: Good night.

16         MR. HARRISON: I will be here about 2:30.

17         THE COURT: Come as early as you want.  Just

18     be here no later than 3.

19         THE COURT: Is it possible for my client to

20     say hello with Miss McGee?

21         THE COURT: Yes.  Is it all right with you,

22     Sergeant.

23         COURT OFFICER: Yes.

24         (Whereupon, the proceedings were adjourned to

25     March 18, 1993.)

```
 1                          Proceedings

 2

 3              It is hereby certified that the
           foregoing is a true and accurate
 4         transcript of the proceedings.

 5                    [signature]
                 ELLEN GIANOULAKOS, CSR, CM
 6               OFFICIAL COURT REPORTER
                 SUPREME COURT-KINGS COUNTY
 7

 8               BETH CICERO,
                 OFFICIAL COURT REPORTER
 9               SUPREME COURT-KINGS COUNTY

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*[handwritten note:] Marshall has rest from here including motion 330.00 re: Murphy*