# EXHIBIT B
# (Part 1)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X      Docket#
JEFFREY MARSHALL,                :    98-CV-1606
              Plaintiff,         :
                                 :
   - versus -                    :    U.S. Courthouse
                                 :    Brooklyn, New York
CHARLES GREINER, et al.,         :
              Defendant          :    July 25, 2002
------------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR EVIDENTIARY HEARING
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:


For the Plaintiff:           **Bruce Barket, Esq.**




For the Defendant:           **Caroline Donhauser, Esq.**
                             **Paul Demartini, Esq.**



Official Transcriber:        **Rosalie Lombardi**


Transcription Service:       **Transcription Plus II**
                             823 Whittier Avenue
                             New Hyde Park, N.Y.  11040
                             (516) 358-7352



              Typist:        **Linda Ferrara**



Proceedings recorded by electronic sound-recording,
transcript produced by transcription service



Proceedings                                    2

1          THE CLERK:  Civil Cause for a Habeas

2     Corpus Evidentiary Hearing, Marshall v.

3     Greiner, docket number 98-CV-1606.

4          Counsel, please state your appearances

5     for the record.

6          MR. BARKET:  For Mr. Marshall, Bruce

7     Barket, B-a-r-k-e-t.

8          Good afternoon, Judge.

9          THE COURT:  Good afternoon.

10          MS. DONHAUSER:  And for the

11     respondent, Caroline R. Donhauser,

12     D-o-n-h-a-u-s-e-r.

13          MR. DEMARTINI:  Paul Demartini

14     D-e-m-a-r-t-i-n-i.

15          THE COURT:  Why don't you have the

16     witness come in and take a seat.

17          Did you get your boots back?

18          THE DEFENDANT:  They argued with me

19     again last night, Judge.

20          THE COURT:  But did they give it to

21     you -- you're wearing them now.

22          THE DEFENDANT:  Yeah, he said no order

23     was there.  Some Lieutenant, I guess -- he

24     wear a white shirt -- if I'm not mistaken, it

25     was a white shirt, he said when the judge

Transcription Plus II          Rosalie Lombardi

Proceedings                    3

1   gives an order, then there won't be no more

2   problem but if you ain't got an order,

3   (inaudible).

4            My leg swelled up and something was

5   wrong.  He said, you're going to court in the

6   morning, you better have an order.

7            MR. BARKET:  Apparently, he left the

8   boots on last night.

9            THE COURT:  They did?

10            MR. BARKET:  They did leave the boots

11   on.

12            THE COURT:  Okay.

13            THE DEFENDANT:  They took them but

14   they didn't --

15            THE COURT:  They gave them back.

16            THE DEFENDANT:  You see my leg is

17   swollen up.  They want the Court to make an

18   order.

19                 (Pause in proceeding)

20            THE COURT:  Let's go.

21            THE COURT:  Do you want to state your

22   name.

23            THE WITNESS:  Yes, Michael, middle

24   initial F, last name Vecchione,

25   V-e-c-c-h-i-o-n-e.

Transcription Plus II        Rosalie Lombardi

Vecchione - Direct - Barket                    4

1          MR. BARKET:  May I proceed, Judge?

2          THE COURT:  Go ahead.

3    DIRECT EXAMINATION

4    BY MR. BARKET:

5        Q.  Good afternoon, sir.

6        A.  Good afternoon.

7        Q.  You are currently employed with the

8    Kings County District Attorney's Office?

9        A.  Yes, I am.

10       Q.  How long have you been so employed?

11       A.  Presently, almost ten years -- a

12   little over ten years.

13       Q.  And what's your current position?

14       A.  I'm chief of the rackets division.

15       Q.  And in 1993, what was your position?

16       A.  I was in the homicide bureau.  It was

17   called the trial cadre then and I was in

18   charge of homicide trials.

19       Q.  Okay.  You say a trial cadre.  Is that

20   another term for bureau?

21       A.  Yeah, it was just the district

22   attorney's name for that group of people.

23       Q.  Okay.

24           And you were the prosecutor who tried

25   the case of Robert Cabeza and Jeffrey

Vecchione - Direct - Barket                    5

1    Marshall?

2         A.   Yes, I was.

3         Q.   Did anyone assist you at that or did

4    you do it yourself?

5         A.   I had co-counsel, Sean Courtney, who

6    is another assistant DA in the office.

7         Q.   And Mr. Hollman, did you see him here

8    yesterday, by the way?

9         A.   Yes, I did.

10        Q.   What was his relationship with you

11   professionally in 1993 and 1994?

12        A.   I don't know what -- when Mr. Hollman

13   came into the office but when he did come into

14   the office, he was an assistant in the bureau

15   that was in charge of.

16        Q.   So, he worked under you?

17        A.   Yes.

18        Q.   Have you had a chance before coming to

19   court today to look over the files that are

20   relevant to this case?

21        A.   Some things; yes.

22        Q.   And there was some effort to made to

23   go through and respond to the subpoena I did.

24   Did you do that or was that done by somebody

25   else?

Transcription Plus II            Rosalie Lombardi

Vecchione - Direct - Barket                                    6

1      A.    It was not done by me.

2      Q.    If I showed you notes from that file,

3   would you be able to recognize your

4   handwriting and the other people's handwriting

5   there?

6      A.    I think so.

7      Q.    Do you remember from memory when your

8   first contact with Cisco Murphy was?

9      A.    Yes, I would say that it was about a

10  month before the trial.  I would say that it

11  was some time in February of 1993.

12     Q.    And where did that meeting take place?

13     A.    The actual meeting took place in my

14  office in the municipal building in downtown

15  Brooklyn.

16     Q.    And how was that meeting arranged, if

17  you know?

18     A.    It wasn't arranged.  I was in my

19  office and I received a phone call from a

20  colleague of mine who was in another office;

21  the district attorney's office was spread

22  amongst several buildings at the time.

23          And he was an assistant.  His name is

24  Bjornabe (phonetic) and he was an assistant in

25  another bureau in the office but he was in 16

Vecchione - Direct - Barket                      7

1   Court Street, which was about a block and a

2   half, two blocks away from the municipal

3   building.

4            He told me that there was someone

5   there who was obviously looking for me but had

6   somehow been directed to him and that he had

7   something to talk to me about with regard to

8   the Cabeza case and said he was going to send

9   him over; was I able to see him.  I said send

10  him over and he did.

11       Q.   And how long did that meeting take

12  place?

13       A.   The meeting with Ciscro?

14       Q.   Yes.

15       A.   I don't really have a recollection.  I

16  don't know.

17       Q.   And what did Mr. Murphy tell you at

18  that time, if you recall?  Sum and substance.

19       A.   He told me that he knew that I was the

20  prosecutor on the case involving Cabeza and

21  Marshall and he told me that he had

22  information to give me with regard to

23  Marshall.  I believe that he told me that he

24  was in jail or had been in jail with Marshall

25  at some point.  And that he had some paralegal

1   background.  He, meaning Murphy, had some

2   paralegal background and that he was working

3   with Marshall on his cases.

4          And that he said to me that he knew

5   that in the Cabeza case that there was going

6   to be some sort of alibi defense.  I believe

7   he told me that Marshall's father was going to

8   testify to an alibi that he was somewhere

9   other than outside the liquor store where the

10  homicide occurred.

11         And that he knew that becuase he

12  helped prepare it or helped -- he listened to

13  it or helped prepare it in some way.

14     Q.   Did he mention anything about the

15  pending criminal cases he had?

16     A.   He told me that he had pending

17  criminal cases, the extent of which I am not

18  sure.  I don't remember what he told me at the

19  time but I know he told me he had some -- he

20  had criminal cases pending.

21     Q.   Did you take any notes of that

22  meeting?

23     A.   I think the only notes that I took

24  were contact information.  His name, his

25  address, that kind of thing.  I may have taken

Vecchione - Direct - Barket                    9

1    his lawyer's name down but I did not take
2    anything in substance down as to what -- I
3    didn't take anything of the substance of what
4    he was telling me.
5         Q.    When was the next point --
6              THE COURT:  And when in point of time
7    was that?
8              THE WITNESS:  I'm sorry, Judge?
9              THE COURT:  When in point of time was
10   this meeting?
11             THE WITNESS:  In relation to the
12   trial?
13             THE COURT:  In relation to the trial,
14   yes.
15             THE WITNESS:  It was about a month
16   before the trial, I believe.  It was in
17   February.
18             THE COURT:  So, when this meeting
19   occurred, had he already been charged with
20   rape?
21             THE WITNESS:  Yes.
22             THE COURT:  Okay.  And it was -- this
23   was the meeting that was held at his request?
24             THE WITNESS:  It was the meeting that
25   was held as a result of him showing up at

Transcription Plus II        Rosalie Lombardi

Vecchione - Direct - Barket                    10

1   another part of the DA's office and then he

2   was ultimately directed to me.

3              THE COURT:  Okay.

4              THE WITNESS:  Yes.

5        Q.   Did you ask him who his lawyer was in

6   the pending cases?

7        A.   I probably did but I -- you know, I

8   don't recall exactly every part of the meeting

9   but I probably did.  I think I would have.

10       Q.   Could you take a look at -- I assume

11  that the --

12             MS. DONHAUSER:  If you can just show

13  me what you're going to show him.

14             MR. BARKET:  Well, I don't know, but

15  the original note.  I don't know what his

16  handwriting is.

17       Q.   Your notes from that meeting, you said

18  there were some notes, some contact

19  information?

20       A.   Yes, I believe so.

21       Q.   Did you -- have you looked at that in

22  the last --

23       A.   Yes.

24       Q.   -- couple of days --

25       A.   Yes.

Vecchione - Direct - Barket                    11

1            MS. DONHAUSER:  Excuse me.

2     Q.    -- in preparation for your testimony?

3     A.    Yes.

4            MS. DONHAUSER:  Can you --

5            MR. BARKET:  It might be easier if he

6     identifies it, rather than -- you know --

7            MS. DONHAUSER:  All right.  Is there

8     something that you want to --

9            MR. BARKET:  Yes.

10           MS. DONHAUSER:  If you want to --

11           MR. BARKET:  I just don't know which

12    one.

13           MS. DONHAUSER:  You think that might

14    be it but you can ask.

15           MR. BARKET:  Okay.

16           Could I, Judge, mark it?

17           THE COURT:  Yes, go ahead.  There it

18    is.  There's the sticker.  The white sticker

19    right there.

20           MR. BARKET:  Right here?

21           MS. DONHAUSER:  And you have a copy of

22    that, Bruce?

23           MR. BARKET:  I think I do, yes.

24           MS. DONHAUSER:  Yes.

25           MR. BARKET:  I think we're up to 7,

Vecchione - Direct - Barket                    12

1    Judge.

2    (Petitioner's Exhibit 7 marked for

3    identification)

4         MR. BARKET:  Is it okay if I just put

5    this right into evidence?

6         THE COURT:  Yes.

7         MS. DONHAUSER:  I guess.

8         THE COURT:  All right.  It's in

9    evidence.

10   (Petitioner's Exhibit 7 marked in evidence)

11   BY MR. BARKET:

12       Q.  Can you take a look at what's been

13   marked as Petitioner's 7.

14       A.  Yes.

15       Q.  Do you recognize the handwriting?

16       A.  Yes.

17       Q.  Is that your handwriting?

18       A.  Yes.

19       Q.  Okay.

20           Now, are those the notes you took from

21   that initial meeting?

22       A.  Yes, I think that there are things on

23   here that I -- that were put on this piece of

24   paper after the meeting.  For instance, he was

25   -- I don't think I put everything -- I don't

Vecchione - Direct - Barket                    13

1    think everything that's on here came about as

2    a result of that particular meeting.

3           The pencil marks, the pencil -- the

4    things that are in pencil, certainly did.  I

5    don't recall when I wrote down an inmate

6    number in the Brooklyn House of Detention, 8th

7    Floor, 8 lower.  I don't recall when I did

8    that but the handwriting is mine; yes.

9       Q.   Well, he clearly wasn't in the

10   Brooklyn House at that time.

11      A.   No, he wasn't, he was sitting across

12   my desk.

13      Q.   Now in the upper right hand corner of

14   that document, there are some indications of

15   an attorney Juan Fiol --

16      A.   Yes.

17      Q.   -- with a phone number.

18      A.   Yes.

19      Q.   What does that say?

20      A.   Lawyer Juan -- it's spelled here,

21   F-o-i-l.  I think it's F-i-o-l, in -- that's

22   the correct spelling but I believe that he

23   gave me that.

24          And there's a telephone number which I

25   recognize as being a Legal Aid telephone

Vecchione - Direct - Barket                              14

1    number at the time and it says Legal Aid on

2    it.

3         Q.   So, does that refresh your memory as

4    to whether or not ---

5         A.   Yeah, I think it --

6         Q.   -- he -- you actually did ask for --

7         A.   Yes.

8         Q.   ---- and received his lawyer's phone

9    number?

10        A.   Yes.

11        Q.   Can I just seek that for a second?  I

12   want to find my copy of that.  Thank you.

13             THE COURT:  You don't have to do that.

14   Just ask from that document.  You don't have

15   to worry about a search for your copy.  What

16   difference does it make?

17        Q.   There's also a notation here that says

18   parole -- it looks like parole officer with a

19   name and number.

20        A.   Yes.

21        Q.   Okay.

22             Does that indicate that he also told

23   you he was on parole at the time?

24        A.   Yes.

25        Q.   And there's an ADA name written in

Transcription Plus II          Rosalie Lombardi

Vecchione - Direct - Barket                    15

1   pen --

2       A.   Uh-huh.

3       Q.   -- with sex crimes written next to it

4   in pencil.

5       A.   Yes.

6       Q.   Who is that?

7       A.   Avery Melman (phonetic) is the name of

8   the assistant and I believe that he was the

9   assistant in sex crimes who had the case --

10  who had Murphy's case.

11      Q.   Do you know the next time that you met

12  with Mr. Murphy?

13      A.   I believe the next time I met with him

14  was the day that he testified in the Cabeza

15  trial.

16      Q.   Did you prepare any orders to produce,

17  to have him brought over from the Brooklyn

18  House of Detention?

19      A.   For that day?

20      Q.   Yes.

21      A.   I must have.  I --

22      Q.   How about for any other day?

23      A.   Yes, I believe so.  I've seen -- in

24  preparation for this, I've seen some orders

25  that were prepared; yes.

Transcription Plus II          Rosalie Lombardi

Vecchione - Direct - Barket                    16

1      Q.    Sorry.

2            Now, could I -- March 17 is day he

3      testified; right?

4      A.    Yes.

5      Q.    Do you recall that being a Wednesday?

6      A.    No, I don't recall the day of the

7      week; no.

8      Q.    Judge, I checked -- I have a universal

9      calendar.  It's a -- I would ask the Court to

10     take judicial note, it's --

11           MS. DONHAUSER:  We agree.

12           MR. DEMARTINI:  We checked also.  It's

13     a Wednesday.

14           MS. DONHAUSER:  We also checked.  The

15     17th was a Wednesday.

16     Q.    Could you take a look at what I've

17     marked as Petitioner's 8 and 9 and I'm going

18     to ask you if these are two orders to produce

19     that you prepared?

20           MS. DONHAUSER:  We're looking at two

21     orders to produce.

22     A.    They were orders to produce --

23     Q.    When I say prepared, did you sign

24     them?

25     A.    One of the two; yes.

Transcription Plus II          Rosalie Lombardi

Vecchione - Direct - Barket                    17

1        Q.    And which one would that be?

2        A.    Number 9.

3        Q.    And that requests Mr. Murphy's

4   production for what day?

5        A.    The 12th of March.

6        Q.    That would be that Monday?

7        A.    I don't know.

8        Q.    Excuse me, no.  That would be the

9   Friday before, March 12.

10            MS. DONHAUSER:  March 12 --

11            MR. DEMARTINI:  Is the Friday.

12            MS. DONHAUSER:  -- is a Friday.  We

13   stipulate to that.

14        Q.    So, you put in a request that

15   Mr. Murphy be brought over from the jail on

16   March 12.  Did you meet with him on that day?

17        A.    I don't recollect meeting with him,

18   other than the two times that I've just told

19   you.

20        Q.    But that is an order to produce to

21   have him brought over on that day.

22            Is that right?

23        A.    It's an order to produce to take him

24   out of the Brooklyn House of Detention; yes.

25        Q.    Was he taken out of the Brooklyn House

Vecchione - Direct - Barket                    18

1    of Detention?

2         A.   On which day?

3         Q.   March 12.

4         A.   I have no recollection of that.

5         Q.   What was the process at the time, once

6    you got -- fill out the order to have him

7    taken out, what would have happened to him?

8         A.   Depending on what he was being taken

9    out for.

10        Q.   Well, what would he have -- what were

11   you having him taken out for on the 12th?

12        A.   There were only two -- there would

13   only be two purposes; one for me to speak to

14   him in my office in preparation for his

15   testimony or to be taken out to be brought to

16   the courthouse to testify.

17        Q.   Now he was going to be an alibi

18   rebuttal witness.

19             Is that correct?

20        A.   Yes.

21        Q.   So, there would have been no purpose

22   for him testifying until after Mr. Brackett

23   had testified.

24             Is that correct?

25        A.   That's correct.

Vecchione - Direct - Barket                    19

1      Q.   Do you recall what date Mr. Brackett

2    testified?

3      A.   I believe he testified the same day as

4    Mr. Murphy.

5          MR. BARKET:   Could I have the

6    originals of this, please?   In the meantime,

7    let me just --

8      Q.   The copy -- was it the practice of

9    your office to save all the signed copies of

10   the orders to produce or did you save copies;

11   sometimes you signed them, sometimes you

12   didn't?

13     A.   Well, that's two different questions.

14   What are you asking me?   I'm not sure what

15   you're asking me.

16     Q.   In other words, you said that the

17   order to produce for the 12th, the copy that

18   was found in your file, what you signed on

19   March 11.

20          Is that correct?

21     A.   Yes.

22     Q.   Now on March 11 --

23          THE COURT:   Could you just help me

24   because I was talking to my law clerk.   The

25   significance of March 11 --

Transcription Plus II        Rosalie Lombardi

**Vecchione - Direct - Barket** 20

1        MR. BARKET:   That's the date he signed

2   the order to produce for March 12.

3        THE COURT:   Which was the date of the

4   -- the date that -- what happened on the 12th?

5        MR. BARKET:   The 12th was Friday.

6   Mr. Murphy didn't testify until the 17th.

7        THE COURT:   I see.

8   BY MR. BARKET:

9    Q.   Now also on the second exhibit, which

10  is Petitioner's 8, asked that Mr. Murphy be

11  produced on March 15, that copy is unsigned.

12        Is that right?

13    A.   This copy that you're showing me now?

14    Q.   Yes.

15    A.   Yes, this is unsigned; yes.

16    Q.   Does that mean that he never signed

17  it, you never made the request that be

18  produced on Monday or that an unsigned copy

19  was stuck in the file and you signed the

20  original for the Court?

21    A.   I don't know.   It could be either.

22    Q.   Could you look at the last page of

23  that document?

24    A.   Yes, I've seen it.

25    Q.   What is that?

Vecchione - Direct - Barket                     21

1       A.   This is a work order that the
2   paralegals would give to our detective
3   investigators to tell them what it is is
4   necessary -- what they needed to do for a
5   particular trial or an investigation.  So,
6   that's what this is.
7       Q.   And what does that say?  What was the
8   reason for his production on March 15?
9       A.   It says -- March 15?  It's not March
10  15.
11      Q.   No, for his production on the 15th,
12  what was the reason for his production that
13  day?
14      A.   This is not dated on the 15th.  This
15  work order is dated the 16th and the date
16  required, meaning the date that the witness
17  was required is the 17th.
18      Q.   And what does it say?
19      A.   Please bring Cisco Murphy from pens
20  to here for trial prep.
21      Q.   And that was attached in your file to
22  the order requesting his production on the
23  15th?
24      A.   I have no idea.  It's attached here.
25  I don't know where it was attached in my file.

Vecchione - Direct - Barket                    22

1          MR. BARKET:  Can I have a stipulation

2     from the prosecutor's office that I got copies

3     as they were from their office?

4          MS. DONHAUSER:  I believe that when we

5     looked at them, all the work orders were all

6     together, which is generally the practice --

7          MR. BARKET:  So --

8          MS. DONHAUSER:  -- in the office.

9          MR. BARKET:  I guess my question is,

10    is the work order that's attached here on

11    Petitioner's 8, is it the same as it was in

12    the file?

13         MS. DONHAUSER:  It was -- to my --

14    best of my recollection and I haven't brought

15    the thing with me, but to the best of my

16    recollection, all the things that you've been

17    showing Mr. Vecchione, the two orders to

18    produce, the signed and the unsigned one, and

19    the work order, are all either stapled or

20    paper clipped together in the file.  They're

21    all together in the file.

22       Q.   Was there a work order to your

23    knowledge to produce an order -- an order to

24    produce, having him produced for the 17th?

25       A.    There must have been because he came

Transcription Plus II          Rosalie Lombardi

**Vecchione - Direct - Barket**                              23

1   to the supreme court.  So, we would not have

2   been able to get him out of the Brooklyn House

3   without a -- what we call Damiani (phonetic)

4   orders, which are these orders to produce, so-

5   to-speak.

6        Q.    Didn't he have his own court date that

7   day?

8        A.    I believe he did; yes.  But in a

9   different --

10       Q.    So, he wouldn't have been produced for

11  the court, his own court date of -- no?

12       A.    No, not in that building.

13             MS. DONHAUSER:  Now you want this?

14             MR. BARKET:   Yes.

15       A.    He was -- do you want me to just

16  explain?

17       Q.    No, you were -- there was two

18  different supreme court buildings --

19       A.    Yes.

20       Q.    -- at that time; one was at 360 Adams?

21       A.    Yes.

22       Q.    And one was at 120 Schermerhorn?

23       A.    Schermerhorn; yes.

24       Q.    Excuse me, I'm sorry.

25             And where were you?

Vecchione - Direct - Barket                    24

1        A.    We were on trial at 360 Adams Street.

2    Mr. Murphy's case was on at 120 Schermerhorn

3    Street.

4                MR. BARKET:   Can I have the original?

5                MS. DONHAUSER:   I want to just make a

6    statement before you take this package.

7                Your Honor, the document that

8    Mr. Barket is interested in is one sheet,

9    reversed two sides with two things stapled to

10   it.  When I found this in the trial folder,

11   all these sheets were stapled together.

12   There's some papers, as I informed Mr. Barket,

13   that are part of this stapled package, which I

14   have not shown Mr. Barket because it has to do

15   with other witnesses.   It's privileged

16   information and so, I would just ask that when

17   we put it into evidence, that we just focus on

18   this one sheet.

19               THE COURT:   Okay.

20               MS. DONHAUSER:   Here you go.

21   BY MR. BARKET:

22       Q.    Did you at any point request any of

23   the pending cases -- the files of his pending

24   cases?

25       A.    When?

Transcription Plus II          Rosalie Lombardi

Vecchione - Direct - Barket                    25

1      Q.    Prior to his testimony on March 17?

2      A.    I probably did it back when he first

3   came into my office; yes.   That would be my

4   practice.

5      Q.    Could you take a look at -- I guess we

6   should -- do you mind if we mark the original?

7           MS. DONHAUSER:   You can mark the

8   original.

9           THE COURT:   You'll detach what you

10  want to have detached.   We're marking in what

11  page?   It's right there.   I don't know what

12  you did with it.

13          MR. BARKET:   I think I took them, so I

14  wouldn't have to keep walking back and forth

15  but --

16          MS. DONHAUSER:   No, you don't want the

17  yellow ones, we're using the yellow ones.

18          MR. BARKET:   I want the white ones.

19          One second, Judge.   I am sorry.

20          THE COURT:   Just mark it in your own

21  handwriting.

22          MR. BARKET:   Here it is.

23  (Petitioner's Exhibit 10 marked for

24  identification)

25  BY MR. BARKET:

Vecchione - Direct - Barket                    26

1      Q.    Could you take a look at what's been

2   marked now as Petitioner's 10?

3      A.    Just the yellow piece?

4      Q.    No, actually I want you to look at the

5   yellow piece and the message that's stapled to

6   it.

7      A.    Yes, okay.

8      Q.    Now the -- do you recognize the

9   handwriting in the yellow piece?

10     A.    No, I don't.

11     Q.    Do you recognize the message on top of

12   that?

13     A.    Recognize it in what way?  Do you mean

14   in terms of --

15     Q.    Do you know what that is?

16     A.    This piece of paper is the kind of

17   message paper that we were using back at the

18   DA's office at that time; yes.

19     Q.    And --

20     A.    So, if someone called the office --

21   called me or called someone in the office and

22   a message was taken, it would be written on

23   one of these types of -- one of these pieces

24   of paper.

25     Q.    And it says Cisco -- it says -- is

Vecchione - Direct - Barket                    27

1    that Jessica Prince?

2        A.   Jessica Prince.

3        Q.   Yes.

4        A.   Yes, she was someone that worked in

5    the office at the time.

6        Q.   Okay.

7             And orange zone is kind of a bureau

8    that you have?

9        A.   Yes.

10       Q.   And it says "CO Ciscro Murphy is on

11   for Wednesday, wants case folder."

12       A.   Right, okay.

13       Q.   Is that the assistant calling you or

14   Mr. Courtney asking that Murphy's case folder

15   be returned to them?

16       A.   It's the assistant calling either one

17   of us or my paralegal asking for the case

18   folder to be brought back to or brought to the

19   orange zone; yes.

20       Q.   Now underneath the message, there's

21   some words that are written.  It says, "Sex

22   crimes case, CW never came forward.  Case was

23   not indicted."

24       A.   Yes, I see that.

25       Q.   Do you know when these notes were

Vecchione - Direct - Barket                    28

1    taken and when this was done?

2        A.   No, I didn't do this.  So, I don't

3    know.

4        Q.   Now at the bottom there it says

5    Damiani, which is the order to produce?

6        A.   Yes, that's this -- what you've marked

7    as People's 8 and 9; yes.

8        Q.   "Damiani and Ciscro for 3/12/93 and

9    then again Damiani for 3/17 pen.  Ciscro case

10   is on tomorrow in part 31."

11       A.   Right.

12       Q.   So, those are notes to or from

13   somebody indicating Mr. Murphy should be

14   produced for those two days.

15            Is that right?

16       A.   Yup -- yes, excuse me, I'm sorry,

17   Judge.

18       Q.   Now, did you prep Mr. Murphy on the

19   17th for his testimony?

20       A.   I spoke to him.  I didn't prep him in

21   the terms of going over his testimony but yes,

22   I spoke to him before he got on the stand;

23   yes.

24       Q.   Where did that conversation take

25   place?

Vecchione - Direct - Barket                    29

1        A.    It took place -- I believe we were

2   using a fourth floor courtroom at 360 Adams

3   Street.  So, it took place in a room that was

4   in the corridor of the courthouse and it was

5   used for just that purpose, to speak to

6   witnesses and so, it was on the fourth floor

7   of the courthouse.

8        Q.    Did Mr. Murphy ever give you a

9   statement, a written statement?

10       A.    No, not to my -- I don't -- no, I

11  don't think so; no.

12       Q.    Could you take a look at what I'm

13  marking now as Petitioner's 11.

14  (Petitioner's Exhibit 11 marked in evidence)

15          MS. DONHAUSER:  Do you want to tell us

16  what it is?

17          MR. BARKET:  Yes, the parole letter.

18          MS. DONHAUSER:  What (inaudible)?

19       Q.    I'm going to ask if you recognize

20  this.

21       A.    Yes, I recognize it.

22       Q.    What is that?

23       A.    This is a letter that I wrote to the

24  New York State Division of Parole on behalf of

25  Mr. Murphy.

Vecchione - Direct - Barket                    30

1      Q.   And in that -- in there it's a

2    recommendation that he be released.

3           Is that correct?

4      A.   I don't see that.   The answer is no.

5      Q.   Is it an indication to the parole

6    board about Mr. Murphy's cooperation with your

7    office?

8      A.   Yes, it is.

9      Q.   Asking that he be given some kind of

10   consideration for that?

11     A.   I don't see that; no.

12     Q.   Well, is there a part in there that

13   says he gave a detailed statement to the

14   district attorney's office?

15     A.   No.

16     Q.   Can I have that back for one second?

17          THE COURT:   Can I see that letter?

18          THE WITNESS:   Sure.

19          THE COURT:   All right.

20     Q.   There's a part that's highlighted

21   there.   Could you read that out loud to the

22   Court, please?

23     A.   "Subsequently, Mr. Murphy gave a

24   detailed statement tying Mr. Marshall directly

25   to the crime."

Vecchione - Direct - Barket                    31

1       Q.   And?

2       A.   "He then testified at the trial, which

3   resulted in convictions of both defendants."

4       Q.   So, where's the detailed statement you

5   told the parole board Murphy gave?

6       A.   He came into my office, sat down

7   across from my desk and spoke to me and told

8   me what he knew about the fake alibi that your

9   client and his father had concocted for the

10  trial.

11      Q.   So the detailed statement that you

12  said he gave to Mr. -- that Mr. Murphy ave to

13  you was that oral conversation you had with

14  him back in February?

15      A.   Yes.

16      Q.   Now this was an individual who you

17  said --

18            THE COURT:  Could I ask you, did you

19  believe that his testimony -- Cisro Murphy's

20  testimony resulted in the conviction of the --

21  of Mr. Marshall?

22            THE WITNESS:  That it resulted in the

23  conviction?

24            THE COURT:  Well, isn't that what --

25  the words that you just read?

Vecchione - Direct - Barket                    32

1              THE WITNESS:  No, I didn't read that,

2     Judge.

3              THE COURT:  I'm sorry, what does it

4     say?

5              THE WITNESS:  "Subsequently,

6     Mr. Murphy gave a detailed statement tying

7     Mr. Marshall directly to the crime."

8              THE COURT:  Right.

9              THE WITNESS:  "He then testified at

10    the trial, which resulted in convictions of

11    both defendants."

12             THE COURT:  I see.

13        Q.   Does it also say in there that but for

14    his testimony, Mr. Marshall might very well

15    have escaped conviction or words to that

16    effect?

17        A.   The words exactly are, "There is no

18    doubt that without the assistance of

19    Mr. Murphy, Jeffrey Marshall could have

20    escaped punishment for this vicious crime."

21             THE COURT:  Do you believe that?

22             THE WITNESS:  I believe that he

23    assisted in --

24             THE COURT:  Is that an accurate --

25             THE WITNESS:  -- me getting the

Transcription Plus II          Rosalie Lombardi

*[handwritten margin note: Believed that Murphy's Testimony was critical to obtain a conviction]*

1   conviction; yes.

2           THE COURT:  Is that an accurate

3   statement?

4           THE WITNESS:  Yes, it is.

5           MS. DONHAUSER:  Judge, you have my

6   running objection to that.

7           THE COURT:  You could have it.

8   Overruled.

9   BY MR. BARKET:

10      Q.   Now this witness, who you've described

11  to the parole board as -- I don't want to put

12  words in your mouth but important to

13  Marshall's conviction, is that a fair

14  characterization?

15          THE COURT:  It speaks for itself.

16          MR. BARKET:  Okay.

17          THE COURT:  Let's go on.

18      Q.   That witness, Mr. Murphy, you're

19  telling the Court now that you never took and

20  there doesn't exist a written statement about

21  what -- of Mr. Murphy's account?

22      A.   That's correct.

23      Q.   And that the only meeting you had with

24  him regarding the substance of his testimony

25  was in February and then the day of his

Vecchione - Direct - Barket                              34

1    testimony.

2         A.    That's correct.

3         Q.    And despite two orders to produce on

4    the 12th and the 15th, you don't recall

5    meeting with him on either of those two days.

6         A.    I don't believe I did.

7         Q.    Now, did you tell Mr. Fiol that you

8    were producing Mr. Murphy in order to have

9    Mr. Murphy's attorney present while you were

10   prepping him?

11        A.    At the courthouse?

12        Q.    Yes.

13        A.    I don't recall exactly but I must

14   have, because I would not have done it any

15   other way.

16        Q.    So, your memory -- do you have a

17   memory of speaking with Mr. Fiol?

18        A.    No, I don't have -- of that day -- in

19   that day or on that day?

20             THE COURT:   Look, you were speaking

21   with his client about testifying in a criminal

22   case.

23             THE WITNESS:   Yes.

24             THE COURT:   His client himself was

25   facing charges for rape and gun possession.

Transcription Plus II          Rosalie Lombardi

Vecchione - Direct - Barket                    35

1        THE WITNESS:  Yes.

2        THE COURT:  Did you discuss with him

3   the fact that you were having meetings with

4   Mr. Murphy and that you intended to have him

5   testify at the trial of the petitioner?

6        THE WITNESS:  I don't recall that

7   particular day.  I do recall --

8        THE COURT:  I don't mean that -- I

9   mean during this period, was Mr. Fiol --

10        THE WITNESS:  I do --

11        THE COURT:  -- informed, essentially,

12   that his client, who was facing criminal

13   charges, was essentially cooperating with you,

14   that you were taking a statement from him and

15   preparing him to testify at trial and you

16   intended to call him as a trial witness.

17        THE WITNESS:  I believe not to that

18   extent.  I did have conversations -- at least

19   one conversation I can recall with Mr. Fiol

20   before the 17th, where I informed him of

21   Mr. Murphy coming into the office and giving

22   me the information.  And that I had not made

23   up my mind at any time.  In fact, I didn't

24   make up my mind until I actually spoke to him

25   that -- on the 17th that I was even going to

Transcription Plus II          Rosalie Lombardi

Vecchione - Direct - Barket                    36

1   use him.

2          But Mr. Fiol was aware of the fact

3   that he had come in -- he, meaning Murphy, had

4   come into the office to offer me the

5   information that he offered to me; yes.

6       Q.   He was made aware that he was going to

7   come into the office?

8       A.   No, he was made aware of the fact that

9   he had -- that Mr. Murphy had come into the

10  office.

11      Q.   Well, did you tell him that you were

12  filing an order to produce, to have him

13  brought over on the 12th, 15th and 17th?

14      A.   My practice would be, yes.  Do I have

15  an independent recollection of that; no.  But

16  my practice would be, yes, I wouldn't have

17  done it any other way.

18      Q.   Now during the time that you -- when

19  you spoke with Mr. Fiol and you said you

20  wanted to -- you told him, obviously what this

21  was about; that Murphy had some evidence that

22  would be helpful to you in the prosecution of

23  Cabeza and Marshall.

24      A.   Uh-huh.

25      Q.   Is that correct?

Vecchione - Direct - Barket                    37

1      A.    Of course I would have.

2      Q.    Now, Mr. Murphy, at the time, as we

3  know now, was looking at two pending

4  indictments; one for rape and one for criminal

5  possession of a weapon.

6           Is that right?

7      A.    Yes.

8      Q.    And without going too far into the

9  law, he was a mandatory, persistent, violent

10  felony offender.

11           Is that right?

12      A.    Yes.

13      Q.    What that meant was that if he was

14  indicted, the only legal plea would include a

15  life sentence; six to life, eight to life,

16  whatever it is for the various crimes.

17           Is that right?

18      A.    Yes.

19      Q.    And he had been indicted, as we know

20  now, on both charges on March 17.

21           Is that correct?

22      A.    I believe so; yes.

23      Q.    And that --

24      A.    I know that he was indicted on the gun

25  case.  I believe that he was indicted on the

Vecchione - Direct - Barket                38

1    other case, as well, but I am -- I think so,

2    but I am not 100 percent certain.

3        Q.   Now, Mr. Fiol, -- excuse me.  You were

4    trying a case involving a New York City Police

5    Officer and a co-defendant for murder.

6             Is that right?

7        A.   Yes.

8        Q.   And this is a case that at the time

9    had some notoriety.

10            Is that true?

11       A.   Yes.

12       Q.   And you were the bureau chief in the

13   homicide bureau.

14            Is that right?

15       A.   So-to-speak; yes.

16       Q.   Now, did Mr. Fiol when you told him

17   that this individual who was looking at a life

18   sentence for two separate indictments and that

19   he had information that was helpful against

20   Mr. Marshall, did Mr. Fiol say well, geez, I

21   would like a deal, I would like some break on

22   his pending cases?

23       A.   I don't have a recollection of that.

24   He probably did but I don't recall it.

25       Q.   When you say he probably did, did you

Transcription Plus II          Rosalie Lombardi

Vecchione - Direct - Barket                    39

1  convey that information to Mr. MARshall's

2  defense attorney that Mr. Murphy's attorney

3  was seeking some kind of benefit from Murphy's

4  testimony?

5      A.   He wasn't seeking any benefit.

6      Q.   When he asked you, probably did --

7      A.   I said I -- Mr. Barket, let me just

8  make myself clear.  You're asking me to recall

9  a conversation that I had with Mr. Fiol that I

10 do not recall.  I would not have spoken to

11 Mr. Murphy -- I mean, after I spoke to

12 Mr. Murphy, I would have contacted Fiol to

13 tell him that Murphy was in my office.  Point

14 of the matter is, Mr. Murphy was not asking

15 for anything.

16     Q.   My question --

17     A.   So --

18     Q.   -- to you is, did Mr. Fiol ask you for

19 a benefit for his client?

20     A.   I don't recall that.

21     Q.   Now you said before he probably did.

22     A.   Only because --

23     Q.   What would he --

24     A.   -- I used to be a defense attorney,

25 Mr. Barket, and I would have done that if I

Transcription Plus II          Rosalie Lombardi

Vecchione - Direct - Barket                    40

1    was the defense attorney.

2         Q.   Any defense attorney in this situation

3    would have done that.

4         A.   Right.

5         Q.   Correct?

6              THE COURT:  Any competent one.

7              Let's go.

8         Q.   Now you indicated -- could you take a

9    look at this yellow piece of paper again?

10        A.   Yes.

11        Q.   What's been marked, I think, as 11.

12             Is that right?

13        A.   10.

14        Q.   10.  Up at the top, there's something

15   that says orange zone.  The defendant, Ciscro

16   Murphy is --

17             THE COURT:  Before we get to that, you

18   have to understand, I've been in this business

19   for a long time, too, both as a prosecutor and

20   a judge.

21             THE WITNESS:  Yes, sir.

22             THE COURT:  And what happened here

23   seems to be to be unusual in the extreme in

24   terms of this guy essentially facing charges

25   and testifying without any kind of promise and

Transcription Plus II        Rosalie Lombardi

Vecchione - Direct - Barket                    41

1   his lawyer, essentially permitting that to

2   happen without asking for some consideration.

3   And that's sort of what troubles me about this

4   case.  I mean, it's just not --

5              THE WITNESS:  Judge, I --

6              THE COURT:  It's just not the way I've

7   ever heard of --

8              THE WITNESS:  I understand.

9              THE COURT:  -- anything happening.

10              THE WITNESS:  I wish that I had a

11   better recollection of the time.  I just

12   don't.  I know that Cisco Murphy did not ask

13   for anything.  I know that.  And I just don't

14   have a recollection --

15              THE COURT:  Well, let's --

16              THE WITNESS:  -- any better.

17              THE COURT:  -- put it this way.  There

18   came a point where he asked for something, or

19   at least his lawyer did becuase before the

20   second trial, there was a formal agreement

21   written --

22              THE WITNESS:  Yes, that's true.

23              THE COURT:  -- which, if my

24   recollection serves me correctly, also

25   referenced his testimony at the first trial

Vecchione - Direct - Barket                42

1   but I could be wrong about that.

2          THE WITNESS:  I don't remember.  I

3   mean, I --

4          MR. BARKET:  I think it did, Judge.

5   It referred to the indictment.

6          THE WITNESS:  It may.

7          MS. DONHAUSER:  I think it refers

8   actually to the indictment number that Jeffrey

9   Marshall had before it was consolidated with

10  Cabeza.

11         MR. BARKET:  Right, it --

12         MS. DONHAUSER:  It's actually a

13  completely different indictment number.

14         MR. BARKET:  -- was a second.

15         MS. DONHAUSER:  I think it's clear

16  from the context of the agreement, however,

17  when it talks about the pending indictment

18  numbers, that it's clear that that's a

19  misprint.  But in any event, we'll make that

20  argument later.

21         THE WITNESS:  The cooperation

22  agreement that you're referring to, Judge,

23  talks about his cooperation for the future

24  cases.

25         THE COURT:  No, I know, but he would

Vecchione - Direct - Barket                    43

1   have asked -- it just strikes me as being

2   unusual that he would have asked for it for

3   the subsequent cases but in this case, his

4   lawyer would not have attempted to have gotten

5   some promise relating to his testimony.

6           THE WITNESS:  Judge, I can -- I recall

7   when having to prepare for this, I can recall

8   back to when Murphy came into the office and

9   essentially handed me the piece of evidence,

10  not asking for anything.  It doesn't happen

11  very often for a prosecutor.  It happened

12  and --

13          THE COURT:  Well, that could happen.

14  I don't -- it wouldn't shock me if something

15  like that happened, particularly if you accept

16  his testimony about what motivated him to do

17  it.

18          THE WITNESS:  Yes.

19          THE COURT:  But whatever motivated to

20  do it on his own, once his lawyer gets a whiff

21  of what's going on here, he's going to say

22  wait a minute, you know, you're facing two

23  charges, including, I guess the -- with his

24  prior criminal record, I mean, he got two to

25  life when the two cases were consolidated.

Transcription Plus II        Rosalie Lombardi

Vecchione - Direct - Barket                    44

1           THE WITNESS:  Yes.

2           THE COURT:  So, I assume he was facing

3     a life sentence.

4           You know, would not attempted to have

5     to negotiated some benefit for him.  Whether

6     the -- there are two issues; one is whether he

7     attempted to or the negotiations were going on

8     and they never came to anything, which would

9     be relevant at the trial if Murphy testified

10    and number two, whether any -- you know, any

11    kind of an understanding had been reached

12    either with Murphy or the defense lawyer.

13          THE WITNESS:  There was no

14    understanding reached and I don't have any

15    recollection if -- there were no ongoing

16    negotiations at the time.  I can -- I will

17    take that to my grave, Judge.  There was

18    nothing on either side -- on either of your

19    two possibilities.

20          THE COURT:  Go ahead.

21    BY MR. BARKET:

22       Q.  Before you go to your grave, you just

23    told us that Mr. Fiol probably asked for some

24    kind of benefit for his client.

25       A.  I could probably --

Transcription Plus II          Rosalie Lombardi

Vecchione - Direct - Barket                    45

1      Q.    That was your probable response.

2      A.    It's an impossible question to answer

3  and I'll withdraw --

4      Q.    You --

5      A.    -- my probable because it was based on

6  something that I would have done as a defense

7  attorney and I should not have answered the

8  question in that way.

9      Q.    Now in the orders to produce, there is

10 an affirmation you fill out.

11          Is that right?

12     A.    I believe so; yes.

13     Q.    And part of that affirmation indicates

14 that you will notify the attorney that the

15 person is being produced.

16     A.    That's right.

17     Q.    Is that right?

18     A.    Correct.

19     Q.    So, in order to get him produced, you

20 have to swear under oath to the Court that you

21 are going to tell the defense attorney that

22 person is being produced.

23          Is that right?

24     A.    Well, that's not an -- it's an

25 affirmation not an affidavit but yes; in

Vecchione - Direct - Barket                46

1  essence, yes.

2      Q.   And you obviously would have complied

3  with what you were telling the Court you were

4  going to do.

5      A.   I told you before that I would do

6  that; yes.

7      Q.   Now do you remember Mr. Fiol talking

8  to you and asking for a misdemeanor in

9  exchange for Murphy's testimony?

10     A.   No, I have no -- I don't recall that.

11     Q.   After Murphy testified, did you have

12 any conversations with Mr. Fiol?

13     A.   After he testified?

14     Q.   Yes; you eventually worked out a deal

15 with him.

16     A.   Ultimately, yes, of course.

17     Q.   Do you remember him being furious with

18 you, being angry, that you had put him on the

19 stand before a deal had been worked out?

20     A.   No.

21     Q.   Could you take a look at the yellow

22 piece of paper again.  I guess it's 10?

23     A.   Yes.

24     Q.   Up at the top it says, "orange zone,

25 defendant Cisco Murphy, file will be

Vecchione - Direct - Barket                    47

1    delivered."

2              Do you see that?

3       A.    I see it.

4       Q.    That's a request and I guess a

5    notation that the file will be delivered.

6    That's the indictment number 12156/92.

7              Is that right?

8       A.    That's what this piece of paper says;

9    yes.

10      Q.    And then there's the note there from

11   the assistant who had that file requesting it

12   back.

13             Is that correct?

14      A.    I don't know.

15      Q.    Well, the message --

16      A.    The message says that it wants case

17   folder but it doesn't mean that we ultimate --

18   that we originally got it from her.

19      Q.    Right, but it appears from these two

20   pieces of paper, does it not, that somebody in

21   your bureau, in order to prep for Murphy's

22   testimony ordered the file, that the file was

23   delivered and the prosecutor who had the case,

24   was calling to say look, the case is on

25   Wednesday, can I have the file.

Vecchione - Direct - Barket                48

1      A.    That's what it appears from these

2   papers; yes.

3      Q.    Could I have the file -- that file?

4            MS. DONHAUSER:  The Cisco Murphy --

5            MR. BARKET:  Cisco Murphy, 12156/92.

6            MS. DONHAUSER:  This one?

7            MR. BARKET:  Yes, the entire file, its

8   contents as well.

9            MS. DONHAUSER:  No.

10           MR. BARKET:  Do you have the contents?

11           MS. DONHAUSER:  I gave you all the

12   contents that's marked in your (inaudible).

13           MR. BARKET:  Okay, so that --

14           MS. DONHAUSER:  Yes, if it's marked

15   with a 12156/92 it comes from this folder.

16   BY MR. BARKET:

17      Q.    Could you take a look at --

18           MS. DONHAUSER:  What are you showing

19   him, Bruce?

20           MR. BARKET:  Well, all the contents of

21   12 --

22           MS. DONHAUSER:  Okay.

23           MR. BARKET:  -- 156.

24           MS. DONHAUSER:  Judge, I just want to

25   make it clear that that's not the entire

Transcription Plus II        Rosalie Lombardi

**Vecchione - Direct - Barket**                    49

1    contents of that file.

2              MR. BARKET:   There's just one document

3    that I want him to look at.

4              MS. DONHAUSER:   Okay.

5         Q.   In that file, 12156/92, there is a

6    NYSIS; isn't there?

7         A.   Yes.

8         Q.   And there would be a NYSIS in that

9    file.

10        A.   Yes.

11        Q.   And that would have been a criminal

12   rap sheet generated for Mr. Murphy at the time

13   of his arrest on the gun charge.

14             Is that correct?

15        A.   I would assume so, yes.

16        Q.   And that's the file from the notes in

17   Marshall's file that you requested and that

18   you got.

19             Is that correct?

20        A.   Yes.

21        Q.   And then when you were in court, and

22   the Court asked you to give the NYSIS to

23   Mr. Harrison, that's the NYSIS you gave him

24   because that's the file you had.

25             Isn't that true?

_____

         Transcription Plus II       Rosalie Lombardi

Vecchione - Direct - Barket                    50

1      A.   Yes.

2           THE COURT:   Do you have another

3    question?

4      A.   Is there another question?

5      Q.   Isn't that true?

6           THE COURT:   He answered it.

7      A.   Yes, I answer it.

8      Q.   Well --

9      A.   I said yes.

10     Q.   Now that NYSIS does not contain

11   Marshall's (sic) rape charge; does it?

12          MR. DEMARTINI:   Murphy.

13     A.   Marshall's rape charge?

14     Q.   Murphy.

15          MR. DEMARTINI:   Murphy.

16          THE COURT:   Murphy.

17     Q.   Murphy's rape charge.

18     A.   I don't know.   Can I see it again?

19     Q.   Sure.

20     A.   This particular one does not.

21     Q.   It would have been impossible actually

22   to have a NYSIS created in October that would

23   have reflected the January arrest; correct?

24     A.   Of course.

25     Q.   There was a 440 motion filed by me

Transcription Plus II        Rosalie Lombardi

1    asking for this case, Mr. Marshall's case, to

2    be reversed back in state court before

3    Judge Aiello.

4         Do you remember that?

5    A.   Yes, I do.

6    Q.   And in response to that, your office

7    prepared some paperwork; didn't it?

8         Is that correct?

9    A.   I assume so; yes.

10   Q.   Well, in fact, you prepared an

11   affidavit; didn't you?

12   A.   I believe it was an affirmation.

13   Q.   Now at that time, the allegations that

14   I made in the 440 motion are essentially the

15   same ones that are before this court, that you

16   -- the same ones were made before this court.

17        Is that correct?

18        MR. DEMARTINI:  Objection.

19   A.   I don't know.

20        THE COURT:  What difference does it

21   make?

22        MR. DEMARTINI:  Unless he read the

23   papers --

24        THE COURT:  What difference does it

25   make?

Vecchione - Direct - Barket                    52

1          MR. DEMARTINI:  -- on the habeas.

2          MR. BARKET:  The --

3          MS. DONHAUSER:  He's not the person

4   who answered the habeas, your Honor.

5          THE COURT:  But it doesn't matter.

6   What's the --

7          MS. DONHAUSER:  And nor is he the

8   person that answered the 440.

9          THE COURT:  Why do you want to --

10    Q.   Did you fill out an affirmation --

11         THE COURT:  Sit down.

12    Q.   -- in response to that 440 motion?

13    A.   I don't think I filled it out, no, but

14   I believe an assistant from the appeals bureau

15   prepared it and I signed it; yes.

16         THE COURT:  I assume that the

17   assistant would have spoken to you --

18         THE WITNESS:  Well, of course, Judge;

19   yes.

20         THE COURT:  -- and then prepared t.

21         THE WITNESS:  Yes.

22         THE COURT:  Okay.

23         THE WITNESS:  Yes.

24         THE COURT:  So --

25    Q.   And you read it?

Transcription Plus II          Rosalie Lombardi

Vecchione - Direct - Barket                53

1        A.   Yes.

2        Q.   You knew it was going in to respond

3    to --

4             THE COURT:   Will you just show it to

5    him --

6        A.   Yes.

7             THE COURT:   Come on.

8        Q.   Take a look at it.

9        A.   Yes, I know --

10       Q.   What does that say about whether or

11   not you knew of a rape charge when you gave --

12   when Mr. Marshall's case was tried?

13       A.   It says that I did not know that there

14   were charges pending against Mr. Murphy that

15   included rape.  That's what it says.

16       Q.   And that's because the NYSIS that you

17   had requested came from the first file, the

18   '92 indictment.  It didn't include the rape

19   charge.

20            Is that correct?

21       A.   The NYSID what?

22       Q.   The NYSIS that was in Marshall's --

23   excuse me, the NYSIS that was in Murphy's gun

24   case was produced in '92 and it didn't include

25   the rape charge.

Transcription Plus II        Rosalie Lombardi

Vecchione - Direct - Barket                    54

1       A.   You asked me about the -- the

2    documents you just showed me before were the

3    content of -- yes, the gun case, okay.   And

4    they did not include the rape charge.   That's

5    correct.

6       Q.   So, in fact, Mr. Harrison, Jeffrey

7    Marshall's lawyer was not told of the rape

8    charge during the trial; was he?

9       A.   No, that's incorrect because that's

10   not the NYSID that I handed Mr. Harrison

11   during the course of the trial.

12      Q.   Where's the -- do you have a marked

13   copy of the NYSIS you handed him?

14      A.   I don't have it.   Obviously, I

15   wouldn't.   But I prepared -- before I take a

16   case to trial, I would run updated NYSID

17   sheets on everybody who was going to testify

18   or who was potentially going to testify.

19            And that's what I handed over to

20   Mr. Harrison.   If I am not correct -- if I am

21   not mistaken, Mr. Harrison referred to it and

22   talked about the actual arrest that was on the

23   NYSID sheet.

24      Q.   Mr. Harrison testified, whether you're

25   mistaken or not, is something we'll leave for

Vecchione - Direct - Barket                    55

1   the Court to decide.

2       A.   Is that a question?  I'm not sure.

3       Q.   No.

4       A.   Oh, okay.

5           THE COURT:  No, it's a statement.

6   Could I see the affidavit again.

7           MR. BARKET:  Yes, your Honor.  It

8   should be part of the Court's file.

9           THE COURT:  I know but I don't -- you

10  know, the Court's file it's a carton of

11  documents.

12          MR. BARKET:  Right.

13          THE COURT:  I'm confused.  You saying

14  this affidavit that to the best of your

15  recollection, you did not know that the

16  charges pending against Murphy included rape.

17          THE WITNESS:  That's what it says,

18  Judge.  I wish that I could have that back.  I

19  made a mistake.

20          THE COURT:  But that would suggest

21  that you -- that the rap sheet, the NYSIS

22  sheet that you gave, if you read it -- if it

23  was an up-to-date NYSIS sheet, then it would

24  have indicated the rape.

25          THE WITNESS:  Yes, the error is in my

Vecchione - Direct - Barket                56

1   signing that without being more careful about

2   signing it.

3           THE COURT:  So this statement, to the

4   best of my recollection, I did not know that

5   the charges pending against Mr. Murphy

6   included rape --

7           THE WITNESS:  Yes.

8           THE COURT:  -- is a mistake?

9           THE WITNESS:  When I read the

10  minutes --

11          THE COURT:  It's a mistake?

12          THE WITNESS:  It's a mistake; yes.

13  Q.   Now, Mr. Hollman was assigned by you

14  to try Marshall's two subsequent murder cases.

15          Is that right?

16  A.   Yes.

17  Q.   Did you tell him that you had a

18  written cooperation agreement with Mr. Murphy?

19  A.   Sure I did.

20  Q.   You're sure you did?

21  A.   Cooperation agreements with regard to

22  the two pending cases?

23  Q.   Yes.

24  A.   I'm -- I must have, absolutely.

25  Q.   So you would have told Mr. Hollman.

Vecchione - Direct - Barket                    57

1    You wouldn't have lied to him or tried to hide

2    that fact?

3         A.   For -- no, I would not have.

4         Q.   Did you receive a letter from

5    Mr. Hollman --

6              THE COURT:  Well, Mr. Hollman

7    testified that he was not aware of the

8    agreement that had been entered into before

9    the second and third trial.

10             THE WITNESS:  I can't account for that

11   testimony, Judge.

12             THE COURT:  Well, his explanation, as

13   I understood it, was that he read the

14   transcript of the first trial and there was no

15   agreement.

16             THE WITNESS:  It's true, there wasn't

17   any agreement.

18             THE COURT:  But he indicated that you

19   did not tell him about the -- when you

20   assigned him to try the case, he said that you

21   had not told him about this agreement or given

22   it to him.

23             THE WITNESS:  Do you want me to

24   comment as to why he --

25             THE COURT:  Yes.

Transcription Plus II          Rosalie Lombardi

Vecchione - Direct - Barket                                    58

1          THE WITNESS:   He is incorrect.

2          Q.   You would have had no reason to lie

3    about the existence of an agreement before --

4          A.   No.

5          Q.   -- right?

6          Did you receive a letter from

7    Mr. Hollman written by Ralph Pasarero from the

8    Nassau County District Attorney's Office?

9          A.   Yes.

10         Q.   And that was a -- you knew at that

11   time that you received that letter that Mr. --

12         THE COURT:   Now I just want to

13   understand this.  If he didn't -- he didn't

14   disclose during the second and third trial the

15   existence of this agreement.

16         THE WITNESS:   That's what I

17   understand; yes.  I didn't know that until

18   these proceedings were actually placed.  I

19   didn't -- I know that there two acquittals in

20   those cases.

21         THE COURT:   So, that if -- but if I

22   understand what you just said, you told him

23   about it and then he didn't disclose it.  I

24   mean it was harmless error because the guy was

25   acquitted at the second two trials so, we're

Transcription Plus II          Rosalie Lombardi

Vecchione - Direct - Barket                59

1    not dealing with -- it's only a kind of a --
2    you know, kind of aback drop --
3         THE WITNESS:  Well --
4         THE COURT:  -- for trying to evaluate
5    what happened here.
6         THE WITNESS:  Yes, sir.
7         THE COURT:  But essentially, if you're
8    right, he knew about this written agreement
9    and he didn't disclose it during two trials
10   when he had a constitutional and ethical
11   obligation to disclose it.
12        Is that right?
13        THE WITNESS:  Of course he did.
14        THE COURT:  Okay.
15        MR. BARKET:  The record should reflect
16   I am returning the -- what's been marked as
17   Petitioner's 10, the original notes of
18   Mr. Vecchione.
19      Q.   Could you take a look at --
20        MS. DONHAUSER:  No, excuse me, that's
21   a mischaracterization.
22        MR. DEMARTINI:  Yes, it's --
23        MS. DONHAUSER:  The Petitioner's 10 is
24   not --
25        MR. BARKET:  Whatever the Petitioner's

Vecchione - Direct - Barket                    60

1   10 is.

2            MS. DONHAUSER:  -- Mr. Vecchione's

3   notes.

4            MR. BARKET:  Whatever Petitioner's 10

5   is.

6            THE COURT:  Well, why don't you say to

7   make you happy, what is it?

8            MS. DONHAUSER:  I don't believe that

9   Mr. Vecchione was ever asked if any of this

10  was his handwriting or whether he recognized

11  the handwriting.

12           MR. BARKET:  I think he said he did.

13           THE WITNESS:  I was asked and I said

14  that I didn't recognize the handwriting.

15           MS. DONHAUSER:  Okay.  So, there you

16  go.

17       Q.   Could I show you what's been marked as

18  Petitioner's 12.

19  (Petitioner's Exhibit 12 marked for

20  identification)

21       Q.   That's the letter that Mr. Pasarero

22  wrote to Mr. Hollman.

23       A.   Yes.

24       Q.   And Mr. Hollman passed that on to you

25  to reply to?

Vecchione - Direct - Barket                    61

1      A.   Yes, I believe so.

2      Q.   Now you knew at that time that

3  Mr. Marshall was being prosecuted by

4  Mr. Pasarero for an attempted murder and a

5  robbery in Nassau County, which was similar to

6  things he -- similar to robberies that had

7  occurred in Brooklyn.

8      A.   I wasn't aware of that but I know that

9  he had a case in Nassau County; yes.

10     Q.   Were you aware that the witnesses in

11 that case were substantially the same as some

12 of the witnesses you had in your case?

13     A.   I believe that there were some in

14 common; yes.

15     Q.   The Stober brothers, Lakisha Smith,

16 Cisco Murphy?

17     A.   I believe that I knew that some of the

18 witnesses were in common.  If you are asking

19 me which ones, I am not sure now which ones.

20     Q.   And you knew that when Mr. Pasarero

21 was writing to you, he was writing to you to

22 prepare for his trial; correct?

23     A.   I would assume so.

24     Q.   And he specifically asked you whether

25 or not there -- for any cooperation agreements

Transcription Plus II        Rosalie Lombardi

Vecchione - Direct - Barket                    62

1   between Mr. Stober, Lakisha Smith, Ciscro

2   Murphy.

3            Is that right?

4       A.   Yes.

5       Q.   And you responded by telling him that

6   you did have a cooperation agreement with

7   Mr. Stober and you included a copy of that in

8   your reply to Mr. Marshall (sic) --

9   Mr. Pasarero.

10           Is that correct?

11      A.   Yes.

12      Q.   And then you replied --

13      A.   I believe so.  If you show it to me, I

14  believe I did; yes.

15      Q.   And then, in -- well, with Mr. Murphy,

16  however, you told Mr. Pasarero with respect to

17  other items, there are no agreements between

18  this office and Ciscro Murphy.

19           Is that true?

20      A.   That's what I wrote; yes.

21           THE COURT:  Refresh my recollection

22  again.  Who is Mr. Pasarero?

23           THE WITNESS:  Mr. Pasarero is an

24  assistant district attorney in Nassau -- was

25  an assistant district attorney in Nassau

Transcription Plus II        Rosalie Lombardi

Vecchione - Direct - Barket                    63

1    County, who had, I think, Mr. Marshall's case

2    in Nassau County.

3              MR. BARKET:  Still is, Judge.  That's

4    the case I tried.

5              THE COURT:  Okay.

6    BY MR. BARKET:

7        Q.   Could you take a look at what I've

8    marked as Petitioner's 13?  That's the letter

9    you wrote in 1995.

10       A.   Yes, I remember.

11       Q.   All right.

12       A.   I saw it.

13       Q.   Two years after you signed the

14   agreement with Mr. Murphy; right?

15       A.   Signed the agreement with Mr. Murphy

16   on the subsequent cases; yes.

17       Q.   And you wrote a letter to

18   Mr. Pasarero saying there was no agreement

19   with you and Mr. Murphy.

20       A.   When I wrote to Mr. Pasarero was

21   concerning the Cabeza case.  The -- I had the

22   Cabeza case pulled because that was my case.

23   I looked through it and there was no -- and I

24   knew there was no cooperation agreement with

25   regard to Murphy.

Transcription Plus II        Rosalie Lombardi

Vecchione - Direct - Barket                    64

1     Q.   So, you're saying you didn't lie to

2   Mr. Pasarero and tell him there was no

3   agreements when you knew there were; right?

4     A.   How would I -- I wouldn't lie.   The

5   agreements were in Mr. Murphy's files, the

6   court files of Mr. Murphy.   So, there would be

7   no -- the subsequent agreements were filed in

8   Mr. Murphy's court files with the Court.

9     Q.   What about Mr. Pasarero's language

10  when he requests, "In addition to the

11  forgoing, I request photocopies of any

12  cooperation or debriefing agreements between

13  your office and the following individuals;

14  Ciscro Murphy, Lakisha Smith, Martin Johnson

15  and Jeffrey Marshall."

16          What about that language led you to

17  believe that he was asking just about the

18  Cabeza case?

19   . A.   The letter was written to Mr. Hollman.

20  Mr. Hollman then gave me the letter after he

21  was -- after he whatever he did with the

22  letter, I don't know, but he gave it to me

23  after that and I fulfilled my -- what I felt

24  was my obligation to take care of the request

25  with regard to the Cabeza case.

Vecchione - Direct - Barket                    65

1        Q.    Who agreed -- who made the agreement

2   with Mr. Murphy; Mr. Hollman or you?

3        A.    They were in the case files that

4   Mr. Hollman tried.

5        Q.    Who made the agreement?

6        A.    I did.

7        Q.    Who authorized the two to life deal

8   for Mr. Murphy?

9        A.    I guess I did.

10            THE COURT:  Can I see that letter?

11            MR. BARKET:  Yes, this is the letter

12   -- 12 is for Mr. Pasarero and 13 is Mr.

13   Vecchione's response.

14   (Petitioner's Exhibit 13 marked for

15   identification)

16            THE COURT:  So, I just want to

17   understand, when you wrote in this letter that

18   with respect to the other items, there are no

19   agreements between this office and Ciscro

20   Murphy --

21            THE WITNESS:  Yes, Judge, that had to

22   do with the Cabeza case.

23            THE COURT:  And you understood this

24   letter to be limited to the Cabeza case?

25            THE WITNESS:  No, my portion of --

Transcription Plus II        Rosalie Lombardi

Vecchione - Cross - Demartini                66

1   what I needed to answer was -- my

2   understanding was that what I needed to answer

3   was limited to the Cabeza case because

4   Mr. Hollman was not familiar with the Cabeza

5   case.  The letter was addressed to Hollman and

6   I took care of answering the portion of the --

7   with regard to the Cabeza case.  I had the

8   Cabeza case pulled to refresh my memory

9   because it was two years later and when I did,

10  I gave -- I sent to Nassau county, the

11  cooperation agreements that were in the Cabeza

12  case.

13           MR. BARKET:  I have nothing further at

14  this time.

15  CROSS-EXAMINATION

16  BY MR. DEMARTINI:

17       Q.   Good afternoon, Mr. Vecchione.

18       A.   Hello.

19       Q.   When Cisco Murphy first came to your

20  office, I think you said that was some time at

21  the beginning of February?

22       A.   I believe so; yes.

23       Q.   What do you remember Mr. Murphy

24  telling you at that time?

25       A.   He told me that he knew that I was the

Transcription Plus II        Rosalie Lombardi

**Vecchione - Cross - Demartini**                    67

1   prosecutor in the Cabeza-Marshall case and he

2   told me that he had been in jail with Jeffrey

3   Marshall and that he had some paralegal

4   background.  And Marshall had asked him to

5   help him prepare papers and specifically, to

6   help him prepare a false alibi for the Cabeza

7   case.

8           He was going to help prepare his

9   father to testify that he was upstairs with

10  him as opposed to being the lookout downstairs

11  near the liquor store.

12      Q.   Did he tell you why he had come to see

13  you?

14      A.   Yes, he did.

15      Q.   And to the best of your recollection,

16  what did he tell you with respect to that?

17      A.   He told me that he was very angry with

18  Mr. Marshall because Mr. Marshall had

19  threatened him and had him beaten up.

20      Q.   What was your response to him?

21      A.   I don't know my specific response.  I

22  probably asked him some questions about it but

23  I don't remember what my response was.

24      Q.   Did he tell you that he had open

25  cases?

Vecchione - Cross - Demartini                68

1      A.    Yes, he did.

2      Q.    Did you have any response to that?

3      A.    I'm sure I did but I don't recall what

4  the response was.  I may have just asked him

5  what the open cases were about.  I'm sure I

6  must have done that.  But I don't specifically

7  recall what my response was.

8      Q.    Did you ask him at any time if he was

9  looking for a deal?

10     A.    I asked him what he was -- yes, I do

11  remember asking him that because that would be

12  the logical thing to ask him and he said I

13  don't want anything.  He says I am -- and he

14  used the vernacular, "I'm pissed off at

15  Marshall and this is why I am coming in."

16     Q.    Now after -- did he tell you when he

17  came -- where he had come from, if he had been

18  in jail --

19     A.    Yes.

20     Q.    -- prior to his coming to see you?

21     A.    Yes, he did.

22     Q.    What did he tell you with respect to

23  that?

24     A.    He told me that he was just released.

25  That the people weren't ready on his latest

Vecchione - Cross - Demartini                69

1    case and he was released as a result of that.

2        Q.   Now at some time after speaking with

3    him, did you, in fact, pull both of his open

4    cases?

5        A.   Yes.

6        Q.   And what were you able to ascertain

7    with respect to the newer case; the rape case?

8    Had he just been released?

9        A.    It appeared from the file that he had

10   been released as a result of a CPL 180.80

11   violation where we weren't ready to proceed

12   with either a grand jury indictment or a

13   hearing within the prescribed period of time.

14       Q.   And in relation to the day that you

15   remember his coming to you, when did this

16   release on the CPL 180.80 for the rape case

17   occur, if you know?

18       A.   Specifically, I don't remember.  I

19   would -- I just recall it being within days

20   but I don't recall specifically.

21       Q.   And how did you leave -- well, what

22   did you tell Mr. Murphy at the end of this

23   interview?

24       A.    I told him that I would look into

25   things and evaluate it and at some point, if I

Vecchione - Cross - Demartini                    70

1   needed him again, I would get in touch with

2   him.

3        Q.   And when is the next time that you

4   recall actually seeing Mr. Murphy?

5        A.   When he testified, March 17.

6        Q.   Now was that in the morning or in the

7   afternoon?

8        A.   It was in the late afternoon.

9        Q.   And I think you said you had a brief

10  time when you spoke with him before he

11  testified?

12       A.   Yes.

13       Q.   And what went on -- where was that

14  interview conducted?

15       A.   In an interview room in the hall --

16  that was in the corridor of the fourth floor

17  at 360 Adams Street, the supreme court

18  building.

19       Q.   Who was present during that interview?

20       A.   To the best of my recollection, it was

21  myself, Mr. Murphy, and two detective

22  investigators from my office.

23       Q.   Would they have been the detective

24  investigators who brought him over to court?

25       A.   Yes.

Transcription Plus II          Rosalie Lombardi

Case 1:08-cv-01359-DLI   Document 47-3   Filed 05/28/10   Page 72 of 77 PageID #: 4723

1    Q.   And what did you tell Mr. Murphy at

2    that time?

3    A.   I came into the room.  He was already

4    in the room and I said to him, "Do you

5    remember me."

6              "Yes."  He answered, "Yes, he did."

7              And I said to him, "Well, the case is

8    on trial and what I want to know is are you

9    willing to testify to what you told me in the

10   office?"

11             And he said, "Yes."

12             And I said to him, "All I want you to

13   do is to tell me what you told me.  Tell the

14   Judge and the jury what you told me in the

15   office."

16             And I may have, at that point, I must

17   have gone over it with him at that point as to

18   what he was going to say.

19             And I said to him, "I am going to ask

20   you whether you have two open cases.  And I'm

21   not going to go into the background of those

22   cases."

23             And I then said to him, "I'm going to

24   ask you if we have any deals, any promises,

25   has anybody made any promises to you, do we

Vecchione - Cross - Demartini                    72

1    have any understandings?  And what would your

2    answer be?"

3            And he said, "There are none."

4            I said, "Okay.  Just go in and tell

5    the Court what you know."

6        Q.   And about how long was this prep or

7    interview of --

8        A.   It wasn't very long because the judge

9    did not give me a long time.  It was -- as I

10   said before, it was the end of the day.  It

11   was the end of the trial.  The judge was

12   looking to end it and he gave me just a few

13   minutes to go out, speak to him and then come

14   in and tell him whether or not we were going

15   to use him.

16       Q.   And did you, in fact, go back into the

17   courtroom after this brief interview?

18       A.   Yes, I did.

19       Q.   What happened when you went into the

20   courtroom?

21       A.   I went back into the courtroom and I

22   told him that I was going to use him but then

23   Mr. Harrison had asked to approach the bench.

24   When we got to the bench, I said to the judge,

25   the problem is his lawyer is not here; Fiol

Vecchione - Cross - Demartini                    73

1   was not there.

2          And the judge then said don't worry

3   about it.  It's the end of the day or words to

4   that effect.  Don't worry about it.  I'll

5   protect him.  He's just -- let's get finished

6   with this.  Put him on.  I'm not going to let

7   you go into any of the underlying portions of

8   his testimony (sic).  And --

9          THE COURT:  Of his testimony?

10          THE WITNESS:  I'm sorry, of his

11   pending cases.

12          And we went back to the table.  That

13   was an off the record conversation.  We went

14   back to the table and we brought Mr. Murphy

15   in.

16      Q.   Now, in your direct examination, did

17   you ask him if he had open cases?

18      A.   I believe I did; yes.

19      Q.   And did he say that he did?

20      A.   Yes.

21      Q.   How many?

22      A.   I think he said he had two.

23      Q.   On cross-examination, did the nature

24   of the open cases come out?

25      A.   Yes.

Vecchione - Cross - Demartini                    74

1        Q.    Was one described as a gun case?

2        A.    Yes.

3        Q.    How was the second one described?

4        A.    I believe Mr. Murphy described it as

5    an assault on a woman or something like that;

6    words to that effect.

7        Q.    And were both cases, both open cases,

8    listed on the NYSID or rap sheets that you

9    handed Mr. Harrison?

10       A.    Yes.

11       Q.    Now going back to after -- right after

12   Mr. Murphy comes to your office the first

13   time, had you decided after you met him that

14   first time, whether or not you were going to

15   use him --

16       A.    No.

17       Q.    -- at that point?

18       A.    No, I did not decide that at that

19   time.

20       Q.    What was your impression of Mr. Murphy

21   after first meeting him?

22       A.    Well, he was a witness who I knew had

23   some good information because I did receive

24   the alibi notice, so I knew that there was

25   going to be an alibi defense.

Vecchione - Cross - Demartini                    75

1              And he sounded as if he knew

2    Mr. Marshall.  I mean, I hadn't checked it out

3    yet to see whether they were in jail together.

4    It was just preliminary.  So, from -- at first

5    blush, he sounded like he knew what he was

6    talking about but I was skeptical in that he

7    was a supposed friend of Marshall's, he was in

8    jail, he had these two cases.  So, I wasn't

9    completely sold on whether or not I was going

10   to use him at that point.

11        Q.   Now at some point after you pulled the

12   gun case -- are you -- let me just go back.

13   Are you familiar with what's known as a felony

14   waiver offer sheet?

15        A.   Yes, I am.

16        Q.   And what exactly is that?

17        A.   That would be a document that's put

18   into the file by a -- generally a grand jury

19   supervisor who would review the case before it

20   was presented to the grand jury and make an

21   offer to the defendant to plead guilty in lieu

22   of indictment.

23             MR. DEMARTINI:  Mr. Barket, I am going

24   to be asking --

25             MR. BARKET:  Yes, I've seen it.

Transcription Plus II          Rosalie Lombardi

Vecchione - Cross - Demartini                    76

1    That's fine.  Go right ahead.

2              MR. DEMARTINI:   That's Government

3    Exhibit 3.

4    (Government's Exhibit 3 marked for

5    identification)

6    BY MR. DEMARTINI:

7         Q.   Can you take a look at that, please?

8         A.   Yes.

9         Q.   What do you recognize that to be?

10        A.   This was a felony waiver offer sheet

11   that we were using back in 1992, '93.

12        Q.   And does it pertain to a particular

13   case?

14        A.   It says Ciscro Murphy and it's got a

15   docket number.  And then it says, "The waiver

16   offer attempt CPW third degree," which would

17   be criminal possession of a weapon in the

18   third degree, "two to four" and it says,

19   "mandatory persistent" underneath it.

20        Q.   So would that have been the initial

21   offer that was made prior to any indictment on

22   the gun case for Mr. Murphy?

23        A.   Yes.

24             THE COURT:   That was made before he

25   visited you, I assume.