# EXHIBIT B
# (Part 2)

Vecchione - Cross - Demartini                77

1          THE WITNESS:  Yes, Judge.

2          MR. DEMARTINI:  And I think we'll have

3    a stipulation as to the buck sheets.

4          MR. BARKET:  Yes, Judge.  I think

5    we'll stipulate to the facts that he was

6    offered two to four before indictment.  He was

7    indicted.  The minimum offer then was six to

8    life.  Then he was indicted again and the law

9    speaks for itself.  The minimum was fourteen

10   to life and he spoke to Mr. Vecchione.

11         MR. DEMARTINI:  I think at some point

12   we'll put in both buck sheets.

13         MS. DONHAUSER:  We'll have to review

14   that.  I don't know --

15         MR. DEMARTINI:  The first one shows

16   the criminal court --

17         MS. DONHAUSER:  -- the last part --

18         MR. DEMARTINI:  -- history, where the

19   two to four offer is made and then the

20   subsequent offers on the supreme court buck

21   sheets.

22      Q.   Now in preparing for the actual trial,

23   People v. Cabeza and Marshall, as Arnold

24   Stober a witness in that case?

25      A.   Yes.

Vecchione - Cross - Demartini                78

1    Q.   And had you entered into a cooperation

2  agreement with Arnold Stober?

3    A.   Yes.

4         MR. BARKET:   Judge, to save time, I'll

5  stipulate that the other agreements were -- if

6  that's where you're going, I'll stipulate the

7  other agreements were turned over.

8         MR. DEMARTINI:   Your Honor, I would

9  ask that they be marked as Government Exhibits

10  4 and 5.

11  (Government's Exhibit 4 and 5 marked for

12  identification)

13    Q.   Did you also have an agreement with

14  Mr. Arnold Stober's brother, John Stober?

15    A.   Yes.

16    Q.   And was he also a witness against

17  Cabeza and Marshall?

18    A.   Yes.

19    Q.   I would show you 4 and 5.  Are those

20  -- do you recognize those two agreements?

21    A.   Yes.

22    Q.   And were those turned over to

23  Mr. Harrison and Mr. London, the two attorneys

24  on the Cabeza and Marshall trial?

25    A.   Yes.

**Vecchione - Cross - Demartini**                    79

1      Q.   Did you have a witness -- and did

2   these two individuals testify on the direct

3   case?

4      A.   Yes.

5      Q.   Was there a witness by the name of

6   Raymond Rivera who testified on the direct

7   case?

8      A.   Yes.

9      Q.   What was his significance in the

10  Marshall-Cabeza trial?

11     A.   He was one of the witnesses who was

12  outside the store and saw -- I believe saw

13  them leaving the store.

14     Q.   Was he able to identify him --

15  actually make an identification of Mr.

16  Marshall?

17     A.   I think he was; yes.

18     Q.   Were any promises made to him?

19     A.   There were -- I believe that he was in

20  jail already.  I think I indicated that I

21  would write some sort of letter on his behalf.

22  I think I was going to move his family and

23  there may have been something else but I don't

24  recall.

25          MR. DEMARTINI:  I would ask that the

Transcription Plus II        Rosalie Lombardi

Vecchione - Cross - Demartini                    80

1   following be marked as Government Exhibit 6.

2   (Government's Exhibit 6 marked for

3   identification)

4        Q.   Mr. Vecchione, do you recognize

5   Government Exhibit 6?

6        A.   Yes, I do.

7        Q.   And what is it?

8        A.   These are my notes as to what I was

9   going to do on behalf of Raymond Rivera and I

10  know that --

11       Q.   And what did you indicate that you

12  were going to do?

13       A.   A letter for work release, because I

14  believe he was in jail already, move him, for

15  his safety, once he got out and move his

16  family for safety.  And I have written on here

17  Giglio, which means that I would have put it

18  in the folder that I would have turned over to

19  the defense attorneys with regard to material

20  that would fall under Giglio.

21       MR. DEMARTINI:  And I would mark the

22  following as Government Exhibit 7.

23  (Government's Exhibit 7 marked for

24  identification)

25       Q.   Mr. Vecchione, do you recognize what's

Transcription Plus II          Rosalie Lombardi

Vecchione - Cross - Demartini                    81

1    been marked Government Exhibit 7?

2         A.    Yes.

3         Q.    And what do you recognize that to be?

4         A.    This is a receipt that I prepared for

5    Mr. Harrison when I turned over Rosario

6    material, criminal records of various

7    witnesses in the case, and Giglio material

8    with regard to Arnold Stober, John Stober and

9    Raymond Rivera.

10              And the second sheet is also a

11   receipt.  It's dated two days later.  At that

12   point, I provided Mr. Harrison with two more

13   pieces of Rosario material and criminal

14   records of one of the victims in the case and

15   Arnold Stober.

16              MR. BARKET:  What number is that?

17              THE WITNESS:  7.

18        Q.    As you got closer to the trial, did

19   you prepare yourself and ultimately for the

20   Court, a witness list or witness lists of the

21   people that you intended to call at trial?

22        A.    I believe that we did.  I don't know

23   that I physically wrote it but I think that we

24   -- I know we did.  I think it might have been

25   Sean Courtney who wrote -- actually wrote out

Transcription Plus II        Rosalie Lombardi

Vecchione - Cross - Demartini                    82

1    the witness list.

2         Q.   And when you were doing this, was

3    Mr. Murphy on your witness list?

4         A.   No.

5              MR. DEMARTINI:  And I would ask that

6    the following be marked as Government Exhibits

7    8-A, B, and C.

8    (Government's Exhibit 8-A, B and C marked for

9    identification)

10        Q.   Do you recognize A, B and C, number 8-

11   A, 8-B and 8-C?

12        A.   A is what appears to be the witness

13   list.  B is a potential witness list, which I

14   wrote out.  A, I did not write.  And C, it

15   says witnesses and it appears as if these are

16   the witnesses that we were intending to call.

17   And I did not write C either.

18        Q.   Now in any of those lists does the

19   name of Ciscro Murphy appear?

20        A.   No.

21        Q.   When did you ultimately decide that

22   you were going to use Murphy as a witness in a

23   case?

24        A.   On the 17th, after I spoke to him in

25   the -- in that little room on the fourth

Transcription Plus II        Rosalie Lombardi

Vecchione - Cross - Demartini                    83

1    floor.

2              THE COURT:  You just -- so help me.

3    Was this when -- this was just before he was

4    called?

5              THE WITNESS:  Yes, sir.

6              THE COURT:  But you had brought -- I

7    assume you had brought him over with the

8    notion --

9              THE WITNESS:  I was hoping that he

10   would --

11             THE COURT:  That he would --

12             THE WITNESS:  -- remember and that he

13   would testify.

14             THE COURT:  So, you -- I mean,

15   basically, you had just -- you had made the

16   decision, essentially, to use him subject to

17   your, you know, having comfort as to what he

18   would say at some earlier point.

19             THE WITNESS:  Yes, absolutely.

20        Q.   Now is it fair to say that on March 11

21   and March 12, 1993 while the trial was

22   progressing, that would be the Thursday and

23   Friday before the following Wednesday when

24   Murphy testifies, that you were busy with your

25   direct case?

Vecchione - Cross - Demartini                    84

1      A.    Yes.

2      Q.    And in your case, Mr. Murphy testified

3   solely as a rebuttal witness.

4            Is that correct?

5      A.    Yes.

6      Q.    On the subsequent case --

7      A.    Excuse me.

8      Q.    -- after he signed his cooperation

9   agreement, was he a primary witness in the

10  first and second trials that Mr. Hollman

11  testified --

12     A.    I believe so; yes.

13     Q.    -- excuse me, tried?

14     A.    Yes.

15           THE COURT:  Could you refresh my

16  recollection?

17           THE WITNESS:  Yes, sir.

18           THE COURT:  I looked at the transcript

19  before when the case was reassigned to me and

20  we had a hearing -- oral argument and I

21  decided that I needed to have an evidentiary

22  hearing.

23           THE WITNESS:  Yes, sir.

24           THE COURT:  So, what I don't remember

25  from the transcript, did anybody ask, either

Vecchione - Cross - Demartini                    85

1   you or Mr. Harrison, ask Ciscro Murphy what he

2   faced, what his exposure was on the pending

3   charges?  Do you recall?

4             THE WITNESS:  I don't recall.  I don't

5   think so but I don't recall it.  I don't

6   recall with 100 percent certainty, Judge.

7             MR. BARKET:  In the Cabeza trial,

8   Judge?

9             THE COURT:  Yes.

10             MR. BARKET:  No.

11             MS. DONHAUSER:  What's the question

12   again because I have -- whether anybody asks

13   whether he could be, like, a mandatory

14   persistent or something?

15             THE COURT:  What penalty do you face

16   on these charges, which is the traditional

17   question that one would ask of a cooperating

18   witness who you knew had pending charges.

19             MR. BARKET:  No.

20             MS. DONHAUSER:  I believe -- well, I

21   think actually Harrison --

22             MR. BARKET:  He doesn't ask him about

23   the penalties.  I'll take a look.  I could be

24   wrong.

25             MS. DONHAUSER:  Okay.  We can continue

Vecchione - Cross - Demartini                    86

1   and I'll look.

2                THE COURT:  Yes, that's okay.

3   BY MR. DEMARTINI:

4        Q.   At the conclusion of the Cabeza and

5   Marshall trial, did you speak with the jurors?

6        A.   No.

7        Q.   So you don't have any direct

8   information from any of the jurors as to why

9   they came to the verdict that they came to?

10       A.   No.  I mean, yes, I do not have --

11       Q.   Okay.

12                Well, but you wrote a letter to the

13   parole board, so you must have had an opinion.

14                THE WITNESS:  That wasn't the

15   question, Judge.  It was what -- the question

16   was --

17       Q.   Did you have any firsthand information

18   from any of the jurors as to how they came

19   about with their verdicts and the Cabeza and

20   Marshall trial?

21       A.   No.

22       Q.   So your letter to the parole board was

23   not based upon any information you got from

24   jurors?

25       A.   No.

Transcription Plus II        Rosalie Lombardi

Vecchione - Cross - Demartini                    87

1        MS. DONHAUSER:  Judge, I have an

2   answer to your question.  It was very brief.

3   Mr. Harrison asked:

4        "Question:  If you were convicted,"

5   meaning of the cases -- of the open cases,

6   "would you become a predicate felon?

7        "Answer:  That's if I was convicted.

8        "Question:  Yes, if --

9        "Answer:  Yes."

10       But there's no discussion of the exact

11  number of years he could receive.

12  BY MR. DEMARTINI:

13     Q.   I would show you what has been

14  previously marked as the Petitioner's Exhibit

15  10.

16     A.   Yes.

17     Q.   Both sides of that top page.

18     A.   Yes.

19     Q.   Is that your handwriting on either of

20  the two pages?

21     A.   No.

22     Q.   Do you recognize the handwriting?

23     A.   No, I don't.

24     Q.   Looking at those two pages, does it

25  indicate that you had information or someone

Transcription Plus II        Rosalie Lombardi

Vecchione - Cross - Demartini                    88

1   in your trial cadre gathered information about

2   both the gun case that Cisco Murphy had

3   pending and the rape case?

4        A.   Yes.

5        Q.   Looking at that, would you be able to

6   conclude whether or not at some point you had

7   in your possession both the gun case and the

8   rape case?

9        A.   Yes.

10       Q.   Excuse me, what was your response?

11       A.   I'm sorry, say that -- ask the

12   question again.  I was reading.

13       Q.   Looking at those two pages of notes,

14   would that allow you to tell us whether or not

15   you had in your possession at some time before

16   you went to trial on the Cabeza and Marshall

17   case, whether or not you had both Mr. Murphy's

18   gun case that was pending and his rape case

19   that was pending?

20       A.   Yes.

21       Q.   The files in both cases?

22       A.   Yes.

23       Q.   And is it your answer that you had

24   both of them?

25       A.   At some point, we had both of them;

Vecchione - Cross - Demartini                    89

1    yes.

2         Q.   I believe you said you tried the

3    Cabeza case with a co-counsel.

4         A.   Yes.

5         Q.   And that was who?

6         A.   Sean Courtney.

7              MR. DEMARTINI:  I would mark the

8    following as Government Exhibit 9, I believe

9    we're up to.

10   (Government's Exhibit 9 marked for

11   identification)

12             MR. BARKET:  You're doing numbers,

13   also?

14             MR. DEMARTINI:  Yes.

15             MR. BARKET:  Okay.

16        Q.   Do you recognize that note?

17        A.   Yes.

18        Q.   And in whose handwriting is that note?

19        A.   Sean Courtney.

20        Q.   What does that refer to?

21        A.   This is a note that was given to an

22   assistant; it appears as if an assistant from

23   the orange zone and it refers to -- excuse me,

24   neither he nor I having spoken to a deputy

25   chief in the sex crimes bureau with regard to

Vecchione - Cross - Demartini                    90

1    Murphy's pending sex crimes case to make a

2    package offer; the gun and the sex crimes

3    case.

4         Q.   And when is that date?

5         A.   April 19.

6         Q.   And that would be April 19 of what

7    year?

8         A.   '93.

9         Q.   And does it make any reference to the

10   deputy that you would be speaking to in the

11   sex crimes unit?

12        A.   Yes, it says Melendez and I know that

13   to be Suzanne Melendez.

14        Q.   She was a deputy in the sex crimes

15   unit at the time?

16        A.   Yes.

17        Q.   Now, the two pending cases that Murphy

18   had, the gun case and the sex crime or the

19   rape case, were either of those two cases

20   cases that would have been assigned to your

21   trial cadre?

22        A.   No.

23        Q.   Where was the sex crimes case?

24        A.   In the sex crimes bureau.

25        Q.   And what about the gun case?  Where

Transcription Plus II        Rosalie Lombardi

1  was that being handled?

2      A.   It was in the orange zone, which is

3  one of the five trial bureaus that handles

4  supreme court cases.

5          MR. DEMARTINI:  Your Honor, at this

6  time I would like to have -- what I have done,

7  it's the complete outside folders of those two

8  cases with their notations.  We have also

9  xeroxed it.  So, we can -- I'll show it to

10 Mr. Barket.  He can check that it is a correct

11 xerox.

12         MR. BARKET:  I'm sure they copied what

13 was there, Judge.

14         THE COURT:  Okay.

15 (Government's Exhibits 10 and 11 marked for

16 identification)

17     Q.   I'll show you what's been marked as

18 Government Exhibits 10 and 11, these -- 10 and

19 11 being xerox copies of these two folders.

20         If you would look -- what are those

21 folders?  Can you tell us what the folders

22 are?

23     A.   These are the supreme court -- these

24 are the felony folders that we were using

25 back, I guess, 1992, 1993 until we changed the

Vecchione - Cross - Demartini                    92

1   outside of the folder to include color coding

2   for each of the zones.

3        Q.   And in particular, what cases do those

4   two folders refer to?

5        A.   Ciscro Murphy, Ciscro Murphy; both

6   Ciscro Murphy.

7        Q.   And would one be his gun case and the

8   other be the sex crimes case; the rape case?

9        A.   Yes.

10       Q.   Referring to the folder that's

11  indictment 1365/93, if you could look at the

12  page that represents the inside flap.

13       A.   Yes.

14       Q.   Is there a note that is dated April

15  22, 1993?

16       A.   Yes.

17       Q.   And what does that note state?

18       A.   It says, "Spoke to M. Vecchione.  Okay

19  to give better plea offer.  Defendant helped

20  M. Vecchione."  I can't read the last word or

21  two.  And it says -- and it's initially SM.

22       Q.   Now, do you know some -- who would be

23  SM at that time in the sex crimes bureau?

24       A.   Suzanne Melendez.

25       Q.   And the date again is?

Transcription Plus II        Rosalie Lombardi

Vecchione - Cross - Demartini                              93

1      A.    April 22.

2      Q.    And that would be before or after you

3  completed the trial in Cabeza and Marshall?

4      A.    After.

5            MR. DEMARTINI:  The rest of it

6  certainly speaks for itself and we'll direct

7  our arguments to it.

8      Q.    Now with respect to our file on the

9  sex crimes case --

10     A.    That's 12156?

11     Q.    That's correct.

12           MS. DONHAUSER:  No.

13           MR. BARKET:  No.

14           THE WITNESS:  No?

15     Q.    1 -- I think it's the --

16     A.    Oh, it's 1365.

17     Q.    1365.

18     A.    Yes.

19     Q.    Of '93.

20     A.    Okay.

21           THE COURT:  With respect to what case?

22           MR. DEMARTINI:  The sex crimes case.

23           THE COURT:  Okay.

24     Q.    Does the file indicate when Mr. Murphy

25  was first arraigned on that case?  I'm talking

Transcription Plus II        Rosalie Lombardi

Vecchione - Cross - Demartini                    94

1    about the criminal court arraignment, would

2    that appear on that folder?

3        A.   It doesn't appear --

4            MR. BARKET:   Can't we just stipulate

5    the date?  I think it was January 27.

6            MR. DEMARTINI:   That he was arraigned

7    on January 27 --

8            MR. BARKET:   27, I believe.

9            MR. DEMARTINI:   -- 1993.

10           MR. BARKET:   It's a matter of record.

11       Q.   I would show you the following rap

12   sheet.  On the top of the rap sheet, does it

13   indicate when it's generated?

14       A.   It's very hard to read.  It looks like

15   1.

16           MR. BARKET:   Judge, I'll stipulate

17   that the rap sheet was generated at the time

18   of the arraignment on that charge.

19       Q.   And is that --

20           MR. BARKET:   Whenever it was.

21       Q.   Does the rap sheet that would be

22   associated with that case contain or indicate

23   that there are two open cases at that point in

24   time for Mr. Murphy; namely, that rape case

25   and the gun case?

Vecchione - Cross - Demartini                 95

1       A.    Yes.

2       Q.    Now you mentioned in, I believe, in

3   answering one of Mr. Barket's questions

4   concerning the letter that an Assistant

5   District Attorney Ralph Pasarero wrote.   He

6   was in Nassau County and he wrote a letter to

7   Mr. Hollman and eventually you got that

8   letter.

9             How did you go about answering his

10  letter?  What did you look at before you

11  answered his letter?

12      A.    The Cabeza file.

13      Q.    When you say the Cabeza file, is that

14  the trial folder or boxes that contain the

15  trial folders for People v. Cabeza and

16  Marshall case?

17      A.    Yes.

18      Q.    Did you pull the files for Marshall's

19  other two cases?

20      A.    No, I believe that they were already

21  acquittals in those cases and those files were

22  sealed.

23      Q.    Did you pull Cisco Murphy's files?

24      A.    No.

25      Q.    Now, when the plea agreement was

Transcription Plus II        Rosalie Lombardi

Vecchione - Cross - Demartini                    96

1   entered into with Mr. Murphy, do you remember

2   when that plea agreement actually was signed?

3       A.    If you showed me, I would be able to

4   hopefully refresh my memory.

5           MR. BARKET:  We'll stipulate it was

6   signed by Mr. Murphy on August 13.

7           MR. DEMARTINI:  I think you have it --

8   you put it into evidence.

9           MR. BARKET:  It already is in.

10          MR. DEMARTINI:  Yes.

11          MR. BARKET:  It's in.

12          MS. DONHAUSER:  Yes.

13          MR. BARKET:  It's dated July 7.  It

14  was signed off --

15          MR. DEMARTINI:  And I showed it --

16          MS. DONHAUSER:  We have copies?  We

17  would like to show him copies?

18          MR. BARKET:  No, I have it.  It was

19  dated January --

20          THE COURT:  No, he's just asking you

21  for the --

22          MR. DEMARTINI:  Can I see that --

23          MR. BARKET:  Oh, I am sorry.

24          MR. DEMARTINI:  -- have that piece of

25  evidence to show the witness?

Vecchione - Cross - Demartini                    97

1          MR. BARKET:  Sure, one second.

2          MR. DEMARTINI:  And I have another --

3          MR. BARKET:  Yes, show him the other

4    copy.  I mean, there's no dispute about what

5    it says.

6          MS. DONHAUSER:  Paul?

7          MR. DEMARTINI:  Yes.

8          MS. DONHAUSER:  Here's an extra copy

9    for you.

10   BY MR. DEMARTINI:

11       Q.  Yes.

12       A.  Are you asking what date it was

13   signed?

14       Q.  Yes, by Mr. Murphy and his attorney.

15       A.  August 13, 1993.

16       Q.  And was that also the date that

17   Mr. Murphy took his plea of two to life?

18          MR. BARKET:  We have the minutes that

19   are in evidence, Judge, yes.

20          THE COURT:  All right.  He's

21   stipulating that it was.

22          MR. BARKET:  I stipulated to it.

23          THE COURT:  Let's go.

24          MR. BARKET:  This is ridiculous.  The

25   minutes are going to be part of the record.

Vecchione - Cross - Demartini                    98

1      Q.    Would you have sent the -- well,

2    looking at the folder for the gun case, does

3    it indicate that the agreement was signed in

4    court on that day?

5      A.    Yes.

6      Q.    Would you have sent over copies to the

7    orange zone?  Well, first let me ask you, were

8    the assistant who stood up on August 13, 1993

9    when Mr. Murphy pled guilty in Judge

10   Goldberg's part 31?

11     A.    No.

12     Q.    Would it have been an assistant from

13   the orange zone?

14     A.    That's what it looks like.  I can't

15   read the handwriting but it was not me.

16     Q.    Now I believe Mr. Barket showed you a

17   note from the orange zone two days prior to

18   the -- strike that.

19          So you didn't take the plea.

20     A.    No.

21     Q.    Is that correct?

22     A.    I did not.

23     Q.    Would you have sent over the

24   cooperation agreements, which were ultimately

25   signed in court?

1      A.    Yes.

2      Q.    Did you expect those cooperation

3  agreements, copies to then be placed in both

4  the Court file and our Cisco Murphy file?

5      A.    Yes.

6      Q.    Did you instruct anyone in the orange

7  zone when they took that plea to ask that the

8  file be sealed, so that no one could see the

9  cooperation agreement?

10     A.    No.

11     Q.    Do you know, in fact, if the file was

12  or wasn't sealed?

13     A.    I don't -- I would have no reason to

14  have it sealed.  There was no -- it was not

15  sealed, as far as I know.

16     Q.    Now I believe you testified on direct

17  examination to one of Mr. Barket's questions

18  that when you interviewed Mr. Murphy that

19  first time he came in, other than this contact

20  information that appears on one of the

21  documents placed into evidence, you didn't

22  take any notes.

23     A.    That's correct.

24     Q.    Is there any reason -- is there a

25  reason why you didn't take notes?

Vecchione - Cross - Demartini                                    100

1      A.   I don't ever take notes.

2      Q.   Why?

3      A.   Becuase I don't want the --

4           THE COURT:   It creates impeachment

5      material.

6           THE WITNESS:   Yes.

7      Q.   Okay.

8      A.   Right.

9      Q.   That's clear, now let's get that on

10     the record.

11          THE COURT:   I know.   We all know.

12     Many, many prosecutors do but it's not unheard

13     of.

14     Q.   When he was telling you his story and

15     what he testified to on rebuttal --

16     A.   Yes.

17     Q.    -- at the trial, was it a long,

18     complicated story?

19     A.   No, it wasn't at all.

20     Q.   It had basically boiled down to a

21     concocted alibi and he was angry at the

22     defendant for trying to have him associated

23     with a gun that Mr. Marshall owned.

24     A.   In essence, yes, that's what it boiled

25     down to.

1    Q.    I believe the following -- I'll show

2    him the original -- you have a copy of the

3    letter that was sent --

4         MR. BARKET:   I think I put it in

5    evidence.

6         MR. DEMARTINI:  Yes, you put it into

7    evidence.  I don't remember what number it is,

8    so I'll show the original.

9    Q.    After you got through trying the

10   Cabeza-Marshall case --

11   A.    Yes.

12   Q.    -- did you receive some correspondence

13   from Mr. Murphy and in particular, that letter

14   that you're looking through now?

15   A.    It's -- yes, I recall I did; yes.

16   Q.    And it's dated when?

17   A.    August 15, 1994.

18   Q.    And if you could look at, I believe

19   it's page 3, does he make -- he, being

20   Mr. Murphy, any reference to his testimony in

21   the Marshall-Cabeza case?

22   A.    Yes.

23   Q.    In his reference in that letter, is

24   there any reference that he was made a promise

25   at that time?

Vecchione - Cross - Demartini                    102

1      A.   No.

2      Q.   What does he say?

3      A.   He says -- how much of the paragraph

4  do you want me to read?

5      Q.   Just the paragraph that contains a

6  reference to the Cabeza case.

7      A.   It says, "Mr. Vecchione, you're my

8  only hope.  Things in here has gotten worse

9  concerning my situation and the prison

10 officials is trying to cover up everything

11 becuase they do not want to be a part of the

12 lawsuit.  Remember when I was going to testify

13 against Born, a/k/a Jeffrey Marshall and

14 Robert Cabeza, and you stated to me, 'to go in

15 there and tell the Court what I know.'  Do you

16 remember that?  Well, for my reason -- my

17 reason for mentioning that is because I need

18 you to believe in me once more, to believe

19 that I will be able to live a law abiding life

20 and become a productive person within my new

21 community and society.  In fact, I would be

22 willing to make myself available to your

23 office on a permanent basis or whenever needed

24 in an effort to show my appreciation."

25     Q.   And, in fact, is that what you told

Transcription Plus II       Rosalie Lombardi

Vecchione - Cross - Demartini                103

1    him just prior to his testifying to go in

2    there and to tell the Court what he had told

3    you previously?

4        A.    Yes, in so many words I did.  I -- to

5    go in there and tell the Court what you know.

6        Q.    So, at any time that you spoke to him

7    up to and including March 17, 1993, did you

8    ever make any promises to him?

9        A.    No.

10       Q.    Did he request any promises or

11   consideration for his testimony?

12       A.    In that time frame?

13       Q.    In that time frame.

14       A.    No.

15       Q.    And when you entered into the

16   cooperation agreement, was that based on

17   additional information that he was now giving

18   you concerning Mr. Marshall?

19       A.    Yes.

20       Q.    And that would be information that

21   related to the second and third homicide

22   trials?

23       A.    Yes.

24       Q.    Just one second.

25             One last thing, the rap sheet that you

Vecchione - Cross - Demartini                104

1    looked at that contained -- that mentions both

2    open cases for Mr. Murphy --

3         A.   Yes.

4         Q.   -- the gun case and the rape case, was

5    that rap sheet in the sex crimes folder that

6    you pulled or had pulled from the sex crimes

7    unit?

8         A.   It would -- I would assume so, since

9    it had the rape arrest on  here.

10        Q.   And did you have that case folder

11   before you went to trial with Mr. Cabeza and

12   Mr. Marshall?

13        A.   Yes.

14        Q.   So, is it your testimony that the rap

15   sheet that you handed or actually there were

16   two rap sheets that you handed to Mr. Harrison

17   at that trial, were rap sheets that contained

18   both cases?

19        A.   Yes.

20        Q.   And, in fact, were there questions of

21   Mr. Murphy that concerned both cases?

22        A.   Yes.

23        Q.   When you turned over the last two

24   cases to Mr. Hollman, the second and third

25   Marshall homicides, do you remember telling

Transcription Plus II          Rosalie Lombardi

1  Mr. Hollman that Mr. Murphy was a cooperating

2  witness?

3      A.  Yes.

4      Q.  And do you know if Mr. Hollman pulled

5  the files of Mr. Murphy?

6      A.  I don't know what he did.

7      Q.  Did you have any follow up -- after

8  you gave the cases to him, did you have --

9  well, did you speak to him initially when you

10  gave him the cases?

11      A.  Yes.

12      Q.  Did you have any follow up

13  conversations from the time that you had that

14  initial conversation when you transferred the

15  cases over to him until he tried the cases?

16      A.  I'm sure I did.  I don't recall any --

17  I don't recall what the content but I am sure

18  I did.  He must have --

19      Q.  Did he come to you asking you about

20  the cases?

21      A.  I'm sure he did.

22      Q.  Do you remember if he asked you about

23  any cooperation agreement with Mr. Murphy?

24      A.  Specifically, I don't recall.  You

25  know, I would have told him that there were

Transcription Plus II        Rosalie Lombardi

Vecchione - Cross - Demartini                106

1  cooperation agreements.  He would not have

2  even known the existence of Mr. Murphy if had

3  it not been for me becuase Mr. Murphy doesn't

4  appear on any of the documents in the file

5  except for the cooperation agreement.  I mean,

6  he was not -- those cases have already been

7  indicted.  Murphy didn't testify in the grand

8  jury.  He wasn't on any DD-5's.  He wasn't on

9  any documents.

10        So, in order for Mr. Hollman to know

11  about Mr. Murphy, I would have been the one to

12  tell him.

13        MR. DEMARTINI:  Judge, I have no

14  further questions.

15        MR. BARKET:  I have no --

16        THE COURT:  I may have misheard.  At

17  the time -- when did he testify in the grand

18  jury in the subsequent two cases?

19        THE WITNESS:  Who is that, Judge?

20        THE COURT:  Ciscro Murphy.

21        THE WITNESS:  He did not.

22        THE COURT:  He did not testify.

23        THE WITNESS:  No, that's my point.

24        THE COURT:  Okay.

25        THE WITNESS:  He did not.

Transcription Plus II        Rosalie Lombardi

1              MR. BARKET:  Could I ask a few more

2    questions, Judge?

3              THE COURT:  Of course.

4    REDIRECT EXAMINATION

5    BY MR. BARKET:

6       Q.   Could you take a look at the letter,

7    which I think has been marked as --

8       A.   This letter, the --

9       Q.   Yes, the letter that Mr. Murphy sent

10   to you.  I believe it's marked as Petitioner's

11   3.

12             THE COURT:  Before he testified at the

13   first trial, the one that's at issue here, had

14   there been any discussion about him testifying

15   in any other trials?

16             THE WITNESS:  No, Judge.

17             MR. BARKET:  I'm sorry, Judge, I

18   didn't hear your question.

19             THE COURT:  I asked whether before he

20   testified against Mr. Marshall at the trial

21   that at's issue here whether he had agreed to

22   testify in any of the other cases and the

23   answer was no.

24      Q.   Petitioner's 3, could you read for the

25   Court the first two sentences, please?

Vecchione - Redirect - Barket                108

1      A.   "Dear Mr. Vecchione, I hope my letter

2   find you doing well.  I am writing to you

3   because I know that you are a fair man and a

4   man of your word."

5      Q.   So, he's obviously, in writing this

6   letter, referring back to some statement you

7   had made to him where he says you're a man of

8   your word; right?

9      A.   I can't tell you what was in his mind.

10     Q.   Well, what does he ultimately ask you

11  to do here?  Take a look at page 4 and read

12  the first sentence on page 4.

13          MS. DONHAUSER:  I'm sorry, which --

14  what's the date on that letter?

15          MR. BARKET:  It's the letter that --

16          MS. DONHAUSER:  The same one?

17          MR. BARKET:  Yes.

18          THE WITNESS:  August 15.  What are you

19  asking me now, Mr. Barket?

20  BY MR. BARKET:

21     Q.   Read the first sentence of page 4.

22     A.   "Mr. Vecchione, I need your help.  I

23  need you to contact Mr. James Ricor (phonetic)

24  in Albany, New York.  He is the director of

25  the temporary release program.  His phone

Transcription Plus II          Rosalie Lombardi

Vecchione - Redirect - Barket                    109

1    number is (518 457-2655."

2         Q.   And --

3         A.   "I need you to -- "

4         Q.   Sorry.

5         A.   Do you want me to --

6         Q.   Go ahead.   Read the next sentence.

7         A.   "I need you to explain my situation

8    and to ask him to let me participate in the

9    work release program."

10        Q.   Thank you.

11             Now you indicated --

12             THE COURT:  Well, other than what's in

13   the agreement, did you make him any other

14   promises, Murphy?

15             THE WITNESS:  No, sir.

16             THE COURT:   -- about writing to parole

17   boards?

18             THE WITNESS:  No, sir, whatever is in

19   the agreement is what I agreed to.

20             THE COURT:  And does the agreement

21   refer to letters to the parole board?

22             MR. BARKET:  The cooperation

23   agreement?

24             THE COURT:  Yes.

25             MR. BARKET:  No, Judge, I think it's

_____

Transcription Plus II         Rosalie Lombardi

Vecchione - Redirect - Barket                    110

1   limited to the two to life.

2   BY MR. BARKET:

3        Q.   With respect to -- do you still have

4   up there the file that, "Spoke to M.

5   Vecchione, okay to give better plea offer,

6   defendant helped Mr. Vecchione in the trial?"

7             Do you have that notation?

8        A.   On the flap?

9        Q.   Right.

10       A.   Yes.

11       Q.   On the --

12       A.   Spoke to -- yes.

13       Q.   Under confidential notes.

14       A.   Yes.

15       Q.   Is that right?

16       A.   Yes.

17       Q.   And it says -- does that help you,

18   "The defendant helped Mr. Vecchione in trial?"

19   Is that the last two words?

20       A.   Your guess is as good as mine.   I

21   guess that's what it means.   I don't -- you

22   know, I don't know.

23       Q.   It actually did help you in the trial;

24   right?

25       A.   Well, of course, he testified.

Transcription Plus II        Rosalie Lombardi

Vecchione - Redirect - Barket                    111

1          MR. BARKET:  And could I have the

2    original of this, please?

3          MS. DONHAUSER:  Which one?

4          MR. BARKET:  Could I have the original

5    of that?

6      Q.  Did you testify before that the deal

7    that you gave Mr. Murphy had nothing to do

8    with his testimony for Cabeza, that the deal

9    was prospective in that it was for him to

10   testify in the next two trials?

11     A.  I had no deal with Mr. Murphy with

12   regard to the Cabeza case.

13         THE COURT:  I think what we --

14         MS. DONHAUSER:  I don't think I have

15   the original of this.

16         THE COURT:  I think what you were

17   talking about is, I mean, is what the

18   agreement references.

19         MS. DONHAUSER:  I can tell you what it

20   looks like.  It's this big.  That's in red.

21   The rest is in (inaudible).  I don't have

22   any --

23         MR. BARKET:  I'm sorry, Judge?

24         THE COURT:  I think what we're talking

25   about and there was some confusion.

Transcription Plus II        Rosalie Lombardi

1    Ms. Donhauser started giving me numbers but --

2    of indictments, but the question was whether

3    the plea agreement actually referenced the

4    first case.

5              THE WITNESS:  It did not, only to the

6    extent -- it does, only to the extent that the

7    number that I put in -- when I say -- it reads

8    as follows, Judge and it's easier to read it.

9              "Under this agreement, Ciscro Murphy

10   will continue to make himself available to

11   representatives of the Kings County DA and to

12   meet with all -- with and at all times to

13   truthfully and completely disclose all

14   information, including context of

15   conversations that he possesses regarding the

16   criminal activities and the associations of

17   the following person; Jeffrey Marshall, also

18   known as Born or Marsh, who is currently

19   indicted under Kings County indictments

20   9490/92 and 12592/92."

21             So, the agreement was to the -- for

22   him to testify and to continue to give us

23   information with regard to the pending

24   indictments and this was signed after the

25   Cabeza case had been tried -- the first case

Vecchione - Redirect - Barket                113

1    had been tried.

2         MR. BARKET:  May I continue, Judge?

3         THE COURT:  Yes.

4    BY MR. BARKET:

5         Q.  Now the that you --

6         THE COURT:  Could I see the letter for

7    the moment?

8         THE WITNESS:  Sure, Judge.

9         Q.  The note that we just read here

10   indicates "4/23 spoke to Mike Vecchione.  Okay

11   to give --"

12        THE COURT:  Could you stop for a

13   minute?

14        MR. BARKET:  I'm sorry.

15             (Pause in proceedings)

16        Q.  That agreement was written on July 6;

17   correct?

18        A.  Yes.

19        Q.  On April -- the notes that we're

20   reading are April 22, 1993.

21             Is that correct?

22        A.  It says April 22, 1993; right.

23        Q.  So that -- and he testified on March

24   17.

25             Is that correct?

Vecchione - Redirect - Barket                    114

1     A.    Right.

2     Q.    So within about six weeks of his

3  testimony, someone had spoken to you and you

4  had authorized the better deal for Mr. Murphy

5  on the rape charge because of his testimony

6  for you in the Cabeza trial.

7           Is that right?

8     A.    No, what we were doing was I had

9  engaged in discussions with Mr. Fiol by that

10  point and we were giving him the deal based on

11  his testimony that was going to come up in the

12  other two trials.

13     Q.    Well, the --

14     A.    In fact, he had --

15     Q.    -- note here says --

16           THE COURT:  Let him finish.  He'll

17  read the note.

18     A.    In fact, he had testified for me, yes,

19  in the other case but that's -- and I'm sure I

20  informed -- I told Suzanne Melendez that he

21  did; yes.

22     Q.    And it --

23     A.    But the cooperation agreement was only

24  for the cases that were coming up, not the

25  case that he had already testified in.

Vecchione - Redirect - Barket                    115

1          Q.    Well, the note here, "Spoke to M.

2    Vecchione," that would be you; yes?

3          A.    Yes.

4          Q.    Okay.

5                "Okay to give better plea offer.

6    Defendant helped Michael Vecchione or M.

7    Vecchione at trial."

8                That's April 22.

9          A.    It says, "Spoke to M. Vecchione.   Then

10   it says okay to give better plea offer.

11   Defendant helped M. Vecchione" and those words

12   that I am not sure of but I'm sure it says --

13   that you're right; yes.

14         Q.    Take a look at what I've marked as

15   Petitioner's 14.

16   (Petitioner's Exhibit 14 marked for

17   identification)

18                MR. BARKET:  And I'm going to ask that

19   we have an understanding, that's a note that

20   was also in the rape file.

21                Is that correct?

22                MS. DONHAUSER:  I have to check that.

23         Q.    Do you see what I've highlighted there

24   in yellow?

25         A.    I see what it says; yes.

Transcription Plus II          Rosalie Lombardi

Vecchione - Redirect - Barket                    116

1      Q.   Okay.

2           Could you read that to the Court,

3  please?

4      A.   It says, "Mike Vecchione and Sean

5  Courtney want to deal this case and the gun

6  case."

7      Q.   And what's the date up in the upper

8  right hand corner of that?

9      A.   April 14.

10     Q.   That's --

11     A.   Is that the -- is this is what you're

12  referring to?

13     Q.   Yes.

14     A.   Okay.

15     Q.   Now, you indicated that by looking at

16  the notes which were marked as number 10 --

17          MR. BARKET:  Can I have those back

18  again?

19          MS. DONHAUSER:  This?

20          MR. BARKET:  Yes.

21     Q.   -- marked as number 10, you can tell

22  from them that you can tell that both files

23  were requested by you and that you had both

24  files on the 17th of March.

25          Is that right?

1      A.    You've asked two questions.   Which one

2  do you want me to answer?

3           MS. DONHAUSER:  Does he have it on the

4  stand?

5           MR. BARKET:  Do you still have the --

6  number 10 up there, the originals?

7           THE WITNESS:  Yes.

8           MR. BARKET:  Okay.

9           MS. DONHAUSER:  Yes.

10     Q.    Could you take a look at that?

11     A.    Yeah, you asked me two questions.

12     Q.    You were asked whether or not you had

13  the file and whether or not you could tell you

14  had the files from those notes.

15     A.    It appears --

16     Q.    And you said yes.  Could you just

17  point to what you were referring to?

18     A.    No, other than this note that says

19  that the assistant from the orange zone wants

20  the case folder back --

21     Q.    That was --

22     A.    -- I would --

23     Q.    The case folder for the orange zone

24  back --

25     A.    Can I finish my answer?

Vecchione - Redirect - Barket                    118

1      Q.   -- would be -- sure.

2      A.   I would have had both files.  Of

3   course, I would have.  I would not have --

4      Q.   Would --

5      A.   -- done anything with Mr. Murphy

6   unless I had looked at both files; yes.

7      Q.   You had a note from -- a note

8   specifically requesting the gun case and a

9   note requesting the gun case back; correct?

10     A.   Yes.

11     Q.   That's the note that you just referred

12   to that we're looking for that case back.

13     A.   Yes.

14     Q.   That was the case that was on P-31 on

15   the 17th; right, the gun case?

16     A.   Part 31; yes.

17     Q.   You also said that you could tell by

18   looking at those notes that you had both

19   files.

20     A.   I can tell --

21     Q.   Is there something in the notes --

22     A.   No.

23     Q.   -- that indicates that you had the

24   other file?

25     A.   Nothing in the notes specifically,

Transcription Plus II          Rosalie Lombardi

Vecchione - Redirect - Barket                    119

1    other than the fact that I would know that I

2    had -- I would get the cases.

3        Q.    Right.

4        A.    I mean, there --

5        Q.    Actually, there is a reference to the

6    other case in the file, isn't there, on that

7    same pad; isn't there?

8        A.    What were you -- what you asked me

9    about before?

10       Q.    There's a reference to the second

11   case; isn't there?

12       A.    Yes, there is.

13       Q.    What does that say?

14       A.    It says, "Complaining witness Lilly

15   Young never came forward.  Complaining witness

16   Della not credible.  Case was not indicted."

17       Q.    So on the 17th of March, when you

18   claimed you had both files, we know that both

19   cases were indicted at that time; don't we?

20       A.    Number one, you say -- you keep

21   prefacing by saying I had the two files on the

22   17th.  I don't recall having the files in

23   court with me on the 17th.  I don't know if I

24   did or not.  You never asked me that.

25            Did I -- I have I looked at the files

Vecchione - Redirect - Barket                    120

1   -- had I looked at the files prior to the

2   17th?  The answer is yes, I did.

3        Q.   Is there any notation in Jeffrey

4   Marshall's file that you've requested or

5   obtained the rape case?

6        A.   In Jeffrey Marshall's file?

7        Q.   Yes.

8        A.   I have no idea.

9        Q.   Is there any notation in any of those

10  files that you requested or obtained the rape

11  file?

12       A.   The only reference to it is the note

13  that's in front of me, which indicates that

14  two of the complaining witnesses in that case

15  were -- one didn't come forward and one was

16  not credible.

17            So, the answer to your question is I

18  had the rape file and I examined it, at some

19  point prior to the 17th; yes.

20       Q.   Okay.

21            And that also says the case was not

22  indicted; correct?

23       A.   At that point, whenever these were

24  made -- whenever these notes were made, the

25  case had not been indicted according to this.

Vecchione - Redirect - Barket                    121

1      Q.   You --

2      A.   I don't know if this is an accurate

3   note.  I mean, I didn't make these notes.  So,

4   I don't know if the case is accurate -- if

5   that's accurate.

6      Q.   How did you find Ciscro Murphy in

7   jail?

8      A.   When?

9      Q.   When you wanted him?

10      A.   I presume, and I didn't find him, but

11   I presume my paralegal put his name in to the

12   computer and found -- and he was in jail.

13      Q.   Isn't it correct that after he went

14   back to jail, Mr. Fiol and you entered into

15   negations for a deal and that you knew he was

16   in jail becuase Mr. Fiol told you?

17      A.   I don't have any recollection of that

18   at all.

19      Q.   Isn't it correct that as these

20   negotiations were going on, the reason why you

21   didn't put Murphy on the witness list is

22   because you never struck a deal with Fiol.

23      A.   There were --

24      Q.   Fiol wanted a misdemeanor and you

25   didn't want to give him a misdemeanor.

Transcription Plus II          Rosalie Lombardi

Vecchione - Redirect - Barket                     122

1          A.    Do you want me to answer the question
2    or you --
3          Q.    Yes.
4          A.    The answer to the question is there
5    were no negotiations going on between the time
6    Mr. Murphy came into my office and the time
7    that he testified.  So your preface -- the
8    preface to your question was not -- is not
9    correct.
10         Q.    So, your testimony now is that your
11   memory is Mr. Fiol never asked you for
12   anything?
13         A.    I didn't say that.  I said there were
14   no negotiations going on.
15         Q.    Is that how --
16         A.    My -- when I --
17               THE COURT:  Are we talking about some
18   definition of negotiation or did you not have
19   any conversation?  What's -- about -- I don't
20   want to get caught up in a --
21               THE WITNESS:  Judge, I --
22               THE COURT:  Did you have any
23   conversations with Mr. Fiol about --
24               THE WITNESS:  I don't recall
25   Mr. Fiol --

1            THE COURT:  -- this issue.

2            THE WITNESS:  I may -- I must have had

3     a conversation with Mr. Fiol to let him know

4     that his client had come into my office but I

5     don't have any recollection of any

6     negotiations taking place or Mr. Fiol asking

7     me for anything becuase I recall it was very

8     simple.

9            Mr. Murphy did not want anything.

10    There was no need to enter into any kind of

11    negotiations.  He did not want anything.  Now

12    is that amusing, Mr. Barket?

13           THE COURT:  Did he say --

14           THE WITNESS:  I don't understand.

15           THE COURT:  Did he say that he didn't

16    want anything or is that just becuase he

17    didn't -- you're assuming that becuase he

18    didn't ask?

19           THE WITNESS:  He absolutely,

20    positively said he did not want anything

21    because I asked him.

22       Q.   And six weeks later, he's getting

23    better deals in the rape question and three

24    months later --

25       A.   Six --

Vecchione - Redirect - Barket          124

1      Q.   -- he's an agreement drafted.

2      A.   -- weeks later -- is that a question

3  or are --

4      Q.   Yes, if he didn't want anything except

5  right after he testified he got something.

6           THE COURT:  Don't argue -- I told you

7  yesterday, there's no need for argumentative

8  questions.  There is no jury --

9           MR. BARKET:  I'm sorry, Judge.

10          THE COURT:  -- present here.

11          MR. BARKET:  Now --

12          THE COURT:  You don't have to ask

13  leading questions.

14          MR. BARKET:  I'll withdraw the

15  question.

16     Q.   Now your testimony concerning the

17  letter you sent to Mr. Pasarero where you

18  represented to him that there were no

19  agreements with Ciscro Murphy, what you're

20  telling the Court now is what you meant to say

21  with that I didn't enter into an agreement

22  with Mr. Cabeza -- on the Cabeza trial with

23  Mr. Murphy, not that there were no agreements

24  in existence; right?

25     A.   There clearly were agreements in

Vecchione - Redirect - Barket                    125

1   existence.

2        Q.    Now there were agreements in existence

3   for three trials of Jeffrey Marshall --

4             THE COURT:  Can I ask this -- could

5   you stop for a minute?  I listened to Murphy

6   here, who was here yesterday and he struck me

7   as a pretty shrewd piece of work.

8             THE WITNESS:  I had a very limited --

9             THE COURT:  I mean, he struck me as

10  basically, you know, no fool.

11            THE WITNESS:  I would say that's

12  correct, Judge.

13            THE COURT:  And it -- I'm not making

14  any judgments now about the ultimate outcome

15  but it strikes me that the notion that he

16  wouldn't ask for anything, that he would

17  affirmatively say that he didn't want anything

18  strikes me as being almost totally

19  inconsistent with his personality.

20            THE WITNESS:  Judge, he asked for

21  nothing.

22            THE COURT:  No, I know but --

23            THE WITNESS:  I asked him -- no, let

24  me just finish.

25            THE COURT:  But the question I asked

1    you was --

2            THE WITNESS:  Okay.

3            THE COURT:  -- did he say I don't want

4    anything or did he just simply ask for nothing

5    and you, as I -- if I heard your answer

6    correctly, you specifically said that he said

7    that he didn't want anything and it's sort of

8    hard for me to believe that someone like

9    Ciscro Murphy, the person I saw here testify,

10   would have said I don't want anything.

11           THE WITNESS:  Judge, I will answer it

12   again.  I asked him, "What are you looking

13   for?"

14           He said, "I am looking for nothing.  I

15   am pissed off at Marshall," or Born or

16   whatever he called him, because of what he had

17   -- he felt that Marshall had done to him.

18           The reason, Judge, I am so clear and I

19   remember this is how -- it hasn't happened

20   very often in my career.

21           THE COURT:  Well, no, that doesn't

22   happen often.

23           THE WITNESS:  In fact, I don't think

24   it's happened at all other than this.

25           MR. BARKET:  May I continue, Judge?

Vecchione - Redirect - Barket                127

1    BY MR. BARKET:

2        Q.   Now, Mr. Murphy after the deal was

3    signed, testified in two trials for your

4    office.

5             Is that correct, the two murder cases?

6        A.   I know that based upon --

7        Q.   Mr. Hollman --

8        A.   -- information -- yes, I wasn't

9    present at the trials; yes.

10       Q.   And you also got a letter from

11   Mr. Pasarero, who was going to use Mr. Murphy

12   in a third trial in Nassau County.

13            Is that correct?

14       A.   I don't know that he was going to use

15   him.  I don't have any information about that.

16       Q.   Didn't he write to you asking for the

17   agreements?  When I say you, it's Mr. Hollman,

18   asking for the agreements?

19       A.   Yes.

20       Q.   Including Mr. Murphy's agreement?

21       A.   That has nothing to do with him -- his

22   desire or his plan to use him.

23       Q.   And so during those three trials,

24   subsequent to signing of the agreement, was

25   that agreement disclosed by you or your office

Vecchione - Redirect - Barket                    128

1    to anyone?

2        A.   What three trials?

3        Q.   The two involving your office, the

4    murder case that Mr. Hollman tried and the

5    third with Mr. Pasarero?

6        A.   The only one I could speak to is the

7    one that took place before the one that I

8    tried.   I had no agreement and, therefore, of

9    course, nothing was turned over because there

10   was no agreement.

11           What happened in the latter two trials

12   and the trial in Nassau County, I have no

13   information.

14       Q.   And the only public notation -- excuse

15   me, withdrawn.

16           The only written statement you make

17   about the agreement is a letter to

18   Mr. Pasarero saying it doesn't exist.

19           Is that right?

20       A.   I don't know what you're asking me.

21   There was no agreement to give to him.

22   Nothing existed with regard to the Cabeza

23   case.

24       Q.   When Mr. Pasarero asked you for any

25   agreements your office has with Ciscro

Vecchione - Redirect - Barket                    129

1   Murphy --

2            MS. DONHAUSER:   Judge, we've gone over

3   this --

4       A.   Mr. Barket, I answered that question

5   already.

6            MS. DONHAUSER:   -- I don't know how

7   many times.

8            THE COURT:   We're going over -- this

9   has been asked and answered.

10      Q.   When Mr. Murphy testified in the trial

11  before Judge Aiello, the Cabeza trial --

12      A.   Yes.

13      Q.   -- you indicated that he said that he

14  -- the second crime was assaulting some girl.

15           Is that correct?

16      A.   If you show me the minutes, I can give

17  you the exact quote.   I don't recall but I

18  believe that that's the way he always

19  characterized it.

20      Q.   Did you stand up --

21      A.   As a sexual assault or an assault on a

22  woman.

23      Q.   Did you stand up and correct him and

24  say to the judge either on or off the record,

25  Judge, that's not an assault, that's a rape?

Transcription Plus II          Rosalie Lombardi

**Vecchione - Redirect - Barket**                    130

1     A.   He was being cross-examined by

2  Mr. Harrison and Mr. Harrison had the rap

3  sheet in front of him.  I was going to

4  interrupt his cross-examination and have --

5  and correct the witness?  I believe that

6  Mr. Harrison had the right to cross-examine

7  him.

8           And if he characterized it as an

9  assault, as opposed to a rape, that's a very

10  good piece of cross-examination material.

11  So --

12     Q.   What do you mean that's a very good

13  piece of cross-examination material?

14     A.   Well, if he's characterizing it one

15  way and the rap sheet says something else, it

16  would be up to Harrison then to, I would

17  assume, cross-examine him with it.

18     Q.   When you say --

19     A.   That would be --

20     Q.   -- a very good piece, that would be

21  something as a defense attorney that would be

22  -- make a lot of hay with, wouldn't you, to be

23  able to say, it's not assault, it's a rape.

24  And you would go into that.

25     A.   Yes.

Vecchione - Redirect - Barket          131

1      Q.   Becuase the person just lied to the

2  Court.

3      A.   Becuase the person mischaracterized or

4  characterized it in his own way; yes.

5      Q.   But there was some testimony you gave

6  on cross, I guess, or the examination by the

7  attorneys in your office, there was a

8  conference at the bench or was that between

9  you and Mr. Harrison and the Court prior to

10 Murphy's testimony?

11     A.   Yes.

12     Q.   Was that on the record or off the

13 record?

14     A.   Off the record.

15          THE COURT:  And what was -- tell me

16 what was the substance of the conversation off

17 the record?

18          THE WITNESS:  We went to the bench and

19 I told the judge that I was going to use --

20 that I had made up my mind that I was going to

21 use him or that he was right outside but that

22 his lawyer wasn't there.

23          And as I said to you, Judge, it was

24 very late in the day.  It may have even been

25 close to 4:30 and Judge Aiello wanted to

Vecchione - Redirect - Barket                    132

1    conclude the case becuase he knew that except

2    for, I believe, a sur rebuttal witness that

3    Harrison may was -- may have wanted to call,

4    that was going to be the end of the trial and

5    he was anxious to get it over with.

6           And he said in so many words, don't

7    worry about that.  I'll protect him.  You're

8    not going -- I'm not going to allow either of

9    you to go into his underlying -- the

10   underlying facts of his cases.

11       Q.   Did Mr. Harrison complain that he

12   wasn't given notice of the alibi rebuttal

13   witness during that conference?

14       A.   Not to my knowledge.

15           THE COURT:  Is there a rule that

16   requires such notice?

17           MR. BARKET:  Yes, Judge.

18           THE WITNESS:  Yes, but I had case law,

19   Judge, that I believe would have taken care of

20   it in the event that that was raised.

21   BY MR. BARKET:

22       Q.   Now when did you first tell

23   Mr. Harrison that Murphy was going to be

24   called, was it that day?

25       A.   That -- to use the name Murphy or that

Vecchione - Redirect - Barket                133

1    I was going to --

2        Q.   Yes, no to use the name Murphy.  You

3    told him that Ciscro Murphy would, you know --

4        A.   When I called him and I said the

5    people call Ciscro Murphy.

6        Q.   So, Mr. Harrison -- the information he

7    has on Mr. Murphy came exclusively from you.

8             Is that right?

9    A.   No.

10   Q.   Well --

11       A.   No, Mr. Harrison -- he worked for

12   Mr. Harrison.  He worked for Mr. Harrison.  He

13   worked for Mr. Marshall at Mr. Harrison's

14   office.  So, Mr. Harrison knew a great deal

15   about Mr. Murphy.

16       Q.   My question --

17       A.   He knew an awful lot about Mr. Murphy.

18       Q.   Did the judge give Mr. Harrison time

19   to go pull Mr. Murphy's criminal files prior

20   to his testimony?

21       A.   I don't recall that.  I don't think

22   Mr. Harrison asked for that.

23           MR. BARKET:  That's all I have, Judge.

24   Thank you.

25   RECROSS-EXAMINATION

Vecchione - Recross - Demartini                    134

1    BY MR. DEMARTINI:

2       Q.   The document that counsel is showing

3    you, the one with the notes, if you could look

4    at the note that's stapled on the back.

5            Does that have to do with the sex

6    crimes case?

7       A.   Excuse me, yes.

8       Q.   And does it, in fact, tell you an

9    indictment number for the sex crimes case?

10      A.   Yes.

11      Q.   So, looking at that note, would that

12   refresh your recollection as to whether or not

13   at some point prior to March 17 when you tried

14   the case and put --

15           MR. BARKET:  I'm sorry, can you -- I

16   just want to be able to see what note he's

17   referring to?

18           MS. DONHAUSER:  It's the --

19           MR. BARKET:  He's looking at --

20           MS. DONHAUSER:  It's this.  This is

21   the statement piece on the flip side of what

22   you were showing him.  You were showing this.

23           MR. BARKET:  Okay.

24           MS. DONHAUSER:  He's showing the

25   opposite side --

Transcription Plus II          Rosalie Lombardi

Vecchione - Recross - Demartini                    135

1          MR. BARKET:  Okay.

2          MS. DONHAUSER:  -- which was this and

3     there's a statement.

4     Q.   Does that note on the back of the

5     yellow pad or the sheet coming from the yellow

6     pad refresh your recollection as to whether or

7     not you would have had the sex crimes case

8     pulled at some time prior to the March 17 date

9     upon which Murphy testified in the Cabeza

10    trial?

11    A.   I didn't need my recollection

12    refreshed but yes, I did pull it before and I

13    did know that there was a rape charge; yes.

14    Q.   And, in fact, that refers to the rape

15    charge.

16    A.   Yes, it does.

17    Q.   And --

18    A.   In fact, these are my -- this part is

19    my handwriting where I have ROR, which means

20    released on his own recognizance becuase

21    that's what had happened as a result of the

22    people not being ready on the rape case.

23    Q.   That was before the indictment?

24    A.   That was before the indictment.

25    Q.   After he was arraigned on the

Transcription Plus II          Rosalie Lombardi

Vecchione - Recross - Demartini                    136

1   complaint.

2        A.   That's correct.

3        Q.   And then that also indicates that

4   subsequently there was an indictment?

5        A.   Yes, the indictment number is on here.

6        Q.   And I would just show you page 11 and

7   I believe all of this is -- will be in the

8   record, 1179 of Murphy's testimony in the

9   Cabeza trial.

10       A.   Okay.

11       Q.   Does that page indicate what Murphy's

12  response was as to his second pending case?

13  Did he merely say it was an assault or did he

14  say it was more than that?

15       A.   He says -- the question is:

16            "Question:  You have two charges.

17            "Answer:  Yes."

18            I'm sorry, the question is:

19            "Question:  And you have two charges;

20  yes?

21            "Answer:  Possession of a weapon in

22  the second -- in the first, I mean."

23            Then the Court interrupts and the

24  Court says:

25            "The Court:  You said there were two

Transcription Plus II          Rosalie Lombardi

1    cases pending; two separate cases?

2             "Answer:  Yes.

3             "The Court:  One is for a weapon and

4    what's the other one?

5             "Answer:  Supposed to be assaulting

6    this girl.

7             "The Court:  One for assault, one for

8    a weapon?  Go ahead."

9        Q..  But Mr. Murphy's response was it's

10   supposed to be assaulting this girl?

11       A.   Correct.

12       Q.   When he spoke to you about his open

13   case, the rape case, how did he characterize

14   it?

15       A.   Similar.

16       Q.   As assaulting a girl?

17       A.   Yes.

18            MR. DEMARTINI:  I have no further

19   questions, your Honor.

20   REDIRECT EXAMINATION

21   BY MR. BARKER:

22       Q.   Did he talk to you about his pending

23   cases without Mr. Fiol being present?

24       A.   No.

25            MR. BARKET:  Nothing further.

Vecchione - Redirect - Barket                    138

1    RECROSS EXAMINATION

2    BY MR. DEMARTINI:

3        Q.   When you say no, do you mean the

4    underlying facts?  He told you what he was

5    charged with.

6        A.   Oh, he told me what he was charged

7    with but that's not what I took that from -- I

8    took from the question was the underlying

9    facts.  I did not go into those with him.

10       Q.   Okay.

11   REDIRECT EXAMINATION

12   BY MR. BARKET:

13       Q.   So, he never told you then -- excuse

14   me, Judge -- he never told you then about the

15   gun, how he got beat up, how the gun wasn't

16   really his, how Jeffrey Marshall planted the

17   gun on him?

18       A.   He was --

19       Q.   He didn't go into that --

20       A.   That --

21       Q.   He didn't give you the defense for the

22   gun charge?

23       A.   No, I don't really remember that.  I

24   just -- I really don't remember.  I know I

25   didn't go into the facts with him.

1          MR. BARKET:  Thank you.  Nothing else,

2     Judge.

3          THE COURT:  Wait, I don't understand

4     that because he's giving you an explanation

5     for why he's coming into talk and for why he

6     wants to cooperate against Murphy.

7          THE WITNESS:  Correct, Judge.

8          THE COURT:  So that explanation --

9          THE WITNESS:  No, but I --

10         THE COURT:  -- would have had to have

11    included some discussion that --

12         THE WITNESS:  He said that Jeffrey

13    Marshall tried to plant some -- plant a gun on

14    him, yes, but I never made the connection

15    between -- with any definitiveness at that

16    point, between the connection with -- between

17    the gun that he says he had on him and the gun

18    that he says Marshall wanted to try to plant

19    on him.

20         THE COURT:  Okay.

21         THE WITNESS:  That's what I meant.

22         THE COURT:  Any other questions?

23         MR. BARKET:  No, your Honor.

24         THE COURT:  Thank you.

25         THE WITNESS:  Thank you.

**Vecchione - Redirect - Barket**          140

1          MR. BARKET:  Could I just see --

2          THE COURT:  Do you want him to leave?

3     He's leaving.  Do you want him for a minute?

4          MR. BARKET:  Just one second.  There's

5     one thing I wanted to check.

6          Yes, there a couple of more questions.

7     I'm sorry.

8          THE COURT:  Could you come back for a

9     minute?

10          MR. BARKET:  I just remembered

11     something.

12     BY MR. BARKET:

13     Q.   Now your testimony is that and I'm

14     referring now to Petitioner's 3, that what you

15     told Mr. Murphy before he testified in the

16     Cabeza trial were words to the effect of to go

17     in there and tell the Court what you know.

18          Is that right?

19     A.   Yes.

20     Q.   Now, Judge, I -- and then after that

21     happened, your bureau, you and Mr. Courtney,

22     there's a notation in the rape case that you

23     wanted to deal the rape case and the gun case.

24          Is that right?

25          MS. DONHAUSER:  What are you --

1          MR. BARKET:  Yes.

2          MS. DONHAUSER:  What information are

3     you --

4          MR. BARKET:  That's number 14, I

5     believe.

6          MS. DONHAUSER:  Yes, can you tell us

7     what the page they are?

8          MR. BARKET:  It's the -- can I

9     approach, Judge.

10          MS. DONHAUSER:  Oh, the note; yes.

11          MR. BARKET:  Do you know what I am

12     referring to?

13          MS. DONHAUSER:  It's the separate

14     note?

15          MR. BARKET:  April 14 date.

16          MS. DONHAUSER:  Yes.

17     Q.   Do you remember seeing that?

18     A.   I don't know whose note that is.  Yes,

19     I remember you showing it to me.

20     Q.   And ultimately what you did is you did

21     consolidate those two cases and you disposed

22     of it.

23          Is that right?

24     A.   That's what happened; yes.

25     Q.   So, if Mr. Murphy had said to me at

Vecchione - Redirect - Barket                142

1   the Franklin Correctional Facility, I mean,

2   he, referring to you, didn't say that in

3   direct words but he said testify, give us all

4   the information you've got, he said he'll talk

5   to the other people to consolidate it before

6   the Cabeza trial, would that statement be

7   accurate?

8       A.    No.

9           MR. BARKET:  Nothing further, Judge.

10          THE COURT:  All right?

11          MR. DEMARTINI:  Nothing.

12          MS. DONHAUSER:  Nothing further.

13          THE COURT:  Do you want to come up?

14          Can I ask you, I just want to

15  understand your theory, what is the theory

16  behind the argument that he failed to disclose

17  -- let's assume he failed to disclose this

18  agreement to Dan Hollman --

19          MR. BARKET:  It would be --

20          THE COURT:  -- and he failed to

21  disclose it to the Nassau County District

22  Attorney, and he did that because?

23          MR. BARKET:  He did that, Judge,

24  because he didn't disclose it in the Cabeza

25  trial and he had a secret agreement with

1  Murphy.  Either Murphy didn't want to be known

2  as a rat while he was in jail, which seems

3  obvious from his testimony or he, for reasons

4  that I think are obvious now, that he didn't

5  want the agreement to be known because

6  Murphy's testimony would be devastated with

7  the agreement.

8          I mean, Murphy is a jailhouse

9  informant, nothing more.  He says Marshall

10  told me this.  That's what makes him useful.

11  If he gets a huge benefit, which he did, for

12  that testimony and people know that his

13  motivation for testifying is not because

14  Marshall --

15          THE COURT:  I understand that.

16          MR. BARKET:  -- beat him up and did

17  all that stuff --

18          THE COURT:  I understand.

19          MR. BARKET:  -- it devastates his

20  testimony.

21          THE COURT:  I understand the impact

22  that it has on his testimony if there's an

23  agreement.  That's not my question.

24          My question is what is the -- he

25  didn't -- let's assume that Dan Hollman's

1   testimony is more accurate.  He didn't

2   disclose to Dan Hollman the existence of the

3   plea agreement, as Hollman was beginning to

4   try the case and he didn't disclose it to the

5   Nassau County District Attorney, even though

6   arguably, the letter clearly requested it --

7   not arguably, it clearly requested it, why

8   would he not disclose it in -- for reasons

9   that are relevant to this trial -- to this

10  hearing right now?

11          MR. BARKET:  In other words, why is it

12  relevant here?

13          THE COURT:  Right.

14          MR. BARKET:  There's the ---

15          THE COURT:  In other words, I

16  understand that if it was disclosed in either

17  of the proceedings, it would have effected the

18  credibility of Cisco Murphy --

19          MR. BARKET:  I understand the

20  question, Judge.

21          THE COURT:  -- on all three trials,

22  so --

23          MR. BARKET:  The short answer is and

24  the best analogy I can give you, it's a 404(b)

25  argument, that this is the agreement that

Proceedings                                      145

1    we're dealing with here and for reasons that

2    we -- that seem obvious, that this man,

3    Vecchione, deliberately concealed this

4    agreement apparently from people in his own

5    office, affirmatively lied about it to a

6    district attorney in Nassau County when he was

7    asked that.

8              THE COURT:  Well, what -- I am asking

9    you what motive is as it effects this

10   particular case?

11             MR. BARKET:  Becuase it then past --

12   it goes to his intent, absence of mistake, and

13   obviously his credibility.  When he's telling

14   the Court there wasn't an agreement before the

15   Cabeza trial, we -- and if there was, I would

16   have disclosed it, which is essentially the

17   purpose of putting in all the other

18   agreements, we know that's not true as it

19   relates to Murphy becuase we know that with

20   Murphy's cooperation agreement, for whatever

21   reason, he consciously decided not to disclose

22   it repeatedly.

23             So that the fact that he didn't

24   disclose it in the subsequent, I would say,

25   three trials, two in Brooklyn and one in

Proceedings                146

1    Nassau, tells you that he would not have
2    disclosed it on the 17th.
3              It was his mode of operation, if you
4    will, as it relates to Murphy and Marshall.
5    And the reason for his doing that is, I see, I
6    would believe, is that he knows that it would
7    destroy and not only his -- look, ordinarily
8    you have a cooperating witness who says I'm
9    getting a deal and this is what happened.  And
10   it's kind of, you know -- in this instance,
11   Murphy's entire testimony, what makes it
12   credible, if it's credible at all, is his
13   motivation for coming in.
14             He essentially says, you know, this is
15   me and Marshall and this is what happened.
16   Once we find out that he's got a huge benefit
17   for that, saved himself a decade in jail, his
18   -- the core of his testimony is destroyed.
19   You can't reveal it.
20             And I believe what happened, Judge, is
21   it --
22             THE COURT:  So, is it that he was
23   afraid that if he disclosed the agreement
24   which on its face, the written agreement
25   operated prospectively, it would raise

Transcription Plus II          Rosalie Lombardi

1    questions about what actually happened at the

2    first trial.

3              Is that it?

4              MR. BARKET:  I think that was part of

5    it, Judge, but I also think his motivation was

6    to not to have that disclosed becuase it would

7    ruin Murphy's credibility in the prospective

8    trials.  That if the agreement was disclosed

9    -- in other words, he has a decision to make

10   for himself every time he has an agreement.

11   Do I disclose it or don't I disclose it?

12             And this man, for whatever reason,

13   consciously decided not to disclose it,

14   repeatedly.  And we have --

15             THE COURT:  No, but you keep going

16   over it.  I'm asking about --

17             MR. DEMARTINI:  Your Honor, there's a

18   flaw in that argument.

19             THE COURT:  I'm asking about it --

20             MR. BARKET:  So --

21             THE COURT:  I think you've answered

22   it.  I was just -- I'm asking about it's

23   relevance.  I understand your argument, its

24   propensity.  If he didn't disclose it --

25             MR. BARKET:  Well, essentially --

Proceedings                                    148

1          THE COURT:  -- you know, in the

2    subsequent three times --

3          MR. BARKET:  And it shows a

4    willingness for him to do exactly that which

5    we've accused him of doing, which is

6    concealing the agreement and keep in mind that

7    what he did behind Mr. Fiol's back was

8    reprehensible for other reasons.

9          THE COURT:  Well, we don't have to get

10   into that --

11         MR. BARKET:  No.

12         THE COURT:  -- because I don't --

13         MR. BARKET:  But it goes --

14         THE COURT:  -- grant habeas corpus

15   relief on that ground.

16         MR. BARKET:  -- to his motivation.  He

17   needs Murphy.  It's obvious from the orders to

18   produce that he wanted Murphy, that he knew he

19   was going to call Murphy as a witness, that he

20   needed Murphy to put this testimony in against

21   Jeffrey Marshall.

22         And he has a problem because Fiol

23   won't let him.  Fiol is saying I want a better

24   deal for my client.

25         THE COURT:  Well, I don't know about

Transcription Plus II          Rosalie Lombardi

Proceedings                149

1    Fiol.

2            MR. DEMARTINI:   We haven't heard --

3            MS. DONHAUSER:   We haven't heard from

4    Fiol.

5            MR. BARKET:   Well, but -- your Honor,

6    that's --

7            THE COURT:   It remains to be -- hear

8    from Fiol.

9            MR. BARKET:   That -- and then after

10   that happens, he makes the deal and it can't

11   -- I mean, I am sure that factored into his

12   mind in not disclosing it during -- in the

13   future trials.

14           MR. DEMARTINI:   Your Honor, the flaw

15   in that argument is if he really doesn't want

16   the deal disclosed, so that he's not going to

17   tell Hollman, then Mr. Vecchione's going to go

18   over, take that plea and get the file sealed.

19   He's not going to leave copies of this thing

20   in every Ciscro Murphy file and in the Court

21   file where Mr. Barket found it.

22           MR. BARKET:   Actually, it was --

23           MS. DONHAUSER:   No.

24           MR. BARKET:   -- clearly a mistake.  We

25   all know that normally when these deals are

Transcription Plus II          Rosalie Lombardi

Proceedings                                            150

1   done, the files are sealed, the cooperation

2   agreements are not --

3              MR. DEMARTINI:  But it wasn't.

4              MR. BARKET:  Yes, because he wasn't

5   there.  He wasn't there.

6              MR. DEMARTINI:  But if he is so eager

7   to have this kept secret, then he's going to

8   be there.

9              MR. BARKET:  Well, he probably told

10  somebody to do it.  He assumed it wouldn't be

11  put in there.

12             MS. DONHAUSER:  That's a --

13             MR. BARKET:  It was a mistake.

14             MR. DEMARTINI:  Yes, that --

15             MS. DONHAUSER:  No, that's a -- it was

16  just some --

17             MR. BARKET:  It was sheer luck --

18             MS. DONHAUSER:  Absolutely not.

19             MR. BARKET:  -- that I found that;

20  sheer luck that I found that.

21             MS. DONHAUSER:  Sheer luck.  I would

22  think as a good attorney you would go look and

23  you did.

24             MR. DEMARTINI:  And I think the sad

25  thing here is that Mr. Hollman was not a good

Proceedings                         151

1  attorney when he was trying the Marshall

2  cases.  I mean, every time I try a case and I

3  believe every time Mr. Barket tried a case as

4  a prosecutor and you too, your Honor, you

5  pulled the files of your witnesses who have

6  criminal records.  Mr. Hollman didn't bother.

7  The agreement definitely was there.

8         MR. BARKET:  The answer is the letter

9  to Mr. Pasarero where another prosecutor

10  trying Jeffrey Marshall asks him for the very

11  thing that is in dispute now and he lies to

12  him.  He says it doesn't exist.

13         MR. DEMARTINI:  It's two years later

14  and he is sloppy, you know?

15         MR. BARKET:  How could --

16         MR. DEMARTINI:  What am I going to do?

17         MR. BARKET:  Two years later and he's

18  sloppy?

19         And, Judge, the perspective on this is

20  Marshall was not some miscellaneous person

21  charged with some small offense.  He's an

22  individual that sat through four -- three

23  murder trials in Brooklyn and the attempted

24  murder of a retired police officer and another

25  money courier in Nassau County in two years.

Transcription Plus II          Rosalie Lombardi

1          THE COURT:  And did he -- was he asked

2   -- again, refresh my recollection, I know I

3   read it before but was he asked whether he had

4   any deals in those subsequent cases?

5          MR. DEMARTINI:  He didn't testify --

6          MR. BARKET:  Murphy --

7          MR. DEMARTINI:  -- in Nassau County.

8          MR. BARKET:  No, he --

9          THE COURT:  No, in the subsequent two

10  in Brooklyn?

11         MR. DEMARTINI:  And he wasn't asked in

12  the second homicide --

13         MS. DONHAUSER:  No, the --

14         MR. DEMARTINI:  -- or the second

15  Hollman trial.

16         MS. DONHAUSER:  In the second Hollman

17  trial he wasn't asked and in the first Hollman

18  trial, he was asked.  We went through that

19  testimony yesterday and he replied that he did

20  not.

21         And that's, I think -- I believe

22  that's when your Honor sort of discussed at

23  length with him his response to that.

24         Now, I think what's significant here,

25  too, is obviously, Cisco Murphy's attorney,

Proceedings                    153

1    Juan Fiol -- Mr. Fiol signed the agreement.

2    He could have spoken to people about the

3    agreement.

4            Cisco Murphy himself, when Dan

5    Hollman asked that question, he could have

6    said something about the agreement.  Now, he

7    didn't.  It seems that Mr. Hollman was unaware

8    of the agreement but, you know, that's

9    assuming that Mr. Vecchione, after the written

10   agreement was signed in court when he wasn't

11   even in court, that somehow something was

12   conveyed to Cisco Murphy by either Cisco

13   Murphy's attorney or somehow was conveyed to

14   Cisco Murphy that he shouldn't tell anybody

15   about the written agreement.  I mean, it's --

16           THE COURT:  Well, we have to hear

17   from Mr. Fiol about what was going on.

18           MR. BARKET:  You have opportunity

19   after opportunity to disclose it.  When no

20   questions are asked, they're silent.

21           MS. DONHAUSER:  We're talking about

22   two agreements.

23           MR. BARKET:  When --

24           MS. DONHAUSER:  We're talking about

25   the signed --

1          MR. BARKET:  No, we're not --

2          MS. DONHAUSER:  -- written agreement.

3          MR. BARKET:  We're not.

4          MS. DONHAUSER:  And your --

5          MR. BARKET:  We're not.

6          MS. DONHAUSER:  You had never made the

7    position that the signed written agreement was

8    a signed written agreement before the Cabeza

9    trial.

10          MR. BARKET:  No.

11          MS. DONHAUSER:  Obviously, it was --

12          MR. BARKET:  At every point they had

13   to disclose the Murphy deal.  If they were

14   asked, they lied about it and if they weren't

15   asked, they remained silent.  And it didn't

16   happen once, it happened repeatedly.

17          And it didn't only happen with respect

18   to the agreement, Judge.  They did this and

19   you'll see the letters while they're writing

20   letter after letter to the parole board and to

21   the temporary release program recommending

22   that this man be released and Murphy's writing

23   them back thanking them for all the letters

24   they're writing for him.

25          MS. DONHAUSER:  The person that is

Proceedings                    155

1    writing those letters is Dan Hollman --

2              MR. BARKET:  And --

3              MS. DONHAUSER:  -- and you heard him

4    on the stand --

5              MR. BARKET:  And --

6              MS. DONHAUSER:  -- yesterday --

7              MR. BARKET:  And --

8              MS. DONHAUSER:  -- he claimed that he

9    didn't say --

10             MR. BARKET:  And Vecchione.

11             MS. DONHAUSER:  -- that it was

12   necessary to reply to that.

13             MR. BARKET:  And --

14             MR. DEMARTINI:  Right, Mr. Vecchione.

15   But the parole letter that Michael Vecchione

16   wrote on July 6, 1993, was he put that in the

17   file, in the Marshall file --

18             MS. DONHAUSER:  It was in the Marshall

19   file.

20             MR. DEMARTINI:  -- and Hollman turned

21   it over.

22             MS. DONHAUSER:  And Hollman turned it

23   over to Mr. Harrison --

24             MR. DEMARTINI:  And it's a -- you

25   know, so it's crazy --

Proceedings                        156

1          MS. DONHAUSER:  -- at the second

2     trial.

3          MR. DEMARTINI:  -- that if you don't

4     want nay of this going in, he's going to leave

5     it there.

6          MR. BARKET:  He didn't turn it over.

7          MR. DEMARTINI:  Yes.

8          MS. DONHAUSER:  He --

9          MR. BARKET:  Murphy was asked about

10    it.  That's how he got it.

11         MS. DONHAUSER:  Absolutely not and we

12    can put into evidence the fact that it was

13    turned over.

14         MR. BARKET:  Hollman asked Murphy, any

15    deals or any promises whatsoever and Murphy

16    lies and says no.

17         MS. DONHAUSER:  And then --

18         MR. DEMARTINI:  The first question on

19    cross --

20         MS. DONHAUSER:  -- Harrison's question

21    is --

22         MR. DEMARTINI:  -- is what?

23         MR. BARKET:  Why don't you guys go

24    back and reopen Murphy's deal because he

25    purged himself in that trial.

Proceedings                           157

1          MS. DONHAUSER:  We can --

2          MR. BARKET:  He purged himself in a

3     murder trial.

4          MS. DONHAUSER:  We can recall Dan

5     Hollman and put into evidence the fact that he

6     disclosed --

7          MR. DEMARTINI:  He turned over the

8     parole letter --

9          MS. DONHAUSER:  -- in fact, we did

10    that yesterday.

11         MR. DEMARTINI:  And that was the first

12    question on cross.

13         MS. DONHAUSER:  And it's part of

14    Rosario.  It's the part of the Rosario -- it's

15    a signed Rosario, signed received by

16    Mr. Harrison --

17         MR. BARKET:  How did he get the parole

18    order and not the written agreement?

19         MS. DONHAUSER:  -- the fact that there

20    is a July 6, 1993 --

21         MR. BARKET:  How did he get the parole

22    agreement letter and not the agreement?

23         MR. DEMARTINI:  Because the parole --

24         MR. BARKET:  They're on the same day.

25         MR. DEMARTINI:  The parole letter was

1   put --

2           MS. DONHAUSER:  The letter was

3   signed --

4           THE COURT:  Let him answer it.

5           MS. DONHAUSER:  The letter was signed

6   July 6, 1993.

7           MR. DEMARTINI:  The parole letter --

8           MR. BARKET:  So was the agreement.

9           THE COURT:  If I can answer.  I can

10  answer.

11          MS. DONHAUSER:  It was signed August

12  1993.

13          THE COURT:  Please, I can't -- there's

14  no point in me listening.

15          MR. DEMARTINI:  Just to answer that

16  one question, the parole letter was put in the

17  Cabeza file.  All of the agreements went over

18  to court because they had to be signed by

19  Mr. Murphy and his attorney.

20          MS. DONHAUSER:  And they were executed

21  on August --

22          MR. DEMARTINI:  And they then were put

23  into Murphy's file.

24          MS. DONHAUSER:  -- 13, 1993.

25          MR. DEMARTINI:  Where we found them

1    and in the court Murphy file where you found

2    them.

3              THE COURT:   I will see you on October

4    (sic) 23.

5              MR. BARKET:   I'm sorry, Judge?

6              THE COURT:   I'll see you on the 23 of

7    August.  I am sorry.

8              MS. DONHAUSER:   Excuse me?

9              MR. DEMARTINI:   August 23 at 2 p.m.?

10              MS. DONHAUSER:   We're --

11              MR. BARKET:   For Mr. Fiol?

12              THE COURT:   For Mr. Fiol.

13              MS. DONHAUSER:   We're not available on

14    that date, your Honor.  I am sorry.  Both of

15    us -- both Mr. Demartini and myself have

16    longstanding plans for vacation.  I have over

17    eleven weeks of vacation due.

18              MR. BARKET:   When are you coming back?

19              MS. DONHAUSER:   After Labor Day.

20              MR. DEMARTINI:   Now do you want us

21    here on that return date in early August when

22    Legal Aid is supposed to present their

23    position with respect to --

24              THE COURT:   I don't -- I gave them

25    until them --

Proceedings                    160

1      MR. DEMARTINI:  All right.

2      THE COURT:  -- to tell me what their

3  position is going to be.

4      MR. DEMARTINI:  Okay.

5      THE COURT:  I don't expect them to be

6  here.

7      MR. DEMARTINI:  Okay.  So, they'll

8  just be communicating with you.

9      THE COURT:  I would assume they'll be

10  communicating with --

11      THE CLERK:  We can continue on

12  September 5.  Thursday, September 5.

13      MR. BARKET:  That's a Thursday.

14  That's fine.

15      MS. DONHAUSER:  Thursday, September 5,

16  that's fine.  11 o'clock or 1 p.m.?

17      MR. BARKET:  11 o'clock and we'll make

18  arrangements for Mr. Marshall to come back

19  down?  He won't be held here all this time.

20      THE COURT:  No, he's not going to be

21  held here.

22      MR. DEMARTINI:  No, we'll put another

23  note for that.

24      THE COURT:  Unless you want to for one

25  witness, waive his appearance, otherwise we'll

Transcription Plus II          Rosalie Lombardi

Proceedings                          161

1    bring him down.

2              MR. BARKET:  I --

3              MS. DONHAUSER:  And it's possible

4    that, your Honor, that we will have witnesses

5    at that time.

6              THE COURT:  Okay.

7              MR. BARKET:  So, no, I don't think I

8    could do that.

9              THE COURT:  All right.

10             So, let's not get lost in terms of

11   doing that; getting him down here.

12             MS. DONHAUSER:  I'll do that this

13   time.

14             THE COURT:  Okay.

15             MS. DONHAUSER:  I'm sorry for the

16   confusion.

17             THE COURT:  Okay.

18             Where's the writ?  I have to write

19   that the writ is satisfied.

20             MR. BARKET:  What was the question?

21             THE COURT:  I need the writ.  Don't go

22   yet.

23                  (Pause in proceedings)

24                  (Discussion held off the record)

25             THE COURT:  Wait one second.  I've got

Transcription Plus II        Rosalie Lombardi

**Proceedings**                                      162

1   to satisfy -- I'm going to write that the writ

2   is satisfied.

3           Do you have the writ?

4           MR. DEMARTINI:  I don't have the write

5   with me, Judge.

6               (Pause in proceeding)

7           THE COURT:  If you don't have it,

8   we'll try and find the original.

9               (Matter concluded)

10                   -oOo-

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Transcription Plus II          Rosalie Lombardi

163

## I   N   D   E   X

**Michael Vecchione:**

Direct Examination by Mr. Barket...............4

Cross-examination by Mr. Demartini...........66

Redirect Examination by Mr. Barket..........107

By Mr. Barket..........137

By Mr. Barket..........138

Recross-examination by Mr. Demartini....134, 138

## E   X   H   I   B   I   T   S

**Petitioner's Exhibits Marked for Identification:**

Petitioner's Exhibit 7.......................12

Petitioner's Exhibit 10......................25

Petitioner's Exhibit 11......................29

Petitioner's Exhibit 12......................60

Petitioner's Exhibit 13......................65

Petitioner's Exhibit 14.....................115

**Petitioner's Exhibits Marked In Evidence:**

Petitioner's Exhibit 7.......................12

Transcription Plus II          Rosalie Lombardi

164

# C E R T I F I C A T E

I, ROSALIE LOMBARDI, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **5th** day of **August**, 2002.

*Rosalie Lombardi*

Rosalie Lombardi
Transcription Plus II

Transcription Plus II          Rosalie Lombardi